Prospectus Supplement dated November 8, 2004 (To Prospectus dated November 8, 2004)

$3,487,692,000 (APPROXIMATE)

ASSET-BACKED PASS-THROUGH CERTIFICATES,
SERIES 2004-WWF1

PARK PLACE SECURITIES, INC.
DEPOSITOR

AMERIQUEST MORTGAGE COMPANY
SELLER

WELLS FARGO BANK, N.A.
MASTER SERVICER

- --------------------------------------------------------------------------
YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-11 IN THIS
PROSPECTUS SUPPLEMENT AND PAGE 1 IN THE PROSPECTUS.


The certificates will represent interests only in a trust consisting primarily
of a pool of one- to four-family adjustable-rate and fixed-rate, first lien and
second lien residential mortgage loans and will not represent ownership
interests in or obligations of any other entity.

This prospectus supplement may be used to offer and sell the certificates
offered hereby only if accompanied by the prospectus.
- --------------------------------------------------------------------------

THE CLASS A AND MEZZANINE CERTIFICATES --

o    will represent senior or mezzanine interests in the trust and will
     receive distributions from the assets of the trust;

o    will receive monthly distributions commencing in December 2004; and

o    will have credit enhancement in the form of excess interest,
     subordination and overcollateralization.

| | ORIGINAL CERTIFICATE PRINCIPAL BALANCE(1) | PRICE TO PUBLIC | UNDERWRITING DISCOUNT | PROCEEDS TO THE DEPOSITOR(2) | CLASS | ORIGINAL CERTIFICATE PRINCIPAL BALANCE(1) | PRICE TO PUBLIC | UNDERWRITING DISCOUNT | PROCEEDS TO TH DEPOSITO: |
|---|---|---|---|---|---|---|---|---|---|
| Class A-1A | $600,000,000 | 100.0000% | 0.2500% | 99.7500% | Class M-3.... | $ 64,500,000 | 100.0000% | 0.2500% | 99.750 |
| Class A-1B | $363,308,000 | 100.0000% | 0.2000% | 99.8000% | Class M-4.... | $109,650,000 | 100.0000% | 0.2500% | 99.750 |
| Class A-1C | $1,000,000,000 | 100.0000% | 0.1900% | 99.8100% | Class M-5.... | $ 73,100,000 | 100.0000% | 0.2500% | 99.750 |
| Class A-1D | $225,000,000 | 100.0000% | 0.2500% | 99.7500% | Class M-6.... | $ 55,900,000 | 100.0000% | 0.2500% | 99.750 |
| Class A-2 | $364,728,000 | 100.0000% | 0.2000% | 99.7500% | Class M-7.... | $ 68,800,000 | 100.0000% | 0.2500% | 99.750 |
| Class A-3 | $91,182,000 | 100.0000% | 0.2500% | 99.7500% | Class M-8.... | $ 47,300,000 | 100.0000% | 0.2500% | 99.750 |
| Class A-5 | $69,474,000 | 100.0000% | 0.2500% | 99.7500% | Class M-9.... | $ 55,900,000 | 100.0000% | 0.2500% | 99.750 |
| Class M-1 | $43,000,000 | 100.0000% | 0.2500% | 99.7500% | Class M-10.. | $ 34,400,000 | 87.9715% | 0.2500% | 87.721 |
| Class M-2 | $221,450,000 | 100.0000% | 0.2500% | 99.7500% | | | | | |

(1) Approximate.
(2) Before deducting expenses payable by the Depositor estimated to be
approximately $800,000.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES
COMMISSION HAS APPROVED OR DISAPPROVED OF THE OFFERED CERTIFICATES OR DETERMINED
THAT THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY
REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THE ATTORNEY GENERAL OF
THE STATE OF NEW YORK HAS NOT PASSED ON OR ENDORSED THE MERITS OF THIS OFFERING.
ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

                    MORGAN STANLEY
                (Lead Manager and Book Runner)
       BEAR, STEARNS & CO. INC.              GOLDMAN, SACHS & CO.
                    (Co-Managers)



PLAINTIFF'S EXHIBIT

IMPORTANT NOTICE ABOUT INFORMATION PRESENTED IN THIS PROSPECTUS SUPPLEMENT
AND THE ACCOMPANYING PROSPECTUS

YOU SHOULD RELY ONLY ON THE INFORMATION CONTAINED IN THIS DOCUMENT. WE HAVE NOT
AUTHORIZED ANYONE TO PROVIDE YOU WITH DIFFERENT INFORMATION. YOU SHOULD NOT
ASSUME THAT THE INFORMATION IN THIS PROSPECTUS SUPPLEMENT OR THE PROSPECTUS IS
ACCURATE AS OF ANY DATE OTHER THAN THE DATE ON THE FRONT OF THIS DOCUMENT.

We provide information to you about the Class A and Mezzanine Certificates in
two separate documents that progressively provide more detail:

o    the accompanying prospectus, which provides general information, some of
     which may not apply to this series of certificates; and

o    this prospectus supplement, which describes the specific terms of this
     series of certificates.

Park Place  Securities,  Inc.  is located at 1100 Town & Country  Road,  Suite
1100,  Orange,  California 92868,  Attention:  Capital Markets,  and its phone
number is (714) 541-9960.

TABLE OF CONTENTS

PROSPECTUS SUPPLEMENT

SUMMARY OF PROSPECTUS SUPPLEMENT..........................................S-3
RISK FACTORS.............................................................S-11
THE MORTGAGE POOL.......................................................S-23
YIELD ON THE CERTIFICATES...............................................S-33
DESCRIPTION OF THE CERTIFICATES.........................................S-57
POOLING AND SERVICING AGREEMENT.........................................S-81
FEDERAL INCOME TAX CONSEQUENCES.........................................S-87
METHOD OF DISTRIBUTION..................................................S-89
SECONDARY MARKET........................................................S-91
LEGAL OPINIONS..........................................................S-91
RATINGS.................................................................S-92
LEGAL INVESTMENT........................................................S-92
ERISA CONSIDERATIONS....................................................S-93
ANNEX I - GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES....I-1

ANNEX II - ASSUMED MORTGAGE LOAN CHARACTERISTICS........................II-1
ANNEX III - COLLATERAL STATISTICS......................................III-1

S-2

WFB.000367

SUMMARY OF PROSPECTUS SUPPLEMENT

THE FOLLOWING SUMMARY IS A VERY BROAD OVERVIEW OF THE CERTIFICATES OFFERED BY THIS PROSPECTUS SUPPLEMENT AND DOES NOT CONTAIN ALL OF THE INFORMATION THAT YOU SHOULD CONSIDER IN MAKING YOUR INVESTMENT DECISION. TO UNDERSTAND ALL OF THE TERMS OF THE CLASS A AND MEZZANINE CERTIFICATES, READ CAREFULLY THIS ENTIRE PROSPECTUS SUPPLEMENT AND THE ENTIRE ACCOMPANYING PROSPECTUS. Capitalized terms used but not defined in this prospectus supplement have the meanings assigned to them in the prospectus. A glossary is included at the end of the prospectus.

Title of Series...... Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2004-WWF1.

Cut-off Date......... The close of business on November 1, 2004.

Collateral Selection
Date................ October 1, 2004.

Closing Date........ On or about November 12, 2004.

Depositor........... Park Place Securities, Inc. (the "Depositor"), a direct wholly-owned subsidiary of Ameriquest Mortgage Company and an affiliate of the Originators. The Depositor will deposit the mortgage loans into the trust. See "The Depositor" in the prospectus.

Seller.............. Ameriquest Mortgage Company (the "Seller"), a Delaware corporation. See "Pooling and Servicing Agreement--The Seller" in this prospectus supplement.

Originators......... Argent Mortgage Company, LLC and Olympus Mortgage Company. See "The Mortgage Pool--Underwriting Standards of the Originators" in this prospectus supplement.

Master Servicer...... Wells Fargo Bank, N.A., a national banking association. See "Pooling and Servicing Agreement--The Master Servicer" in this prospectus supplement.

Trustee............. Wachovia Bank, National Association (the "Trustee"), a national banking association, will be the Trustee of the trust. See "Pooling and Servicing Agreement--The Trustee" in this prospectus supplement.

Trust Administrator.. Wells Fargo Bank, N.A. (the "Trust Administrator"), a national banking association, will be the Trust Administrator of the trust, will perform administrative functions with respect to the certificates and will act as the initial paying agent and certificate registrar. See "Pooling and Servicing Agreement--The Trust Administrator" in this prospectus supplement.

Custodian........... Deutsche Bank National Trust Company (the "Custodian"), a national banking association, will be the Custodian with respect to the mortgage loans. See "Pooling and Servicing Agreement--General" in this prospectus supplement.

NIMS Insurer........ One or more insurance companies (together, the "NIMS Insurer") may issue a financial guaranty insurance policy covering certain payments to be made on net interest margin securities to be issued by a separate trust and secured by, among other things, all or a portion of the Class CE, Class P and/or Residual Certificates.

Distribution Dates... Distributions on the Certificates will be made on the 25th day of each month, or, if such day is not a business day, on the next succeeding business day, beginning in December 2004 (each, a "Distribution Date").

Certificates........ The classes of Certificates, their pass-through rates and initial certificate principal balances are shown or described in the table below.

WFB.000368

| Class | Initial Certificate Principal Balance(1) | Pass-Through Rate | Margin (2)(%) | (3)(%) | Fitch | Ratings Moody's | S&P |
|---|---|---|---|---|---|---|---|
| **Offered Certificates** | | | | | | | |
| A-1A | $600,000,000 | Variable(4) | 0.1700 | 0.3400 | AAA | Aaa | AAA |
| A-1B.... | $363,308,000 | Variable(4) | 0.5000 | 1.0000 | AAA | Aaa | AAA |
| A-1C.... | $1,000,000,000 | Variable(4) | 0.3625 | 0.7250 | AAA | Aaa | AAA |
| A-1D.... | $225,000,000 | Variable(4) | 0.4600 | 0.9200 | AAA | Aaa | N/R |
| A-2..... | $364,728,000 | Variable(4) | 0.3700 | 0.7400 | AAA | Aaa | AAA |
| A-3..... | $91,182,000 | Variable(4) | 0.4500 | 0.9000 | AAA | Aaa | N/R |
| A-5..... | $69,474,000 | Variable(4) | 0.4700 | 0.9400 | AAA | Aaa | N/R |
| M-1..... | $43,000,000 | Variable(4) | 0.6300 | 0.9450 | AA+ | Aa1 | AA+ |
| M-2..... | $221,450,000 | Variable(4) | 0.6800 | 1.0200 | AA | Aa2 | AA |
| M-3..... | $64,500,000 | Variable(4) | 0.7400 | 1.1100 | AA | Aa2 | AA- |
| M-4..... | $109,650,000 | Variable(4) | 1.1000 | 1.6500 | AA- | A1 | A+ |
| M-5..... | $73,100,000 | Variable(4) | 1.2000 | 1.8000 | A | A2 | A |
| M-6..... | $55,900,000 | Variable(4) | 1.3500 | 2.0250 | A | A2 | A- |
| M-7..... | $68,800,000 | Variable(4) | 1.8000 | 2.7000 | BBB+ | A3 | BBB+ |
| M-8..... | $47,300,000 | Variable(4) | 1.9500 | 2.9250 | BBB | Baa1 | BBB |
| M-9..... | $55,900,000 | Variable(4) | 3.4000 | 5.1000 | BBB | Baa2 | BBB- |
| M-10.... | $34,400,000 | Variable(4) | 2.5000 | 3.7500 | BBB- | Baa3 | N/R |
| **Non-Offered Certificates** | | | | | | | |
| A-4..... | $625,258,000 | Variable(4) | 0.3700 | 0.7400 | AAA | Aaa | AAA |
| M-11.... | $32,250,000 | Variable(4) | 2.5000 | 3.7500 | BB+ | Ba1 | BB+ |
| CE...... | $154,800,874(5) | N/A | N/A | N/A | N/R | N/R | N/R |
| P....... | $100 | N/A | N/A | N/A | N/R | N/R | N/R |
| A-IO-S.. | Notional Amount | N/A | N/A | N/A | N/R | N/R | N/R |
| R....... | N/A | N/A | N/A | N/A | N/R | N/R | N/R |
| R-X..... | N/A | N/A | N/A | N/A | N/R | N/R | N/R |

(1) Approximate.
(2) For the Interest Accrual Period for each Distribution Date on or prior to the Optional Termination Date.
(3) For the Interest Accrual Period for each Distribution Date after the Optional Termination Date.
(4) The pass-through rate on each class of Class A and Mezzanine Certificates will be based on one-month LIBOR plus the applicable margin set forth above, subject to the rate caps described in this prospectus supplement.
(5) Represents approximately 3.60% of the sum of (i) the aggregate principal balance of the Initial Mortgage Loans as of the Cut-off Date and (ii) the amounts on deposit in the pre-funding accounts on the Closing Date and is approximately equal to the initial amount of overcollateralization required to be provided by the mortgage pool under the Pooling and Servicing Agreement.

THE TRUST

The Depositor will establish a trust relating to the Series 2004-WWF1 certificates (the "Trust") pursuant to a pooling and servicing agreement, dated as of November 1, 2004 (the "Pooling and Servicing Agreement"), among the Depositor, the Master Servicer, the Trustee and the Trust Administrator. The Trust will issue twenty-four classes of certificates. The certificates will represent in the aggregate the entire beneficial ownership interest in the trust. Distributions of interest and/or principal on the Class A and Mezzanine Certificates will be made only from payments received in connection with the mortgage loans held in the trust and the Net WAC Rate Carryover Reserve Account and amounts on deposit in the pre-funding accounts and the interest coverage accounts, if any.

DESIGNATIONS

In this prospectus supplement, the following designations are used to refer to the specified classes of Certificates.

CLASS A CERTIFICATES

Class A-1A, Class A-1B, Class A-1C, Class A-1D, Class A-2, Class A-3, Class A-4 and Class A-5 Certificates.

WFB.000369

S-4

WFB.000370

MEZZANINE CERTIFICATES

Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M- 10 and Class M-11 Certificates.

OFFERED CERTIFICATES

Class A (other than the Class A-4 Certificates) and Mezzanine Certificates (other than the Class M-11 Certificates).

NON-OFFERED CERTIFICATES

Class A-4, Class M-11, Class A-IO-S, Class CE, Class P and Residual Certificates.

GROUP I CERTIFICATES

Class A-1A, Class A-1B, Class A-1C and Class A-1D Certificates.

GROUP II CERTIFICATES

Class A-2 and Class A-3 Certificates.

GROUP III CERTIFICATES

Class A-4 and Class A-5 Certificates.

RESIDUAL CERTIFICATES

Class R and Class R-X Certificates.

THE MORTGAGE LOANS

On the Closing Date, the Trust will acquire an initial pool of mortgage loans consisting of fixed-rate and adjustable-rate mortgage loans secured by first or second liens (the "Initial Mortgage Loans").

On or before the 90th day following the Closing Date, the Trust will acquire subsequent mortgage loans to be included in the mortgage pool (the "Subsequent Mortgage Loans"; together with the Initial Mortgage Loans, the "Mortgage Loans") subject to the conditions set forth in this prospectus supplement under "The Mortgage Pool--Conveyance of Additional Mortgage Loans and Subsequent Mortgage Loans and the Pre-Funding Accounts."

The Mortgage Loans will have been originated or acquired by the Seller's wholesale lending affiliates, Argent Mortgage Company, LLC and Olympus Mortgage Company.

For purposes of calculating interest and principal distributions on the certificates, the Mortgage Loans will be divided into three loan groups, designated as the "Group I Mortgage Loans," the "Group II Mortgage Loans" and the "Group III Mortgage Loans." The Group I Mortgage Loans will consist of adjustable- rate and fixed-rate mortgage loans with principal balances at origination that conform to Freddie Mac and Fannie Mae loan limits. The Group II Mortgage Loans will consist of adjustable-rate and fixed-rate mortgage loans with principal balances at origination that conform to Freddie Mac and Fannie Mae loan limits. The Group III Mortgage Loans will consist of adjustable-rate and fixed-rate mortgage loans with principal balances at origination that may or may not conform to Freddie Mac or Fannie Mae loan limits.

The statistical information presented in this prospectus supplement relates to the pool of mortgage loans identified on the Collateral Selection Date (the "Collateral Selection Date Mortgage Loans").

References to percentages of the mortgage loans in this prospectus supplement are based on the Collateral Selection Date Mortgage Loans with the aggregate scheduled principal balance of such Mortgage Loans as specified in the amortization schedule at the Cut-off Date after application of all amounts allocable to unscheduled payments of principal received prior to the Collateral Selection Date. Prior to the issuance of the certificates, up to 10% of the Collateral Selection Date Mortgage Loans will be removed from the mortgage pool as a result of incomplete documentation or otherwise and any Collateral Selection Date Mortgage Loans that prepay or default will be removed. Other mortgage loans, together with the Additional Mortgage Loans (as defined below), will be included in the mortgage pool prior to the issuance of the certificates. However, the removal and inclusion of such mortgage loans will not materially alter the characteristics of the Collateral Selection Date Mortgage Loans as described in this prospectus supplement, although the range of mortgage rates and maturities and certain other characteristics of the Mortgage Loans will vary.

The Collateral Selection Date Mortgage Loans included in Group I (the "Group I

WFB.000371

Collateral Selection Date Mortgage Loans") will have the following approximate
characteristics as of the Cut-off Date:

Number of Group I Collateral
Selection Date Mortgage Loans:          13,957

Aggregate Scheduled Principal
Balance:                                $2,162,733,102

Group I Collateral Selection Date
Mortgage Loans with prepayment
charges:                                67.27%

S-5

WFB.000372

| | |
|---|---|
| Fixed-rate Group I Collateral Selection Date Mortgage Loans: | 18.83% |
| Adjustable-rate Group I Collateral Selection Date Mortgage Loans: | 81.17% |
| First lien Group I Collateral Selecti Date Mortgage Loans: | 98.86% |
| Second lien Group I Collateral Selection Date Mortgage Loans: | 1.14% |
| Range of current mortgage rates: | 5.350% to 12.800% |
| Weighted average current mortgage rate: | 7.501% |
| Weighted average gross margin of the adjustable-rate Group I Collateral Selection Date Mortgage Loans: | 5.917% |
| Weighted average minimum mortgage rate of the adjustable-rate Group I Collateral Selection Date Mortgage Loans: | 7.530% |
| Weighted average maximum mortgage rate of the adjustable-rate Group I Collateral Selection Date Mortgage Loans: | 13.530% |
| Weighted average next adjustment date of the adjustable-rate Group I Collateral Selection Date Mortgage Loans: | January 2007 |
| Weighted average remaining term to maturity: | 357 months |
| Range of principal balances as of the Cut-off Date: | $4,634 to $639,420 |
| Average principal balance as of the Cut-off Date: | $154,957 |
| Range of original combined loan-to-value ratios: | 13.21% to 100.00% |
| Weighted average original loan-to-value ratio: | 82.81% |
| Geographic concentrations in excess of 5%: | |

| | |
|---|---|
| California | 22.20% |
| Illinois | 10.63% |
| Florida | 8.78% |
| New York | 5.96% |

Originated by:

| | |
|---|---|
| Argent Mortgage Company, LLC | 94.07% |
| Olympus Mortgage Company | 5.93% |

The Collateral Selection Date Mortgage Loans included in Group II (the "Group II Collateral Selection Date Mortgage Loans") will have the following approximate characteristics as of the Cut-off Date:

| | |
|---|---|
| Number of Group II Collateral Selection Date Mortgage Loans: | 3,457 |
| Aggregate Scheduled Principal Balance: | $450,608,937 |
| Group II Collateral Selection Date Mortgage Loans with prepayment charges: | 71.62% |
| Fixed-rate Group II Collateral Selection Date Mortgage Loans: | 19.27% |

WFB.000373

| | |
|---|---|
| Adjustable-rate Group II Collateral Selection Date Mortgage Loans: | 80.73% |
| First lien Group II Collateral Selection Date Mortgage Loans: | 98.79% |
| Second lien Group II Collateral Selection Date Mortgage Loans: | 1.21% |
| Range of current mortgage rates: | 5.350% to 12.650% |
| Weighted average current mortgage rate: | 7.523% |
| Weighted average gross margin of the adjustable-rate Group II Collateral Selection Date Mortgage Loans: | 5.934% |
| Weighted average minimum mortgage rate of the adjustable-rate Group II Collateral Selection Date Mortgage Loans: | 7.549% |
| Weighted average maximum mortgage rate of the adjustable-rate Group II Collateral Selection Date Mortgage Loans: | 13.549% |
| Weighted average next adjustment date of the adjustable-rate Group I Collateral Selection Date Mortgage Loans: | December 2006 |
| Weighted average remaining term to maturity: | 356 months |
| Range of principal balances as of the Cut-off Date: | $19,981 to $499,547 |
| Average principal balance as of the Cut-off Date: | $130,347 |
| Range of original combined loan-to-value ratios: | 25.68% to 100.00% |
| Weighted average original loan-to-value ratio: | 82.69% |

S-6

WFB.000374

Geographic concentrations in excess of 5%:

|  |  |
|---|---|
| California | 20.00% |
| Florida | 11.31% |
| Illinois | 7.49% |
| Michigan | 6.75% |
| Arizona | 5.66% |

Originated by:

|  |  |
|---|---|
| Argent Mortgage Company, LLC | 93.53% |
| Olympus Mortgage Company | 6.47% |

The Collateral Selection Date Mortgage Loans included in Group III (the "Group III Collateral Selection Date Mortgage Loans") will have the following approximate characteristics as of the Cut-off Date:

| | |
|---|---|
| Number of Group III Collateral Selection Date Mortgage Loans: | 1,741 |
| Aggregate Scheduled Principal Balance: | $686,658,936 |
| Group III Collateral Selection Date Mortgage Loans with prepayment charges: | 74.24% |
| Fixed-rate Group III Collateral Selection Date Mortgage Loans: | 21.79% |
| Adjustable-rate Group III Collateral Selection Date Mortgage Loans: | 78.21% |
| First lien Group III Collateral Selection Date Mortgage Loans: | 98.38% |
| Second lien Group III Collateral Selection Date Mortgage Loans: | 1.62% |
| Range of current mortgage rates: | 5.350% to 12.500% |
| Weighted average current mortgage rate: | 7.119% |
| Weighted average gross margin of the adjustable-rate Group III Collateral Selection Date Mortgage Loans: | 5.920% |
| Weighted average minimum mortgage rate of the adjustable-rate Group III Collateral Selection Date Mortgage Loans: | 7.254% |
| Weighted average maximum mortgage rate of the adjustable-rate Group III Collateral Selection Date Mortgage Loans: | 13.254% |
| Weighted average next adjustment date of the adjustable-rate Group III Collateral Selection Date Mortgage Loans: | December 2006 |
| Weighted average remaining term to maturity: | 358 months |
| Range of principal balances as of the Cut-off Date: | $50,124 to $749,559 |
| Average principal balance as of the Cut-off Date: | $394,405 |
| Range of original combined loan-to-value ratios: | 15.71% to 100.00% |
| Weighted average original loan-to-value ratio: | 83.48% |

Geographic concentrations in excess of 5%:

|  |  |
|---|---|
| California | 59.77% |
| New York | 10.84% |

WFB.000375

Originated by:

| | |
|---|---|
| Argent Mortgage Company, LLC | 92.93% |
| Olympus Mortgage Company | 7.07% |

The mortgage rate on each adjustable-rate Mortgage Loan will adjust semi-annually on each adjustment date to equal the sum of six-month LIBOR and the related gross margin, subject to periodic and lifetime limitations. With respect to the adjustable-rate Mortgage Loans, the first adjustment date will occur only after an initial period of two or three years after origination. For additional information regarding the Mortgage Loans, see "The Mortgage Pool" in this prospectus supplement.

For additional information regarding the Collateral Selection Date Mortgage Loans, see "The Mortgage Pool" in this prospectus supplement and Annex III.

On the Closing Date, each loan group will include additional fixed-rate and adjustable-rate mortgage loans (the "Additional Mortgage Loans") that conform to the criteria described under "The Mortgage Pool--Conveyance of Additional Mortgage Loans and Subsequent Mortgage Loans and the Pre-Funding Accounts" with an aggregate principal balance as of the Cut-off Date of approximately $150,000,000. The Additional Mortgage Loans in loan group I will have an aggregate principal balance as of the Cut-off Date of approximately $98,195,937, the Additional Mortgage Loans in loan group II will have an aggregate principal balance as of the Cut-off Date of approximately $20,681,926 and the Additional Mortgage Loans in loan group III will have an aggregate principal balance as of the Cut-off Date of approximately $31,122,137.

S-7

WFB.000376

PRE-FUNDING ACCOUNTS

On the Closing Date, the Depositor will pay to the Trust Administrator approximately $557,239,915, which will be held by the Trust Administrator on behalf of the Trustee in a pre-funding account relating to the Group I Mortgage Loans (the "Group I Pre-Funding Account"), approximately $115,843,591, which will be held by the Trust Administrator on behalf of the Trustee in another pre-funding account relating to the Group II Mortgage Loans (the "Group II Pre-Funding Account") and approximately $176,916,493, which will be held by the Trust Administrator on behalf of the Trustee in another pre-funding account relating to the Group III Mortgage Loans (the "Group III Pre-Funding Account" and together with the Group I Pre-Funding Account and the Group II Pre-Funding Account, the "Pre-Funding Accounts").

The amount on deposit in the Pre-Funding Accounts will be reduced by the amounts used to purchase Subsequent Mortgage Loans for the related loan group from the period from the Closing Date up to and including the 90th day following the Closing Date. Any amounts remaining in the Pre-Funding Accounts after the 90th day following the Closing Date will be distributed on the next Distribution Date to the holders of the related Class A Certificates in the manner set forth in "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" herein. See "The Mortgage Pool--Conveyance of Additional Mortgage Loans and Subsequent Mortgage Loans and the Pre-Funding Accounts" in this prospectus supplement.

INTEREST COVERAGE ACCOUNTS

On the Closing Date, the Depositor may pay to the Trust Administrator on behalf of the Trustee, for deposit in one or more interest coverage accounts, amounts as specified in the Pooling and Servicing Agreement. Funds on deposit in the interest coverage accounts, if any, will be applied by the Trust Administrator to cover a portion of certain shortfalls in the amount of interest generated by the assets of the Trust attributable to the pre-funding feature during the funding period. See "Description of the Certificates--Interest Coverage Account" in this prospectus supplement.

THE CERTIFICATES

The Offered Certificates will be sold by the Depositor to the Underwriters on the Closing Date.

The Offered Certificates will initially be represented by one or more global certificates registered in the name of a nominee of The Depository Trust Company in minimum denominations of $25,000 and integral multiples of $1.00 in excess thereof. See "Description of the Securities--Book-Entry Certificates" in the prospectus.

The Class A-4, Class A-IO-S, Class M-11, Class CE, Class P and Residual Certificates are not offered by this prospectus supplement. Such certificates may be delivered to the Seller as partial consideration for the Mortgage Loans or alternatively, the Depositor may sell all or a portion of such certificates to one or more third- party investors.

CREDIT ENHANCEMENT

The credit enhancement provided for the benefit of the holders of the Class A and Mezzanine Certificates consists of excess interest, subordination and overcollateralization, each as described below and under "Description of the Certificates--Credit Enhancement" and "--Overcollateralization Provisions" in this prospectus supplement.

EXCESS INTEREST. The Mortgage Loans bear interest each month in an amount that in the aggregate is expected to exceed the amount needed to distribute monthly interest on the Class A and Mezzanine Certificates and to pay certain fees and expenses of the Trust. Any excess interest from the Mortgage Loans each month will be available to absorb realized losses on the Mortgage Loans and to maintain or restore overcollateralization at required levels.

SUBORDINATION. The rights of the holders of the Mezzanine Certificates and the Class CE Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the Class A Certificates.

In addition, the rights of the holders of Mezzanine Certificates with higher numerical class designations to receive distributions in respect of the Mortgage Loans will be subordinated to the rights of holders of Mezzanine Certificates with lower numerical class designations, and the rights of the holders of the Class CE Certificates to receive distributions in respect of the Mortgage Loans will be subordinated to the rights of the holders of the Mezzanine Certificates, in each case to the extent described under "Description of the Certificates--Allocation of Losses; Subordination" in this prospectus supplement.

WFB.000377

S-8

WFB.000378

Subordination is intended to enhance the likelihood of regular distributions on the more senior certificates in respect of interest and principal and to afford such certificates protection against realized losses on the Mortgage Loans.

OVERCOLLATERALIZATION. The sum of the aggregate principal balance of the Initial Mortgage Loans as of the Cut-off Date and the amounts on deposit in the Pre-Funding Accounts as of the Closing Date is expected to exceed the aggregate certificate principal balance of the Class A, Mezzanine and Class P Certificates on the Closing Date by an amount equal to the initial amount of overcollateralization required to be provided by the mortgage pool under the Pooling and Servicing Agreement. The amount of overcollateralization will be available to absorb realized losses on the Mortgage Loans. See "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement.

ALLOCATION OF LOSSES. On any Distribution Date, realized losses on the Mortgage Loans will first, reduce the excess interest and second, reduce the overcollateralization for such Distribution Date. If on any Distribution Date, the amount of overcollateralization is reduced to zero, any additional realized losses will be allocated to reduce the certificate principal balance of each class of Mezzanine Certificates in reverse numerical order until the certificate principal balance of each such class has been reduced to zero. The Pooling and Servicing Agreement does not permit the allocation of realized losses on the Mortgage Loans to the Class A or Class P Certificates. However, investors in the Class A Certificates should realize that under certain loss scenarios, there may not be enough principal and interest on the Mortgage Loans to distribute to the Class A Certificates all principal and interest amounts to which such certificates are then entitled. See "Description of the Certificates--Allocation of Losses; Subordination" in this prospectus supplement.

Once realized losses are allocated to the Mezzanine Certificates, such realized losses will not be reinstated (except in the case of subsequent recoveries) nor will such certificates accrue interest on any allocated realized loss amounts. However, the amount of any realized losses allocated to the Mezzanine Certificates may be distributed to the holders of those certificates according to the priorities set forth under "Description of the Certificates - --Overcollateralization Provisions" in this prospectus supplement.

CAP CONTRACTS

The following Certificates will have the benefit of an interest rate corridor: (i) the Class A-1A Certificates, (ii) the Class A-1B and Class A-1C Certificates, (iii) the Class A-1D Certificates, (iv) the Class A-3 Certificates, (iv) the Group III Certificates and (v) the Mezzanine Certificates (collectively, the "Cap Contracts"). Each of the Cap Contracts requires the counterparty to pay amounts to the Trust Administrator on behalf of the Trust to the extent one-month LIBOR for any related interest accrual period exceeds the rate set forth in the related Cap Contract, but not more than the maximum rate set forth in the related Cap Contract, in an amount equal to such excess multiplied by the lesser of (i) the notional amount for such interest accrual period set forth in the related Cap Contract and (ii) the aggregate certificate principal balance of the related Certificates. Cap payments, if any, made by the counterparty under the Cap Contracts will be deposited in the Net WAC Rate Carryover Reserve Account and will be available for distribution on the related Certificates in respect of basis risk shortfall amounts, to the limited extent described in this prospectus supplement.

See "Description of the Certificates--The Cap Contracts" in this prospectus supplement.

ADVANCES

The Master Servicer is required to advance delinquent payments of principal and interest on the Mortgage Loans, subject to the limitations described in this prospectus supplement. The Master Servicer is entitled to be reimbursed for such advances, and therefore such advances are not a form of credit enhancement. See "Description of the Certificates --Advances" in this prospectus supplement and "Distributions on the Securities--Advances by Master Servicer in Respect of Delinquencies on the Trust Fund Assets" in the prospectus.

OPTIONAL TERMINATION

At their option, the holders of at least 76% of the voting rights of the Class CE Certificates may purchase all of the Mortgage Loans, together with any properties in respect thereof acquired on behalf of the trust, and thereby effect termination and early retirement of the certificates, after the aggregate principal balance of the Mortgage Loans (and properties acquired in respect thereof) remaining in the Trust has been reduced to an amount less than 10% of the sum of (i) the aggregate principal balance of the Initial Mortgage Loans as of

WFB.000379

the Cut-off Date and (ii) the original pre-funded amounts. If the holders of at least 76% of the voting rights of the Class CE Certificates fail to exercise such option, the Master Servicer or the NIMS Insurer, if any, may exercise that option. See "Pooling and Servicing Agreement--Termination" in this prospectus supplement and "Distributions on the Securities--Termination of the Trust Fund and Disposition of Trust Fund Assets" in the prospectus.

FEDERAL INCOME TAX CONSEQUENCES

One or more elections will be made to treat designated portions of the Trust (exclusive of the Pre-Funding Accounts, the Interest Coverage Accounts, if any, the Net WAC Rate Carryover Reserve Account and the Cap Contracts, as described more fully herein) as real estate mortgage investment conduits for federal income tax purposes. See "Federal Income Tax Consequences--REMICs" in the prospectus.

For further information regarding the federal income tax consequences of investing in the Class A and Mezzanine Certificates, see "Federal Income Tax Consequences" in this prospectus supplement and in the prospectus.

RATINGS

It is a condition to the issuance of the certificates that the Class A and Mezzanine Certificates receive the ratings from Fitch Ratings ("Fitch"), Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P") set forth on the table on page S-4.

A security rating does not address the frequency of prepayments on the Mortgage Loans, the receipt of any amounts from the Net WAC Rate Carryover Reserve Account or the corresponding effect on yield to investors. See "Yield on the Certificates" and "Ratings" in this prospectus supplement and "Yield and Maturity Considerations" in the prospectus.

LEGAL INVESTMENT

The Class A and Mezzanine Certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA").

See "Legal Investment" in this prospectus supplement and in the prospectus.

ERISA CONSIDERATIONS

It is expected that the Offered Certificates may be eligible for purchase by a pension or other employee benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") so long as certain conditions are met. A fiduciary of an employee benefit plan must determine that the purchase of a certificate is consistent with its fiduciary duties under applicable law and does not result in a nonexempt prohibited transaction under applicable law.

See "ERISA Considerations" in this prospectus supplement and "Considerations for Benefit Plan Investors" in the prospectus.

S-10

WFB.000380

RISK FACTORS

In addition to the matters described elsewhere in this prospectus supplement and the prospectus, prospective investors should carefully consider the following factors before deciding to invest in the Class A and Mezzanine Certificates.

THE ORIGINATORS' UNDERWRITING STANDARDS ARE NOT AS STRINGENT AS THOSE OF MORE TRADITIONAL LENDERS OR OF FANNIE MAE AND FREDDIE MAC, WHICH MAY RESULT IN LOSSES ALLOCATED TO THE OFFERED CERTIFICATES

The Originators' underwriting standards are primarily intended to assess the applicant's credit standing and ability to repay as well as the value and the adequacy of the mortgaged property as collateral for the mortgage loan. The Originators provide loans primarily to borrowers who do not qualify for loans conforming to Fannie Mae and Freddie Mac guidelines but who generally have equity in their property and the apparent ability to repay. While the Originators' primary considerations in underwriting a mortgage loan are the applicant's credit standing and repayment ability, as well as the value and adequacy of the mortgaged property as collateral, the Originators also consider, among other things, the applicant's credit history and debt service-to-income ratio, and the type and occupancy status of the mortgaged property. The Originators' underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the Originators' first lien mortgage loan (or at any time thereafter), which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the Originators' loan-to-value ratio determination.

As a result of such underwriting standards, the Mortgage Loans are likely to experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in a more traditional manner. To the extent the credit enhancement features described in this prospectus supplement are insufficient to cover such losses, holders of the related Certificates may suffer a loss on their investment.

Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans than on mortgage loans originated in a more traditional manner. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans. See "The Mortgage Pool--Underwriting Standards of the Originators" in this prospectus supplement.

CERTAIN MORTGAGE LOANS HAVE HIGH LOAN-TO-VALUE RATIOS (IN THE CASE OF FIRST LIENS) OR COMBINED LOAN-TO-VALUE RATIOS (IN THE CASE OF SECOND LIENS) WHICH MAY PRESENT A GREATER RISK OF LOSS RELATING TO SUCH MORTGAGE LOANS

Mortgage loans with a loan-to-value ratio or combined loan-to-value ratio of greater than 80% may present a greater risk of loss than mortgage loans with loan-to-value ratios or combined loan-to-value ratios of 80% or below. Approximately 55.31% of the Group I Collateral Selection Date Mortgage Loans, approximately 56.41% of the Group II Collateral Selection Date Mortgage Loans and approximately 60.45% of the Group III Collateral Selection Date Mortgage Loans, in each case by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, had a loan- to-value ratio or combined loan-to-value ratio at origination in excess of 80% and are not covered by any primary mortgage insurance. No Collateral Selection Date Mortgage Loan had a loan-to-value ratio or combined loan-to-value ratio exceeding 100% at origination. An overall decline in the residential real estate market, a rise in interest rates over a period of time and the general condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of such mortgaged property from the appraised value at the time the Mortgage Loan was originated. If there is a reduction in value of the mortgaged property, the loan-to-value ratio or combined loan-to-value ratio may increase over what it was at the time of origination. Such an increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the Mortgage Loan. There can be no assurance that the loan-to-value ratio or combined loan-to-value ratio of any Mortgage Loan determined at any time after origination is less than or equal to its original loan-to-value ratio or combined loan-to-value ratio. Additionally, the Originators' determination of the value of a mortgaged property used in the calculation of the loan-to-value ratios or combined loan-to-value ratios of the Mortgage Loans may differ from the appraised value of such mortgaged property or the actual value of such mortgaged property. See "The Mortgage Pool--General" in this prospectus supplement.

WFB.000381

MOST OF THE COLLATERAL SELECTION DATE MORTGAGE LOANS ARE NEWLY ORIGINATED AND HAVE LITTLE, IF ANY, PAYMENT HISTORY

None of the Collateral Selection Date Mortgage Loans are delinquent in their monthly payments as of the Collateral Selection Date. Investors should note, however, that certain of the Collateral Selection Date Mortgage Loans will have a first payment date occurring after the Collateral Selection Date and, therefore, such Collateral Selection Date Mortgage Loans could not have been delinquent in any monthly payment as of the Collateral Selection Date.

SECOND LIEN LOANS HAVE A GREATER RISK OF LOSS

Approximately 1.14% of the Group I Collateral Selection Date Mortgage Loans, approximately 1.21% of the Group II Collateral Selection Date Mortgage Loans and approximately 1.62% of the Group III Collateral Selection Date Mortgage Loans, in each case, by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, are secured by second liens on the related mortgaged properties. The proceeds from any liquidation, insurance or condemnation proceedings will be available to satisfy the outstanding balance of such Mortgage Loans only to the extent that the claims of the related senior mortgages have been satisfied in full, including any related foreclosure costs. In circumstances when it has been determined to be uneconomical to foreclose on the mortgaged property, the Master Servicer may write off the entire balance of such Mortgage Loan as a bad debt. The foregoing considerations will be particularly applicable to Mortgage Loans secured by second liens that have high combined loan-to-value ratios because it is comparatively more likely that the Master Servicer would determine foreclosure to be uneconomical in the case of such Mortgage Loans. In addition, the rate of default of second lien Mortgage Loans may be greater than that of Mortgage Loans secured by first liens on comparable properties.

SIMULTANEOUS SECOND LIEN RISK

With respect to approximately 5.98% of the Group I Collateral Selection Date Mortgage Loans, approximately 5.07% of the Group II Collateral Selection Date Mortgage Loans and approximately 2.15% of the Group III Collateral Selection Date Mortgage Loans, in each case by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, at the time of origination of the first lien Mortgage Loan, the Originators also originated a second lien mortgage loan which will not be included in the Trust. The weighted average loan-to-value ratio at origination of the first-liens on such Collateral Selection Date Mortgage Loans is approximately 79.99% and the weighted average combined loan-to-value ratio at origination of such Collateral Selection Date Mortgage Loans (including the second lien) is approximately 99.97%.

With respect to approximately 3.62% of the Group I Collateral Selection Date Mortgage Loans, approximately 2.75% of the Group II Collateral Selection Date Mortgage Loans and approximately 0.81% of the Group III Collateral Selection Date Mortgage Loans, in each case by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, at the time of origination of the first lien Mortgage Loan, the applicable Originator also originated a second lien mortgage loan which will be included in the Trust. The weighted average combined loan-to-value ratio at origination of such Collateral Selection Date Mortgage Loans (including the second lien) is approximately 99.99%.

With respect to any Mortgage Loans originated with a simultaneous second lien, foreclosure frequency may be increased relative to Mortgage Loans that were originated without a simultaneous second lien because the mortgagors on such Mortgage Loans have less equity in the mortgaged property. Investors should also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the Originators or from any other lender.

RISKS ASSOCIATED WITH MORTGAGE LOANS SECURED BY MANUFACTURED HOMES

Approximately 2.78% of the Group I Collateral Selection Date Mortgage Loans, approximately 3.10% of the Group II Collateral Selection Date Mortgage Loans and approximately 0.44% of the Group III Collateral Selection Date Mortgage Loans, in each case by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, are secured by a lien on real estate to which a manufactured home has been permanently attached. Under the laws of most states, a manufactured home that has been permanently attached to its site becomes subject to real estate title and recording laws. The Seller has recorded or caused to be recorded a real estate mortgage or deed of trust where the related

WFB.000382

manufactured home is located in order to perfect a security interest in each manufactured home securing a mortgage loan to be conveyed to the trust. If, however, the manufactured home is deemed not permanently attached to the real estate, under the laws of most states, it will be considered personal property and perfection of a security interest in such manufactured home is effected, depending on applicable state law, either by noting the security interest on the certificate of title for the manufactured home or by filing a financing statement under the Uniform Commercial Code of the state where the manufactured home is located. Consequently, if a determination is made that the manufactured home is considered personal property, other parties could obtain an interest in the manufactured home which is prior to the security interest retained by the trust. For further information regarding the primary risk to holders of mortgage loans secured by manufactured homes, see "Legal Aspects of Mortgage Assets - Manufactured Housing Contracts" in the prospectus.

GEOGRAPHIC CONCENTRATION RISK

The charts entitled "Geographic Distribution" for the Collateral Selection Date Mortgage Loans presented in Annex III list geographic concentrations of the Group I Collateral Selection Date Mortgage Loans, Group II Collateral Selection Date Mortgage Loans and Group III Collateral Selection Date Mortgage Loans, respectively, by state. Mortgaged properties in certain states (e.g. California) may be particularly susceptible to certain types of hazards, such as earthquakes, hurricanes, floods, mudslides, wildfires and other natural disasters for which there may or may not be insurance.

In addition, the conditions below will have a disproportionate impact on the Mortgage Loans in general:

o       Economic conditions in states with high concentrations of Mortgage Loans may affect the ability of mortgagors to repay their loans on time even if such conditions do not affect real property values.

o       Declines in the residential real estate markets in states with high concentrations of Mortgage Loans may reduce the value of properties located in those states, which would result in an increase in loan-to-value or combined loan-to-value ratios.

o       Any increase in the market value of properties located in states with high concentrations of Mortgage Loans would reduce loan-to-value or combined loan-to-value ratios and could, therefore, make alternative sources of financing available to mortgagors at lower interest rates, which could result in an increased rate of prepayment of the Mortgage Loans.

THERE WILL BE VARIATIONS IN THE MORTGAGE LOANS FROM THE CHARACTERISTICS DESCRIBED IN THIS PROSPECTUS SUPPLEMENT

The pool of mortgage loans used to derive the statistical information herein includes mortgage loans the characteristics of which will vary from the specific characteristics reflected in the final pool of Mortgage Loans, although the extent of such variance is not expected to be material. A detailed description of the Initial Mortgage Loans actually delivered on the Closing Date will be available on the Closing Date and will be filed with the Securities and Exchange Commission by the Depositor on Form 8-K within 15 days after the Closing Date.

VIOLATION OF VARIOUS FEDERAL AND STATE LAWS MAY RESULT IN LOSSES ON THE MORTGAGE LOANS

Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and require licensing of the Originators. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the Mortgage Loans.

The Mortgage Loans are also subject to federal laws, including:

o       the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the borrowers regarding the terms of the Mortgage Loans;

S-13

WFB.000383

o       the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit;

o       the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience;

o       the Depository Institutions Deregulation and Monetary Control Act of 1980, which preempts certain state usury laws; and

o       the Alternative Mortgage Transaction Parity Act of 1982, which preempts certain state lending laws which regulate alternative mortgage transactions.

Violations of certain provisions of these federal and state laws may limit the ability of the Master Servicer to collect all or part of the principal of or interest on the Mortgage Loans and in addition could subject the Trust to damages and administrative enforcement and could result in the mortgagors rescinding such Mortgage Loans whether held by the Trust or subsequent holders of the Mortgage Loans.

The Seller will represent that as of the Closing Date or the Subsequent Transfer Date, each Initial Mortgage Loan or Subsequent Mortgage Loan, as applicable, at the time of origination, was in compliance with applicable federal, state and local laws and regulations. In the event of a breach of such representation, the Seller will be obligated to cure such breach or repurchase or replace the affected Mortgage Loan in the manner described in the prospectus. If the Seller is unable or otherwise fails to satisfy such obligations, the yield on the Class A and Mezzanine Certificates may be materially and adversely affected.

HIGH COST LOANS

The Seller will represent that none of the Mortgage Loans will be "High Cost Loans" within the meaning of the Home Ownership and Equity Protection Act of 1994 (the "Homeownership Act") and none of the Mortgage Loans will be high cost loans under any state or local law, ordinance or regulation similar to the Homeownership Act. See "Legal Aspects of Mortgage Assets--Anti-Deficiency Legislation and Other Limitations on Lenders" in the prospectus.

In addition to the Homeownership Act, a number of legislative proposals have been introduced at the federal, state and municipal level that are designed to discourage predatory lending practices. Some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in mortgage loans that have mortgage rates or origination costs in excess of prescribed levels, and require that borrowers be given certain disclosures prior to the consummation of such mortgage loans. In some cases, state law may impose requirements and restrictions greater than those in the Homeownership Act. The Originators' failure to comply with these laws could subject the Trust, and other assignees of the Mortgage Loans, to monetary penalties and could result in the borrowers rescinding such Mortgage Loans whether held by the Trust or subsequent holders of the Mortgage Loans. Lawsuits have been brought in various states making claims against assignees of High Cost Loans for violations of state law. Named defendants in these cases include numerous participants within the secondary mortgage market, including some securitization trusts.

The Seller will represent that none of the Mortgage Loans will be "High Cost Home Loans" or "Covered Loans" within the meaning of the Georgia Fair Lending Act.

DELAY IN RECEIPT OF LIQUIDATION PROCEEDS; LIQUIDATION PROCEEDS MAY BE LESS THAN MORTGAGE LOAN BALANCE

Substantial delays could be encountered in connection with the liquidation of delinquent Mortgage Loans. Further, reimbursement of advances made on a Mortgage Loan and liquidation expenses such as legal fees, real estate taxes and maintenance and preservation expenses may reduce the portion of liquidation proceeds distributable to you. If a mortgaged property fails to provide adequate security for the Mortgage Loan, you will incur a loss on your investment if the credit enhancements are insufficient to cover the loss.

WFB.000384

THE ADDITIONAL MORTGAGE LOANS AND THE SUBSEQUENT MORTGAGE LOANS MAY HAVE
DIFFERENT CHARACTERISTICS THAN THE COLLATERAL SELECTION DATE MORTGAGE LOANS

Each Additional Mortgage Loan and Subsequent Mortgage Loan will
generally satisfy the eligibility criteria described in this prospectus
supplement at the time of its sale to the Trust. The characteristics of the
Additional Mortgage Loans and Subsequent Mortgage Loans will, however, vary from
the specific characteristics reflected in the statistical information relating
to the Collateral Selection Date Mortgage Loans presented in this prospectus
supplement, although the extent of such variance is not expected to be material.
See "The Mortgage Pool--Conveyance of Additional Mortgage Loans and Subsequent
Mortgage Loans and the Pre-Funding Accounts" in this prospectus supplement.

THE DIFFERENCE BETWEEN THE PASS-THROUGH RATES ON THE CLASS A AND MEZZANINE
CERTIFICATES AND THE MORTGAGE RATES ON THE MORTGAGE LOANS MAY AFFECT THE YIELDS
ON SUCH CERTIFICATES

Each class of Class A and Mezzanine Certificates accrues interest at a
pass-through rate based on a one-month LIBOR index plus a specified margin, but
such pass-through rate is subject to a limit. The limit on the pass-through rate
for each class of Class A Certificates is based on the weighted average of the
mortgage rates of the Mortgage Loans in the related loan group, net of certain
fees and expenses of the Trust. The limit on the pass-through rate for each
class of Mezzanine Certificates is based on the weighted average (weighted on
the basis of the results of subtracting from the aggregate principal balance of
each loan group plus any amounts on deposit in the related Pre-Funding Account,
the current certificate principal balance of the related Class A Certificates)
of (i) the weighted average of the mortgage rates of the Group I Mortgage Loans,
net of certain fees and expenses of the Trust, (ii) the weighted average of the
mortgage rates of the Group II Mortgage Loans, net of certain fees and expenses
of the Trust and (iii) the weighted average of the mortgage rates of the Group
III Mortgage Loans, net of certain fees and expenses of the Trust. The
adjustable-rate Mortgage Loans have mortgage rates that adjust based on a
six-month LIBOR index, have periodic and lifetime limitations on adjustments to
their mortgage rates, and have the first adjustment to their mortgage rates two
or three years after the origination thereof. The fixed-rate Mortgage Loans have
mortgage rates that do not adjust. As a result of the limits on the pass-through
rates on the Class A and Mezzanine Certificates, such certificates may accrue
less interest than they would accrue if their pass-through rates were based
solely on the one-month LIBOR index plus the specified margin.

A variety of factors could limit the pass-through rates and adversely
affect the yields to maturity on the Class A and Mezzanine Certificates. Some of
these factors are described below.

o       The pass-through rates for the Class A and Mezzanine Certificates may
        adjust monthly while the mortgage rates on the adjustable-rate Mortgage
        Loans adjust less frequently and the mortgage rates on the fixed-rate
        Mortgage Loans do not adjust at all. Furthermore, all of the
        adjustable-rate Mortgage Loans will have the first adjustment to their
        mortgage rates two or three years after their origination.
        Consequently, the limits on the pass-through rates on the Class A and
        Mezzanine Certificates may prevent any increases in the pass-through
        rate on one or more classes of such certificates for extended periods
        in a rising interest rate environment.

o       If prepayments, defaults and liquidations occur more rapidly on the
        applicable Mortgage Loans with relatively higher mortgage rates than on
        the Mortgage Loans with relatively lower mortgage rates, the
        pass-through rate on one or more classes of Class A and Mezzanine
        Certificates is more likely to be limited.

o       The mortgage rates on the adjustable-rate Mortgage Loans may respond to
        different economic and market factors than does one-month LIBOR. It is
        possible that the mortgage rates on the adjustable-rate Mortgage Loans
        may decline while the pass-through rates on the Class A and Mezzanine
        Certificates are stable or rising. It is also possible that the
        mortgage rates on the adjustable-rate Mortgage Loans and the
        pass-through rates on the Class A and Mezzanine Certificates may both
        decline or increase during the same period, but that the pass-through
        rates on the Class A and Mezzanine Certificates may decline more slowly
        or increase more rapidly.

WFB.000385

If the pass-through rate on any class of Class A or Mezzanine Certificates is limited for any Distribution Date, the resulting basis risk shortfalls may be recovered by the holders of the certificates on the same Distribution Date or on future Distribution Dates, to the extent that on such Distribution Date or future Distribution Dates there are any available funds remaining after certain other distributions on the Class A and Mezzanine Certificates and the payment of certain fees and expenses of the Trust. The ratings on the Class A and Mezzanine Certificates will not address the likelihood of the recovery of any such basis risk shortfalls by holders of the Class A and Mezzanine Certificates.

Amounts used to pay such shortfalls on the Class A and Mezzanine Certificates will be supplemented by any amount received by the Trust Administrator under the related Cap Contract, pursuant to which the counterparty thereunder will be obligated to make payments to the Trust Administrator when one-month LIBOR exceeds the percentage set forth in the related Cap Contract, subject to the maximum rate as set forth in such Cap Contract. However, the amount received under any Cap Contract may be insufficient to pay the holders of the applicable certificates the full amount of interest which they would have received absent the limitations of the rate cap.

RISK RELATING TO DISTRIBUTION PRIORITY OF THE CLASS A CERTIFICATES

With respect to the Group I Certificates, on and after the Distribution Date on which the aggregate certificate principal balance of the Subordinate Certificates have been reduced to zero, any principal distributions allocated to such certificates are required to be allocated on a PRO RATA basis based on the certificate principal balance of each such class. However, principal distributions will not be allocated on such a PRO RATA basis, but instead will be distributed first, to the Class A-1A Certificates until their certificate principal balance has been reduced to zero, and then to the Class A-1B, Class A-1C and Class A-1D Certificates, on a PRO RATA basis based on the certificate principal balance of each such class, if on any Distribution Date beginning in November 2011 the certificate principal balance of the Class A-1A Certificates exceeds a specified target amount (after application of principal on such Distribution Date but assuming no Class A-1A Accelerated Amortization Event (as defined herein) is in effect on such Distribution Date). In that event, the weighted average lives of the Class A-1B, Class A-1C and Class A-1D Certificates would be longer than would otherwise be the case if distributions of principal were to be allocated on a PRO RATA basis among the Group I Certificates. In addition, as a result of the allocation of principal in that event to the Class A-1A Certificates before the Class A-1B, Class A-1C and Class A-1D Certificates, the holders of the Class A-1B, Class A-1C and Class A-1D Certificates would have a greater risk of losses on the Group I Mortgage Loans adversely affecting the yield to maturity on such certificates.

Similarly, with respect to the Group II and Group III Certificates, any principal distributions allocated to such certificates are required to be allocated on a PRO RATA basis based on the certificate principal balance of each such class. However, principal distributions will not be allocated on such a PRO RATA basis, but instead will be distributed first, to the Class A-2 or Class A-4 Certificates, as applicable, until their certificate principal balance has been reduced to zero, and then to the Class A-3 or Class A-5 Certificates, as applicable, if on any Distribution Date a Sequential Trigger Event (as defined herein) is in effect on such Distribution Date. In that event, the weighted average lives of the Class A-3 and Class A-5 Certificates would be longer than would otherwise be the case if distributions of principal were to be allocated on a PRO RATA basis among the Group II or Group III Certificates, as applicable. In addition, as a result of the allocation of principal in that event to the Class A-2 and Class A-4 Certificates before the Class A-3 and Class A-5 Certificates, the holders of the Class A-3 and Class A-5 Certificates would have a greater risk of losses on the Group II Mortgage Loans and Group III Mortgage Loans, as applicable, adversely affecting the yield to maturity on such certificates. Since a Sequential Trigger Event may be in effect on one or more Distribution Dates but not on other Distribution Dates, the priority of principal distributions on the Group I, Group II and Group III Certificates may change from one Distribution Date to another.

THE RATE AND TIMING OF PRINCIPAL DISTRIBUTIONS ON THE CLASS A AND MEZZANINE CERTIFICATES WILL BE AFFECTED BY PREPAYMENT SPEEDS

The rate and timing of distributions allocable to principal on the Class A and Mezzanine Certificates will depend, in general, on the rate and timing of principal payments (including prepayments and collections upon defaults, liquidations and repurchases) on the Mortgage Loans and the allocation thereof to distribute principal on such certificates as described under "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" in this prospectus supplement. As is the case with asset-backed pass-through certificates generally, the

WFB.000386

Class A and Mezzanine Certificates are subject to substantial inherent cash-flow uncertainties because the Mortgage Loans may be prepaid at any time.

With respect to approximately 67.27% of the Group I Collateral Selection Date Mortgage Loans, approximately 71.62% of the Group II Collateral Selection Date Mortgage Loans and approximately 74.24% of the Group III Collateral Selection Date Mortgage Loans, in each case by aggregate scheduled principal balance of the related loan group as of the Cut-off Date, a mortgagor principal prepayment may subject the related mortgagor to a prepayment charge, subject to certain limitations in the related mortgage note and limitations upon collection in the Pooling and Servicing Agreement. Generally, each such Mortgage Loan provides for payment of a prepayment charge on certain prepayments made within a defined period set forth in the related mortgage note (generally within the first three years but possibly as short as one year from the date of origination of such mortgage loan). A prepayment charge may or may not act as a deterrent to prepayment of the related Mortgage Loan.

The rate of prepayments on the Mortgage Loans will be sensitive to prevailing interest rates. Generally, when prevailing interest rates are increasing, prepayment rates on mortgage loans tend to decrease. A decrease in the prepayment rates on the Mortgage Loans will result in a reduced rate of principal distributions to investors in the Class A and Mezzanine Certificates at a time when reinvestment at such higher prevailing rates would be desirable. Conversely, when prevailing interest rates are declining, prepayment rates on mortgage loans tend to increase. An increase in the prepayment rates on the Mortgage Loans will result in a greater rate of principal distributions to investors in the Class A and Mezzanine Certificates at a time when reinvestment at comparable yields may not be possible. Furthermore, because the mortgage rates for the adjustable-rate Mortgage Loans are based on six-month LIBOR plus a fixed percentage amount, such rates could be higher than prevailing market interest rates at the time of adjustment, and this may result in an increase in the rate of prepayments on such Mortgage Loans after such adjustment.

The Seller may be required to repurchase Mortgage Loans from the Trust in the event certain breaches of representations and warranties have not been cured. In addition, the NIMS Insurer, if any, or the Master Servicer may purchase Mortgage Loans 90 days or more delinquent, subject to the conditions set forth in the Pooling and Servicing Agreement. These purchases will have the same effect on the holders of the Class A and Mezzanine Certificates as a prepayment of those Mortgage Loans.

The holders of at least 76% of the voting rights of the Class CE Certificates, the Master Servicer or the NIMS Insurer, if any, may purchase all of the Mortgage Loans when the aggregate principal balance of the Mortgage Loans (and properties acquired in respect thereof) is less than 10% of the sum of (i) the aggregate principal balance of the Initial Mortgage Loans as of the Cut-off Date and (ii) the original pre-funded amounts.

THE YIELDS TO MATURITY ON THE CLASS A AND MEZZANINE CERTIFICATES WILL DEPEND ON A VARIETY OF FACTORS

The yield to maturity on each class of Class A and Mezzanine Certificates will depend, in general, on (i) the applicable pass-through rate thereon from time to time; (ii) the applicable purchase price; (iii) the rate and timing of principal payments (including any amounts distributed to the Class A Certificates after the end of the funding period, prepayments and collections upon defaults, liquidations and repurchases) and the allocation thereof to reduce the certificate principal balances; (iv) the rate, timing and severity of realized losses on the Mortgage Loans; (v) adjustments to the mortgage rates on the adjustable-rate Mortgage Loans; (vi) the amount of excess interest generated by the Mortgage Loans; (vii) the allocation to the Class A and Mezzanine Certificates of some types of interest shortfalls; and (viii) payments, if any, received under the related Cap Contract.

In general, if the Class A and Mezzanine Certificates are purchased at a premium and principal distributions thereon occur at a rate faster than anticipated at the time of purchase, the investor's actual yield to maturity will be lower than that assumed at the time of purchase. Conversely, if the Class A and Mezzanine Certificates are purchased at a discount and principal distributions thereon occur at a rate slower than that anticipated at the time of purchase, the investor's actual yield to maturity will be lower than that originally assumed.

WFB.000387

As a result of the absorption of realized losses on the Mortgage Loans by excess interest and overcollateralization, each as described in this prospectus supplement, liquidations of defaulted Mortgage Loans, whether or not realized losses are allocated to the Mezzanine Certificates upon such liquidations, will result in an earlier return of principal to the Class A and Mezzanine Certificates and will influence the yields on such certificates in a manner similar to the manner in which principal prepayments on the Mortgage Loans will influence the yields on the Class A and Mezzanine Certificates. The overcollateralization provisions are intended to result in an accelerated rate of principal distributions to holders of the Class A and Mezzanine Certificates at any time that the overcollateralization provided by the mortgage pool falls below the required level.

POTENTIAL INADEQUACY OF CREDIT ENHANCEMENT FOR THE CLASS A AND MEZZANINE CERTIFICATES

The credit enhancement features described in this prospectus supplement are intended to increase the likelihood that holders of the Class A and Mezzanine Certificates will receive regular distributions of interest and principal. If delinquencies or defaults occur on the Mortgage Loans, neither the Master Servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted Mortgage Loans if such advances are deemed non-recoverable. If substantial losses occur as a result of defaults and delinquent payments on the Mortgage Loans, you may suffer losses.

INTEREST GENERATED BY THE MORTGAGE LOANS MAY BE INSUFFICIENT TO MAINTAIN OR RESTORE OVERCOLLATERALIZATION

The Mortgage Loans are expected to generate more interest than is needed to distribute interest owed on the Class A and Mezzanine Certificates and to pay certain fees and expenses of the Trust. Any remaining interest generated by the Mortgage Loans will first be used to absorb losses that occur on the Mortgage Loans and will then be used to maintain or restore overcollateralization. We cannot assure you, however, that enough excess interest will be generated to maintain or restore the required level of overcollateralization. The factors described below will affect the amount of excess interest that the Mortgage Loans will generate.

o       Each time a Mortgage Loan is prepaid in full, liquidated, written off or repurchased, excess interest may be reduced because the Mortgage Loan will no longer be outstanding and generating interest or, in the case of a partial prepayment, will be generating less interest.

o       If the rates of delinquencies, defaults or losses on the Mortgage Loans are higher than expected, excess interest will be reduced by the amount necessary to compensate for any shortfalls in cash available to make required distributions on the Class A and Mezzanine Certificates.

o       The adjustable-rate Mortgage Loans have mortgage rates that adjust less frequently than, and on the basis of an index that is different from, the index used to determine the pass-through rates on the Class A and Mezzanine Certificates, and the fixed-rate Mortgage Loans have mortgage rates that do not adjust. As a result, the pass- through rates on the related Class A and Mezzanine Certificates may increase relative to mortgage rates on the applicable Mortgage Loans, requiring that a greater portion of the interest generated by those Mortgage Loans be applied to cover interest on the related Class A and Mezzanine Certificates.

THE CLASS A CERTIFICATES MAY RECEIVE A PRINCIPAL DISTRIBUTION AS A RESULT OF EXCESS FUNDS IN THE PRE-FUNDING ACCOUNTS

To the extent that amounts on deposit in a Pre-Funding Account have not been fully applied to the purchase of Subsequent Mortgage Loans by the end of the funding period, the holders of the related Class A Certificates will receive, on the Distribution Date immediately following the end of the funding period, any amounts in that Pre-Funding Account after giving effect to any purchase of related Subsequent Mortgage Loans, which will be applied as principal in reduction of the Certificate Principal Balance of those certificates. Although no assurance can be given, the Depositor intends that the principal amount of Subsequent Mortgage Loans sold to the Trust will require the application of substantially all amounts on deposit in the Pre-Funding Accounts and that there will be no material principal distribution to the holders of the Class A Certificates on such Distribution Date.

WFB.000388

THERE ARE VARIOUS RISKS ASSOCIATED WITH THE MEZZANINE CERTIFICATES

The weighted average lives of, and the yields to maturity on, the Mezzanine Certificates will be progressively more sensitive, in increasing order of their numerical class designations, to the rate and timing of mortgagor defaults and the severity of ensuing losses on the Mortgage Loans. If the actual rate and severity of losses on the Mortgage Loans is higher than those assumed by an investor in such certificate, the actual yield to maturity on such certificate may be lower than the yield anticipated by such holder. The timing of losses on the Mortgage Loans will also affect an investor's yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the Mortgage Loans, to the extent they exceed the amount of excess interest and overcollateralization following distributions of principal on the related Distribution Date, will reduce the certificate principal balance of the class of Mezzanine Certificates then outstanding with the highest numerical class designation. As a result of these reductions, less interest will accrue on these classes of certificates than would be the case if those losses were not so allocated. Once a realized loss is allocated to a Mezzanine Certificate, such written down amount will not be reinstated (except in the case of subsequent recoveries) and will not accrue interest. However, the amount of any realized losses allocated to the Mezzanine Certificates may be distributed to the holders of such certificates according to the priorities set forth under "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement.

Unless the aggregate certificate principal balance of the Class A Certificates has been reduced to zero, the Mezzanine Certificates will not be entitled to any principal distributions until at least the Distribution Date in December 2007 or a later date as provided in this prospectus supplement or during any period in which delinquencies or realized losses on the Mortgage Loans exceed certain levels described under "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" in this prospectus supplement. As a result, the weighted average lives of such certificates will be longer than would be the case if distributions of principal were allocated among all of the certificates at the same time. As a result of the longer weighted average lives of such certificates, the holders of such certificates have a greater risk of suffering a loss on their investments. Further, because such certificates might not receive any principal if certain delinquency levels described under "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" in this prospectus supplement are exceeded, it is possible for such certificates to receive no principal distributions on a particular distribution date even if no losses have occurred on the mortgage pool.

In addition, the multiple class structure of the Mezzanine Certificates causes the yield of such classes to be particularly sensitive to changes in the rates of prepayment on the Mortgage Loans. Because distributions of principal will be made to the holders of the Mezzanine Certificates according to the priorities described in this prospectus supplement, the yield to maturity on such classes of certificates will be sensitive to the rates of prepayment on the Mortgage Loans experienced both before and after the commencement of principal distributions on such classes. The yield to maturity on the Mezzanine Certificates will also be extremely sensitive to losses due to defaults on the Mortgage Loans (and the timing thereof), to the extent such losses are not covered by excess interest otherwise distributable to the Class CE Certificates or a class of Mezzanine Certificates with a higher numerical class designation. Furthermore, as described in this prospectus supplement, the timing of receipt of principal and interest by the Mezzanine Certificates may be adversely affected by losses even if such classes of certificates do not ultimately bear such loss.

PREPAYMENT INTEREST SHORTFALLS AND RELIEF ACT SHORTFALLS

When a Mortgage Loan is prepaid, the mortgagor is charged interest on the amount prepaid only up to (but not including) the date on which the prepayment is made, rather than for an entire month. This may result in a shortfall in interest collections available for distribution on the next Distribution Date. The Master Servicer is required to cover a portion of the shortfall in interest collections that are attributable to prepayments, but only up to an amount equal to the product of (x) 0.50% and (y) the principal balance of the Mortgage Loans as of the first day of the related Due Period. In addition, certain shortfalls in interest collections arising from the application of the Servicemembers Civil Relief Act and similar state laws (the "Relief Act") will not be covered by the Master Servicer.

WFB.000389

On any Distribution Date, any shortfalls resulting from the application of the Relief Act and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the Master Servicer, in each case regardless of which loan group experienced the shortfall, will first, reduce the interest accrued on the Class CE Certificates, and thereafter, will reduce the monthly interest distributable amounts with respect to the Class A and Mezzanine Certificates, on a PRO RATA basis based on the respective amounts of interest accrued on such certificates for such Distribution Date. The holders of the Class A and Mezzanine Certificates will not be entitled to reimbursement for any such interest shortfalls. If these shortfalls are allocated to the Class A and Mezzanine Certificates, the amount of interest distributed to those certificates will be reduced, adversely affecting the yield on your investment.

## REIMBURSEMENT OF ADVANCES BY THE MASTER SERVICER COULD DELAY DISTRIBUTIONS ON THE CERTIFICATES

Under the Pooling and Servicing Agreement, the Master Servicer will make cash advances to cover delinquent payments of principal and interest on the Mortgage Loans to the extent it reasonably believes that the cash advances are recoverable from future payments on the Mortgage Loans. The Master Servicer may make such advances from amounts held for future distribution. In addition, the Master Servicer may withdraw from the collection account funds that were not included in available funds for the preceding Distribution Date to reimburse itself for advances previously made. Any such amounts withdrawn by the Master Servicer in reimbursement of advances previously made are generally required to be replaced by the Master Servicer on or before the next Distribution Date, subject to subsequent withdrawal. To the extent that the Master Servicer is unable to replace any amounts withdrawn in reimbursement of advances previously made, there could be a delay in distributions on the Class A and Mezzanine Certificates. Furthermore, the Master Servicer's right to reimburse itself for advances previously made from funds held for future distribution could lead to amounts required to be restored to the collection account by the Master Servicer that are higher, and potentially substantially higher, than one month's advance obligation.

## THE CERTIFICATES ARE OBLIGATIONS OF THE TRUST ONLY

The certificates will not represent an ownership interest in or obligation of the Depositor, the Master Servicer, the Seller, the Originators, the Trustee, the Trust Administrator or any of their respective affiliates. Neither the certificates nor the underlying Mortgage Loans will be guaranteed or insured by any governmental agency or instrumentality, or by the Depositor, the Master Servicer, the Seller, the Originators, the Trustee, the Trust Administrator or any of their respective affiliates. Proceeds of the assets included in the Trust will be the sole source of distributions on the Class A and Mezzanine Certificates, and there will be no recourse to the Depositor, the Master Servicer, the Seller, the Originators, the Trustee, the Trust Administrator or any other entity in the event that such proceeds are insufficient or otherwise unavailable to make all distributions provided for under the Class A and Mezzanine Certificates.

## TRANSFER OF SERVICING MAY RESULT IN HIGHER DELINQUENCIES AND DEFAULTS

Wells Fargo Bank, N.A. will be the Master Servicer under the Pooling and Servicing Agreement. However, Ameriquest Mortgage Company will service the Mortgage Loans prior to the Closing Date through the transfer of servicing to Wells Fargo Bank, N.A.. Although the transfer of servicing with respect to the Mortgage Loans is scheduled to be completed in February 2005, all transfers of servicing involve the risk of disruption in collections due to data input errors, misapplied or misdirected payments, system incompatibilities and other reasons. As a result, the rate of delinquencies and defaults on the Mortgage Loans are likely to increase, at least for a period of time. There can be no assurance as to the extent or duration of any disruptions associated with the transfer of servicing or as to the resulting effects on the yield on the Class A and Mezzanine Certificates.

## THE CAP CONTRACTS ARE SUBJECT TO COUNTERPARTY RISK

The assets of the Trust include the Cap Contracts, which will require the counterparty thereunder to make certain payments for the benefit of the holders of certain of the Class A Certificates and the Mezzanine Certificates. To the extent that distributions on such certificates depend in part on payments to be received by the Trust Administrator under the related Cap Contract, the ability of the Trust Administrator to make such distributions on such certificates will be subject to the credit risk of the counterparty to the Cap Contracts. Although there is a mechanism in place to facilitate replacement of the Cap Contracts upon the default or credit impairment of the Cap Contract counterparty, there can be

WFB.000390

no assurance that any such mechanism will result in the ability of the Depositor to obtain a suitable replacement Cap Contract.

THE LIQUIDITY OF YOUR CERTIFICATES MAY BE LIMITED

None of Morgan Stanley & Co. Incorporated, Bear, Stearns & Co. Inc. and Goldman, Sachs & Co. (collectively, the "Underwriters") has any obligation to make a secondary market in the classes of Offered Certificates. There is therefore no assurance that a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield. The market values of the certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you.

The secondary markets for asset-backed securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

THE RATINGS ON THE CERTIFICATES COULD BE REDUCED OR WITHDRAWN

Each rating agency rating the Class A and Mezzanine Certificates may change or withdraw its initial ratings at any time in the future if, in its sole judgment, circumstances warrant a change. No person is obligated to maintain the ratings at their initial levels. If a rating agency reduces or withdraws its rating on one or more classes of the Class A or Mezzanine Certificates, the liquidity and market value of the affected certificates is likely to be reduced.

RIGHTS OF THE NIMS INSURER MAY NEGATIVELY IMPACT THE CLASS A AND MEZZANINE CERTIFICATES

Pursuant to the terms of the Pooling and Servicing Agreement, unless there exists a continuance of any failure by the NIMS Insurer, if any, to make a required payment under the policy insuring the net interest margin securities (such event, a "NIMS Insurer Default"), the NIMS Insurer, if any, will be entitled to exercise, among others, the following rights of the holders of the Class A and Mezzanine Certificates, without the consent of such holders, and the holders of the Class A and Mezzanine Certificates may exercise such rights only with the prior written consent of the NIMS Insurer, if any: (i) the right to provide notices of Master Servicer defaults and the right to direct the Trustee to terminate the rights and obligations of the Master Servicer under the Pooling and Servicing Agreement in the event of a default by the Master Servicer; (ii) the right to remove the Trustee, the Trust Administrator or any co-trustee or custodian pursuant to the Pooling and Servicing Agreement; and (iii) the right to direct the Trustee or the Trust Administrator to make investigations and take actions pursuant to the Pooling and Servicing Agreement. In addition, unless a NIMS Insurer Default exists, such NIMS Insurer's consent will be required prior to, among other things, (i) the removal and replacement of the Master Servicer, any successor Master Servicer, the Trust Administrator or the Trustee, (ii) the appointment or termination of any subservicer or co-trustee or (iii) any amendment to the Pooling and Servicing Agreement.

INVESTORS IN THE CLASS A AND MEZZANINE CERTIFICATES SHOULD NOTE THAT:

o    any insurance policy issued by the NIMS Insurer, if any, will not cover, and will not benefit, in any manner whatsoever, the Class A or Mezzanine Certificates;

o    the rights to be granted to the NIMS Insurer, if any, are extensive;

o    the interests of the NIMS Insurer, if any, may be inconsistent with, and adverse to, the interests of the holders of the Class A and Mezzanine Certificates and the NIMS Insurer, if any, has no obligation or duty to consider the interests of the Class A and Mezzanine Certificates in connection with the exercise or non-exercise of such NIMS Insurer's rights;

o    such NIMS Insurer's, if any, exercise of the rights and consents set forth above may negatively affect the Class A and Mezzanine Certificates and the existence of such NIMS Insurer's, if any, rights, whether or not exercised,

S-21

WFB.000391

may adversely affect the liquidity of the Class A and Mezzanine Certificates relative to other asset-backed certificates backed by comparable mortgage loans and with comparable payment priorities and ratings; and

o        there may be more than one series of notes insured by the NIMS Insurer and the NIMS Insurer will have the rights set forth herein so long as any such series of notes remain outstanding.

ENVIRONMENTAL RISKS

        Federal, state and local laws and regulations impose a wide range of requirements on activities that may affect the environment, health and safety. In certain circumstances, these laws and regulations impose obligations on owners or operators of residential properties such as those that secure the mortgage loans. Failure to comply with these laws and regulations can result in fines and penalties that could be assessed against the Trust as owner of the related property.

        In some states, a lien on the property due to contamination has priority over the lien of an existing mortgage. Further, a mortgage lender may be held liable as an "owner" or "operator" for costs associated with the release of petroleum from an underground storage tank under certain circumstances. If the Trust is considered the owner or operator of a property, it may suffer losses as a result of any liability imposed for environmental hazards on the property.

TERRORIST ATTACKS AND MILITARY ACTION COULD ADVERSELY AFFECT THE YIELD ON YOUR CERTIFICATES

        The terrorist attacks in the United States on September 11, 2001 suggest that there is an increased likelihood of future terrorist activity in the United States. In addition, current political and military tensions in the Middle East have resulted in a significant deployment of United States military personnel in the region. Investors should consider the possible effects of past and possible future terrorist attacks and any resulting military response by the United States on the delinquency, default and prepayment experience of the Mortgage Loans. In accordance with the servicing standard set forth in the Pooling and Servicing Agreement, the Master Servicer may defer, reduce or forgive payments and delay foreclosure proceedings in respect of Mortgage Loans to borrowers affected in some way by such past and possible future events.

        In addition, the current deployment of United States military personnel in the Middle East and the activation of a substantial number of United States military reservists and members of the National Guard may significantly increase the proportion of Mortgage Loans whose mortgage rates are reduced by the application of the Relief Act and similar state laws. See "Legal Aspects of Mortgage Assets--Servicemembers Civil Relief Act" in the prospectus. Certain shortfalls in interest collections arising from the application of the Relief Act or any state law providing for similar relief will not be covered by the Master Servicer, any subservicer or any bond guaranty insurance policy.

LEGAL ACTIONS ARE PENDING AGAINST THE SELLER

        Because the nature of the sub-prime mortgage lending and servicing business involves the collection of numerous accounts, the validity of liens and compliance with state and federal lending laws, sub-prime lenders and servicers, including the Seller, are subject to numerous claims and legal actions (collectively, "Legal Actions") in the ordinary course of their businesses. These Legal Actions include lawsuits styled as class actions and alleging violations of various federal and state consumer protection laws. While it is impossible to estimate with certainty the ultimate legal and financial liability with respect to such Legal Actions, and an adverse judgment in one or more Legal Actions may have a significant adverse financial effect on the Seller, the Seller believes that the aggregate amount of liabilities arising from such Legal Actions will not result in monetary damages which will have a material adverse effect on the financial condition or results of the Seller.

        In the year 2000, three plaintiffs filed separate actions in California Superior Court against the Seller, including claims under California Code Sections 17200 and 17500, alleging that the Seller engaged in unfair business practices in connection with the origination of its mortgage loans. These cases were consolidated in 2001. The complaints sought damages for fraud, restitution and injunctive relief. The claims for fraud and damages were subsequently dismissed on the Seller's motion for summary judgment.

S-22

WFB.000392

In California Superior Court on the afternoon of March 7, 2003, the court certified a class including all persons (a) who had obtained a mortgage loan from the Seller in California during the period from October 1996 to the present or in any of 32 other states during the period from April 1998 to the present and (b) whose mortgage loan contains or contained certain terms that differ from those set forth in the Good Faith Estimate ("GFE") of costs and fees provided to the borrower pursuant to the Real Estate Settlement Procedures Act at the time of the loan application with respect to any of the following: (1) the GFE referred to a fixed rate mortgage loan and the borrower received an adjustable-rate mortgage loan; (2) the GFE contained a lower interest rate than the actual mortgage loan interest rate; (3) the GFE contained lower origination or discount fees than actual fees; (4) the GFE did not provide for any prepayment charges and the mortgage loan obtained contained provisions for prepayment charges; or (5) the mortgage loan obtained did not include monthly payments for property taxes and insurance, and the GFE did not disclose this fact. The Court gave no consideration to how a change in any of the GFE terms or the other loan terms during the loan negotiation process may have offset a change in any of the five GFE terms referenced above in the mortgage loan actually obtained. In August 2003, the California Court of Appeals modified the class as certified by the trial court by reducing the number of states involved from 33 to four, which states are Alabama, Arkansas, California and Texas.

The Mortgage Loans may not be rescinded as a result of this action, damages are not an available remedy and there is no assignee liability to subsequent holders of the Mortgage Loans. The only available remedies are injunctive relief and restitution. The Seller believes that it has meritorious defenses to the underlying claim, that class membership was determined improperly and that restitution for the type of violation alleged is inherently indeterminable, and intends to defend this action vigorously.

In a separate action, in June 2004, the Seller was named as a defendant and served with a class action complaint filed by Brian J. Borre and Joanne M. Borre, as plaintiffs, in the Circuit Court of Cook County Illinois. The complaint alleges that the Seller violated Section 4.1a of the Illinois Interest Act by charging more than 3 points on loans with an interest rate of 8% per annum or higher. The complaint also alleges that the Seller and defendant Nations Title Agency of Illinois, Inc. violated state law by improperly charging certain fees. The class is defined as all persons who are residents of Illinois who obtained loans from the Seller (which loans are still outstanding or were paid off within two years prior to the filing of this action) at an interest rate of 8% per annum or higher and were charged more than 3 points on such loans. The class has not been certified. The Seller believes that it has meritorious defenses to the underlying claim and intends to defend this action vigorously.

SUITABILITY OF THE CLASS A AND MEZZANINE CERTIFICATES AS INVESTMENTS

The Class A and Mezzanine Certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly payments or payment on any specific date. The Class A and Mezzanine Certificates are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

THE MORTGAGE POOL

The statistical information presented in this prospectus supplement relates to the pool of mortgage loans identified on the Collateral Selection Date (the "Collateral Selection Date Mortgage Loans"). The scheduled principal balance set forth herein for each such Collateral Selection Date Mortgage Loan is as specified in the amortization schedule at the Cut-off Date after application of all amounts allocable to unscheduled payments of principal received prior to the Collateral Selection Date. Percentages used herein are based on such Cut-off Date scheduled balances of the Collateral Selection Date Mortgage Loans. Prior to the issuance of the Certificates, up to 10% of the Collateral Selection Date Mortgage Loans will be removed from the mortgage pool as a result of incomplete documentation or otherwise and any Mortgage Loans that prepay or default will be removed. Other mortgage loans, together with the Additional Mortgage Loans, will be included in the mortgage pool prior to the issuance of the Certificates. However, the removal and inclusion of such mortgage loans will not materially alter the characteristics of the Mortgage Loans as described in this prospectus supplement, although the range of mortgage rates and maturities and certain other characteristics of the Mortgage Loans will vary.

WFB.000393

GENERAL

The mortgage loans delivered to the Trust on the Closing Date (the "Initial Mortgage Loans") will consist of conventional, one-to four- family, adjustable-rate and fixed-rate mortgage loans. The Depositor will purchase the Initial Mortgage Loans from the Seller pursuant to the Mortgage Loan Purchase Agreement, to be dated as of the date of this prospectus supplement (the "Mortgage Loan Purchase Agreement"), between the Seller and the Depositor. Pursuant to the Pooling and Servicing Agreement, to be dated as of the Cut-off Date (the "Pooling and Servicing Agreement"), among the Depositor, the Master Servicer, the Trustee and the Trust Administrator, the Depositor will cause the Initial Mortgage Loans to be assigned to the Trustee for the benefit of the certificateholders.

The Initial Mortgage Loans included in loan group I, loan group II and loan group III (exclusive of the Additional Mortgage Loans) are expected to have aggregate principal balances as of the Cut-off Date of approximately $2,162,733,102, $450,608,937 and $686,658,936, respectively.

Subsequent Group I Mortgage Loans (the "Subsequent Group I Mortgage Loans"), subsequent Group II Mortgage Loans (the "Subsequent Group II Mortgage Loans") and subsequent Group III Mortgage Loans (the "Subsequent Group III Mortgage Loans"; together with the Subsequent Group I Mortgage Loans and the Subsequent Group II Mortgage Loans, the "Subsequent Mortgage Loans") are intended to be purchased by the Trust from the Depositor from time to time on or before the 90th day following the Closing Date from funds on deposit in the Pre-Funding Accounts. The Subsequent Mortgage Loans, if available, will be purchased by the Depositor and sold by the Depositor to the Trust for deposit in the mortgage pool. The Pooling and Servicing Agreement will provide that each Mortgage Loan in the mortgage pool must conform to certain specified characteristics and following the conveyance of the Additional Mortgage Loans and the Subsequent Mortgage Loans, the mortgage pool must conform to certain specified characteristics, as described below under "--Conveyance of Additional Mortgage Loans and Subsequent Mortgage Loans and Pre-Funding Accounts."

The Mortgage Loans will be secured by mortgages or deeds of trust or other similar security instruments creating first liens and second liens on residential properties (the "Mortgaged Properties") consisting of attached, detached or semi-detached one-to four-family dwelling units, individual condominium units or individual units in planned unit developments and manufactured housing. The Mortgage Loans will have original terms to maturity of not greater than 30 years from the date on which the first payment was due on each Mortgage Loan. Approximately 1.14% of the Group I Collateral Selection Date Mortgage Loans, approximately 1.21% of the Group II Collateral Selection Date Mortgage Loans and approximately 1.62% of the Group III Collateral Selection Date Mortgage Loans are secured by second liens, in each case by aggregate scheduled principal balance of the related loan group as of the Cut-off Date.

Each adjustable-rate Mortgage Loan will accrue interest at the adjustable-rate calculated as specified under the terms of the related mortgage note and each fixed-rate Mortgage Loan will have a Mortgage Rate that is fixed for the life of such Mortgage (each such rate, a "Mortgage Rate").

Approximately 93.76% and 6.24% of the Collateral Selection Date Mortgage Loans, in each case, by aggregate scheduled principal balance as of the Cut-off Date, were originated or acquired by the Seller's wholesale lending affiliates, Argent Mortgage Company, LLC ("Argent") and Olympus Mortgage Company ("Olympus"), respectively.

Each adjustable-rate Mortgage Loan will accrue interest at a Mortgage Rate that is adjustable. The adjustable- rate Mortgage Loans will provide for semi-annual adjustment to the Mortgage Rate thereon and for corresponding adjustments to the monthly payment amount due thereon, in each case on each adjustment date applicable thereto (each such date, an "Adjustment Date"); provided, that the first adjustment for approximately 71.93% of the adjustable-rate Group I Collateral Selection Date Mortgage Loans, approximately 75.33% of the adjustable-rate Group II Collateral Selection Date Mortgage Loans and approximately 77.52% of the adjustable-rate Group III Collateral Selection Date Mortgage Loans will occur after an initial period of two years after origination, and the first adjustment for approximately 28.07% of the adjustable-rate Group I Collateral Selection Date Mortgage Loans, approximately 24.67% of the adjustable- rate Group II Collateral Selection Date Mortgage Loans and approximately 22.48% of the adjustable-rate Group III Collateral Selection Date Mortgage Loans will occur after an initial period of three years after origination. On each Adjustment Date for each adjustable-rate Mortgage Loan, the Mortgage Rate thereon will be adjusted (subject to

WFB.000394

rounding) to equal the sum of the applicable Index (as defined below) and a fixed percentage amount (the "Gross Margin"). The Mortgage Rate on each adjustable-rate Mortgage Loan will not decrease on the first related Adjustment Date, will not increase by more than 2.000% per annum on the first related Adjustment Date (the "Initial Periodic Rate Cap") and will not increase or decrease by more than 1.000% per annum on any Adjustment Date thereafter (the "Periodic Rate Cap"). Each Mortgage Rate on each adjustable-rate Mortgage Loan will not exceed a specified maximum Mortgage Rate over the life of such Mortgage Loan (the "Maximum Mortgage Rate") or be less than a specified minimum Mortgage Rate over the life of such Mortgage Loan (the "Minimum Mortgage Rate"). Effective with the first monthly payment due on each adjustable-rate Mortgage Loan after each related Adjustment Date, the monthly payment amount will be adjusted to an amount that will amortize fully the outstanding principal balance of the related Mortgage Loan over its remaining term, and pay interest at the Mortgage Rate as so adjusted. Due to the application of the Periodic Rate Caps and the Maximum Mortgage Rates, the Mortgage Rate on each such adjustable-rate Mortgage Loan, as adjusted on any related Adjustment Date, may be less than the sum of the Index and the related Gross Margin, rounded as described herein. None of the adjustable-rate Mortgage Loans permits the related mortgagor to convert the adjustable Mortgage Rate thereon to a fixed Mortgage Rate.

The Mortgage Loans will have scheduled monthly payments due on the first day of the month (with respect to each Mortgage Loan, a "Due Date"). Each Mortgage Loan will contain a customary "due-on-sale" clause which provides that (subject to state and federal restrictions) the Mortgage Loan must be repaid at the time of sale of the related mortgaged property or with the consent of the holder of the mortgage note assumed by a creditworthy purchaser of the related mortgaged property.

None of the Mortgage Loans will be buydown mortgage loans.

For purposes of calculating interest and principal distributions on the Class A Certificates, the Mortgage Loans will be divided into three loan groups, designated as the "Group I Mortgage Loans," the "Group II Mortgage Loans" and the "Group III Mortgage Loans." Each of the Group I Mortgage Loans and the Group II Mortgage Loans will consist of adjustable-rate and fixed-rate mortgage loans with principal balances at origination that conform to Freddie Mac and Fannie Mae loan limits and the Group III Mortgage Loans will consist of adjustable-rate and fixed-rate mortgage loans with principal balances at origination that may or may not conform to Freddie Mac or Fannie Mae loan limits.

Approximately 67.27% of the Group I Collateral Selection Date Mortgage Loans, approximately 71.62% of the Group II Collateral Selection Date Mortgage Loans and approximately 74.24% of the Group III Collateral Selection Date Mortgage Loans, in each case by aggregate scheduled principal balances of the related loan group as of the Cut-off Date, provide for payment by the mortgagor of a prepayment charge on certain principal prepayments, subject to certain limitations in the related mortgage note and limitations upon collection in the Pooling and Servicing Agreement. Generally, each such Mortgage Loan provides for payment of a prepayment charge on certain prepayments made within a defined period set forth in the related Mortgage Note (generally within the first three years but possibly as short as one year from the date of origination of such Mortgage Loan). The amount of the prepayment charge is as provided in the related Mortgage Note. The holders of the Class P Certificates will be entitled to all prepayment charges received on the Mortgage Loans in each loan group, and such amounts will not be available for distribution on the other classes of Certificates. Under certain instances, as described under the terms of the Pooling and Servicing Agreement, the Master Servicer may waive the payment of any otherwise applicable prepayment charge. Investors should conduct their own analysis of the effect, if any, that the prepayment charges, and decisions by the Master Servicer with respect to the waiver thereof, may have on the prepayment performance of the Mortgage Loans. The Depositor makes no representation as to the effect that the prepayment charges, and decisions by the Master Servicer with respect to the waiver thereof, may have on the prepayment performance of the Mortgage Loans. As of July 1, 2003, the Alternative Mortgage Parity Act of 1982 (the "Parity Act"), which regulates the ability of the Originators to impose prepayment charges, was amended, and as a result, the Originators will be required to comply with state and local laws in originating mortgage loans with prepayment charge provisions with respect to loans originated on or after July 1, 2003. The Depositor makes no representations as to the effect that the prepayment charges, decisions by the Master Servicer with respect to the waiver thereof and the recent amendment of the Parity Act, may have on the prepayment performance of the Mortgage Loans. However, the ruling of the Office of Thrift Supervision (the "OTS") does not retroactively affect loans originated before July 1, 2003. See "Legal Aspects of Mortgage Assets—Enforceability of Certain Provisions—Prepayment Charges" in the prospectus.

WFB.000395

MORTGAGE LOAN STATISTICS

The Group I Collateral Selection Date Mortgage Loans consist of 13,957 adjustable-rate and fixed-rate Mortgage Loans having an aggregate principal balance as of the Cut-off Date of approximately $2,162,733,102, after application of scheduled payments due on or before the Cut-off Date whether or not received and application of all unscheduled payments of principal received prior to the Collateral Selection Date, and subject to a permitted variance of plus or minus 5%. None of the Group I Collateral Selection Date Mortgage Loans had a first Due Date prior to April 2004 or after December 2004, or will have a remaining term to stated maturity of less than 173 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any Group I Collateral Selection Date Mortgage Loan is November 2034. The Group I Collateral Selection Date Mortgage Loans are expected to have the characteristics set forth in Annex III of this prospectus supplement as of the Cut-off Date (the sum in any column may not equal the total indicated due to rounding).

The Group II Collateral Selection Date Mortgage Loans consist of 3,457 adjustable-rate and fixed-rate Mortgage Loans having an aggregate principal balance as of the Cut-off Date of approximately $450,608,937, after application of scheduled payments due on or before the Cut-off Date whether or not received and application of all unscheduled payments of principal received prior to the Collateral Selection Date, and subject to a permitted variance of plus or minus 5%. None of the Group II Collateral Selection Date Mortgage Loans had a first Due Date prior to May 2004 or after December 2004, or will have a remaining term to stated maturity of less than 177 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any Group II Collateral Selection Date Mortgage Loan is November 2034. The Group II Collateral Selection Date Mortgage Loans are expected to have the characteristics set forth in Annex III of this prospectus supplement as of the Cut-off Date (the sum in any column may not equal the total indicated due to rounding).

The Group III Collateral Selection Date Mortgage Loans consist of 1,741 adjustable-rate and fixed-rate Mortgage Loans having an aggregate principal balance as of the Cut-off Date of approximately $686,658,936, after application of scheduled payments due on or before the Cut-off Date whether or not received and application of all unscheduled payments of principal received prior to the Collateral Selection Date, and subject to a permitted variance of plus or minus 5%. None of the Group III Collateral Selection Date Mortgage Loans had a first Due Date prior to April 2004 or after November 2004, or will have a remaining term to stated maturity of less than 179 months or greater than 359 months as of the Cut-off Date. The latest maturity date of any Group III Collateral Selection Date Mortgage Loan is October 2034. The Group III Collateral Selection Date Mortgage Loans are expected to have the characteristics set forth in Annex III of this prospectus supplement as of the Cut-off Date (the sum in any column may not equal the total indicated due to rounding).

The Depositor believes that the information set forth in this prospectus supplement and in Annex III with respect to the Collateral Selection Date Mortgage Loans will be representative of the characteristics of the mortgage pool as it will be constituted at the time the Certificates are issued, although the range of mortgage rates and maturities and certain other characteristics of the Mortgage Loans will vary.

Unless otherwise noted, all statistical percentages or weighted averages set forth in this prospectus supplement are measured as a percentage of the aggregate scheduled principal balance of the Collateral Selection Date Mortgage Loans in the related loan group as of the Cut-off Date.

CONVEYANCE OF ADDITIONAL MORTGAGE LOANS AND SUBSEQUENT MORTGAGE LOANS AND THE PRE-FUNDING ACCOUNTS

The Additional Mortgage Loans originated prior to the Closing Date will be included in the assets of the Trust on the Closing Date. The Additional Mortgage Loans in loan group I will have an aggregate principal balance as of the Cut-off Date of approximately $98,195,937, the Additional Mortgage Loans in loan group II will have an aggregate principal balance as of the Cut-off Date of approximately $20,681,926 and the Additional Mortgage Loans in loan group III will have an aggregate principal balance as of the Cut-off Date of approximately $31,122,137. In addition to the Additional Mortgage Loans, under and to the extent provided in the Pooling and Servicing Agreement, following the initial issuance of the Certificates, the Trust will be obligated to purchase from the Depositor during the Funding Period (as defined herein), subject to the availability thereof, the Subsequent Mortgage Loans. Each Subsequent Mortgage

WFB.000396

Loan is required to have been underwritten in accordance with the criteria set forth under "--Underwriting Standards of the Originators" herein. The Subsequent Mortgage Loans will be transferred to the Trust pursuant to subsequent transfer instruments (the "Subsequent Transfer Instruments") between the Depositor and the Trust. In connection with the purchase of Subsequent Mortgage Loans on such dates of transfer (the "Subsequent Transfer Dates"), the Trust will be required to pay to the Depositor from amounts on deposit in the Group I Pre-Funding Account, the Group II Pre- Funding Account or the Group III Pre-Funding Account, as applicable, a cash purchase price of 100% of the principal balance thereof. The Depositor will designate the later of the first day of the month in which the related Subsequent Transfer Date occurs and the origination date of such mortgage loan as the Cut-off Date with respect to the related Subsequent Mortgage Loans (each a "Subsequent Cut-off Date"). The amount paid from the Group I Pre-Funding Account, the Group II Pre-Funding Account or the Group III Pre-Funding Account, as applicable, on each Subsequent Transfer Date will not include accrued interest on the related Subsequent Mortgage Loans. Following each Subsequent Transfer Date, the aggregate principal balance of the Group I Mortgage Loans, the Group II Mortgage Loans or the Group III Mortgage Loans, as applicable, will increase by an amount equal to the aggregate principal balance of the related Subsequent Mortgage Loans so purchased, and the amount in the Group I Pre-Funding Account, the Group II Pre-Funding Account or the Group III Pre-Funding Account, as applicable, will decrease accordingly. The "Funding Period" is the period from the Closing Date until the earlier of (i) the date on which the amounts on deposit in the Pre- Funding Accounts are reduced to zero and (ii) the 90th day following the Closing Date.

A segregated trust account (the "Group I Pre-Funding Account") will be established by the Trust Administrator on behalf of the Trustee and funded on the Closing Date by the Depositor with approximately $557,239,915 (the "Original Group I Pre-Funded Amount"), subject to a permitted variance equal to the aggregate principal balance of any of the Initial Group I Mortgage Loans which are added or removed from the Trust within the permitted variance as described herein under "The Mortgage Pool," to provide the Trust with sufficient funds to purchase Subsequent Group I Mortgage Loans. The Original Group I Pre-Funded Amount will be reduced during the Funding Period by the amount used to purchase Subsequent Group I Mortgage Loans for the mortgage pool in accordance with the Pooling and Servicing Agreement.

A segregated trust account (the "Group II Pre-Funding Account") will be established by the Trust Administrator on behalf of the Trustee and funded on the Closing Date by the Depositor with approximately $115,843,591 (the "Original Group II Pre-Funded Amount"), subject to a permitted variance equal to the aggregate principal balance of any of the Initial Group II Mortgage Loans which are added or removed from the Trust within the permitted variance as described herein under "The Mortgage Pool," to provide the Trust with sufficient funds to purchase Subsequent Group II Mortgage Loans. The Original Group II Pre-Funded Amount will be reduced during the Funding Period by the amount used to purchase Subsequent Group II Mortgage Loans for the mortgage pool in accordance with the Pooling and Servicing Agreement.

A segregated trust account (the "Group III Pre-Funding Account") will be established by the Trust Administrator on behalf of the Trustee and funded on the Closing Date by the Depositor with approximately $176,916,493 (the "Original Group III Pre-Funded Amount"; and together with the Original Group I Pre-Funded Amount and the Original Group II Pre-Funded Amount, the "Original Pre-Funded Amounts"), subject to a permitted variance equal to the aggregate principal balance of any of the Initial Group III Mortgage Loans which are added or removed from the Trust within the permitted variance as described herein under "The Mortgage Pool," to provide the Trust with sufficient funds to purchase Subsequent Group III Mortgage Loans. The Original Group III Pre-Funded Amount will be reduced during the Funding Period by the amount used to purchase Subsequent Group III Mortgage Loans for the mortgage pool in accordance with the Pooling and Servicing Agreement.

The Original Pre-Funded Amounts in the aggregate will not exceed 25% of the aggregate initial Certificate Principal Balance of the Offered Certificates.

S-27

WFB.000397

Any conveyance of Additional Mortgage Loans on the Closing Date and Subsequent Mortgage Loans on a Subsequent Transfer Date is subject to certain conditions including, but not limited to:

(a) each such Mortgage Loan must satisfy the representations and warranties specified in the Mortgage Loan Purchase Agreement (in the case of any Additional Mortgage Loan), the related Subsequent Transfer Instrument (in the case of any Subsequent Mortgage Loan) and the Pooling and Servicing Agreement;

(b) the Depositor will not select such Mortgage Loans in a manner that it believes to be adverse to the interests of the certificateholders;

(c) the Depositor will deliver certain opinions of counsel with respect to the validity of the conveyance of such Mortgage Loans;

(d) the NIMS Insurer, if any, must consent to such conveyance; and

(e) as of the Cut-off Date or the related Subsequent Cut-off Date, as applicable, each Mortgage Loan will satisfy the following criteria:

(i) the Mortgage Loan may not be 30 or more days delinquent as of the Cut-off Date or related Subsequent Cut-off Date, as applicable; provided, however that the Additional Mortgage Loans and the Subsequent Mortgage Loans may have a first payment date occurring on or after the Cut-off Date or the related Subsequent Cut-off Date and, therefore, such Mortgage Loans could not have been delinquent as of the Cut-off Date or the related Subsequent Cut-off Date, as applicable;

(ii) the remaining term to stated maturity of the Mortgage Loan will not be less than 173 months and will not exceed 360 months from its first payment date;

(iii) the Mortgage Loan will not provide for negative amortization;

(iv) the Mortgage Loan will not have a loan-to-value ratio or combined loan-to-value ratio greater than 100.00%;

(v) the Mortgage Loans will have, as of the Cut-off Date or the related Subsequent Cut-off Date, as applicable, a weighted average age since origination not in excess of 5 months;

(vi) no Mortgage Loan will have a Mortgage Rate less than 5.350% or greater than 12.800%;

(vii) the Mortgage Loan will have a first payment date occurring on or before March 2005;

(viii) the Mortgage Loan will have a principal balance no greater than $749,560

(ix) the Mortgage Loan will have been underwritten in accordance with the criteria set forth under "--Underwriting Standards of the Originators" herein.

Following the purchase of any Subsequent Group I Mortgage Loan by the Trust, the Group I Mortgage Loans (including the Subsequent Group I Mortgage Loans) will as of the related Subsequent Cut-off Date: (i) have a weighted average original term to stated maturity of not more than 358 months from the first payment date thereon; (ii) have a weighted average Mortgage Rate of not less than 7.478% and not more than 7.551%; (iii) have a weighted average loan-to-value ratio of not more than 82.81%, (iv) have no Mortgage Loan with a principal balance in excess of $639,421; (v) will consist of Mortgage Loans with prepayment charges representing no less than approximately 67.27% of the Group I Mortgage Loans, (vi) with respect to the adjustable-rate Group I Mortgage Loans, have a weighted average Gross Margin of not less than 5.917%, (vii) have a weighted average FICO score of not less than 608 and (viii) will have no more than 14.76% of the Group I Mortgage Loans with a FICO score of less than 540, in each case measured by aggregate principal balance of the Group I Mortgage Loans as of the related Cut-off Date applicable to each Mortgage Loan. For

WFB.000398

purposes of the calculations described in this paragraph, percentages of the Group I Mortgage Loans will be based on the principal balance of the Initial Mortgage Loans in loan group I as of the Cut-off Date and the principal balance of the Subsequent Group I Mortgage Loans as of the related Subsequent Cut-off Date.

Following the purchase of any Subsequent Group II Mortgage Loan by the Trust, the Group II Mortgage Loans (including the Subsequent Group II Mortgage Loans) will as of the related Subsequent Cut-off Date: (i) have a weighted average original term to stated maturity of not more than 357 months from the first payment date thereon; (ii) have a weighted average Mortgage Rate of not less than 7.500% and not more than 7.573%; (iii) have a weighted average loan-to-value ratio of not more than 82.69%, (iv) have no Mortgage Loan with a principal balance in excess of $499,547; (v) will consist of Mortgage Loans with prepayment charges representing no less than approximately 71.62% of the Group II Mortgage Loans, (vi) with respect to the adjustable-rate Group II Mortgage Loans, have a weighted average Gross Margin of not less than 5.934%, (vii) have a weighted average FICO score of not less than 605 and (viii) will have no more than 16.94% of the Group II Mortgage Loans with a FICO score of less than 540, in each case measured by aggregate principal balance of the Group II Mortgage Loans as of the related Cut-off Date applicable to each Mortgage Loan. For purposes of the calculations described in this paragraph, percentages of the Group II Mortgage Loans will be based on the principal balance of the Initial Mortgage Loans in loan Group II as of the Cut-off Date and the principal balance of the Subsequent Group II Mortgage Loans as of the related Subsequent Cut-off Date.

Following the purchase of any Subsequent Group III Mortgage Loan by the Trust, the Group III Mortgage Loans (including the Subsequent Group III Mortgage Loans) will as of the related Subsequent Cut-off Date: (i) have a weighted average original term to stated maturity of not more than 359 months from the first payment date thereon; (ii) have a weighted average Mortgage Rate of not less than 7.096% and not more than 7.169%; (iii) have a weighted average loan-to-value ratio of not more than 83.48%, (iv) have no Mortgage Loan with a principal balance in excess of $749,560; (v) will consist of Mortgage Loans with prepayment charges representing no less than approximately 74.24% of the Group III Mortgage Loans, (vi) with respect to the adjustable-rate Group III Mortgage Loans, have a weighted average Gross Margin of not less than 5.920%, (vii) have a weighted average FICO score of not less than 618 and (viii) will have no more than 10.24% of the Group III Mortgage Loans with a FICO score of less than 540, in each case measured by aggregate principal balance of the Group III Mortgage Loans as of the related Cut-off Date applicable to each Mortgage Loan. For purposes of the calculations described in this paragraph, percentages of the Group III Mortgage Loans will be based on the principal balance of the Initial Mortgage Loans in loan Group III as of the Cut-off Date and the principal balance of the Subsequent Group III Mortgage Loans as of the related Subsequent Cut-off Date.

Notwithstanding the foregoing, any Subsequent Mortgage Loan may be rejected by the NIMS Insurer, if any, or by Fitch, Moody's or S&P, if the inclusion of such Subsequent Mortgage Loan would adversely affect the ratings on any class of Class A or Mezzanine Certificates.

FICO SCORES

"FICO Scores" are statistical credit scores obtained by many mortgage lenders in connection with the loan application to help assess a borrower's creditworthiness. FICO Scores are generated by models developed by a third party and are made available to lenders through three national credit bureaus. The models were derived by analyzing data on consumers in order to establish patterns which are believed to be indicative of the borrower's probability of default. The FICO Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit, and bankruptcy experience. FICO Scores range from approximately 250 to approximately 900, with higher scores indicating an individual with a more favorable credit history compared to an individual with a lower score. However, a FICO Score purports only to be a measurement of the relative degree of risk a borrower represents to a lender, i.e., that a borrower with a higher score is statistically expected to be less likely to default in payment than a borrower with a lower score. In addition, it should be noted that FICO Scores were developed to indicate a level of default probability over a two-year period which does not correspond to the life of a mortgage loan. Furthermore, FICO Scores were not developed specifically for use in connection with mortgage loans, but for consumer loans in general. Therefore, a FICO Score does not take into consideration the effect of mortgage loan characteristics on the probability of repayment by the borrower. The FICO Scores set forth in the tables in Annex III to this prospectus supplement were obtained at the time of origination of the Collateral Selection Date Mortgage Loans. None of the Seller, the Originators, the Master Servicer, the Trustee, the Trust

WFB.000399

Administrator, the Underwriters or the Depositor makes any representations or warranties as to the actual performance of any Mortgage Loan or that a particular FICO Score should be relied upon as a basis for an expectation that the borrower will repay the Mortgage Loan according to its terms.

THE INDEX

The Index for each adjustable-rate Mortgage Loan will be set forth in the related Mortgage Note. The "Index" is the average of interbank offered rates for six-month U.S. dollar deposits in the London market based on quotations of major banks, and most recently available as of a day specified in the related mortgage note as published in the Western Edition of THE WALL STREET JOURNAL ("Six-Month LIBOR"). If the Index becomes unpublished or is otherwise unavailable, the Master Servicer will select an alternative index which is based upon comparable information.

UNDERWRITING STANDARDS OF THE ORIGINATORS

The Originators provided the information in the following paragraphs. None of the Depositor, the Trustee, the Trust Administrator, the Underwriters, the Master Servicer, the Certificate Insurer or any of their respective affiliates has made or will make any representations as to the accuracy or completeness of such information. The following is a description of the underwriting standards used by the Originators in connection with their origination of the Mortgage Loans.

All of the Mortgage Loans were originated by the Originators generally in accordance with the underwriting criteria described below.

The Mortgage Loans were originated generally in accordance with guidelines (the "Underwriting Guidelines") established by the Originators with one of the following income documentation types: "Full Documentation," "Limited Documentation" or "Stated Income." The Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral. On a case-by-case basis, the Originators may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the Risk Categories described below, warrants an exception to the requirements set forth in the Underwriting Guidelines. Compensating factors may include, but are not limited to, loan-to-value ratio, debt-to-income ratio, good credit history, stable employment history, length at current employment and time in residence at the applicant's current address. It is expected that a substantial number of the Mortgage Loans to be included in the mortgage pool will represent such underwriting exceptions.

The Underwriting Guidelines are less stringent than the standards generally acceptable to Fannie Mae and Freddie Mac with regard to: (1) the applicant's credit standing and repayment ability and (2) the property offered as collateral. Applicants who qualify under the Underwriting Guidelines generally have payment histories and debt ratios which would not satisfy Fannie Mae and Freddie Mac underwriting guidelines and may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. The Underwriting Guidelines establish the maximum permitted loan-to-value ratio for each loan type based upon these and other risk factors.

All of the Mortgage Loans originated by the Originators are based on loan application packages submitted directly or indirectly by a loan applicant to the Originators. Each loan application package has an application completed by the applicant that includes information with respect to the applicant's liabilities, income, credit history and employment history, as well as certain other personal information. The Originators also obtain (or the broker submits) a credit report on each applicant from a credit reporting company. The credit report typically contains the reported information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and reported records of default, bankruptcy, repossession and judgments. If applicable, the loan application package must also generally include a letter from the applicant explaining all late payments on mortgage debt and, generally, consumer (i.e. non-mortgage) debt.

During the underwriting process, each Originator reviews and verifies the loan applicant's sources of income (except under the Stated Income and Limited Documentation types, under which programs such information may not be independently verified), calculates the amount of income from all such sources indicated on the loan application, reviews

WFB.000400

the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and reviews the mortgaged property for compliance with the Underwriting Guidelines. The Underwriting Guidelines are applied in accordance with a procedure which complies with applicable federal and state laws and regulations and requires (i) an appraisal of the mortgaged property which conforms to the Uniform Standards of Professional Appraisal Practice and are generally on forms similar to those acceptable to Fannie Mae and Freddie Mac and (ii) a review of such appraisal, which review may be conducted by a representative of the Originators or a fee appraiser and may include a desk review of the original appraisal or a drive-by review appraisal of the mortgaged property. The Underwriting Guidelines permit loans with combined loan-to-value ratios at origination of up to 100%, subject to certain Risk Category limitations (as further described in that section). The maximum allowable loan-to-value ratio varies based upon the income documentation, property type, creditworthiness, debt service-to-income ratio of the applicant and the overall risks associated with the loan decision.

A.     INCOME DOCUMENTATION TYPES

FULL DOCUMENTATION. The Full Documentation residential loan program is generally based upon current year to date income documentation as well as the previous year's income documentation (i.e., tax returns and/or W-2 forms) or bank statements for the previous 24 months. The documentation required is specific to the applicant's sources of income. The applicant's employment and/or business licenses are generally verified.

LIMITED DOCUMENTATION. The Limited Documentation residential loan program is generally based on bank statements from the past twelve months supported by additional documentation provided by the applicant or current year to date documentation. The applicant's employment and/or business licenses are generally verified.

STATED INCOME. The Stated Income residential loan program requires the applicant's employment and income sources to be stated on the application. The applicant's income as stated must be reasonable for the related occupation in the loan underwriter's discretion. However, the applicant's income as stated on the application is not independently verified.

B.     PROPERTY REQUIREMENTS

Properties that are to secure mortgage loans have a valuation obtained by either: (1) an appraisal performed by a qualified and licensed appraiser who is a staff appraiser or an independent appraiser who is in good standing with the related Originator's in-house appraisal department or (2) subject to the related Originator's Underwriting Guidelines, an insured automated valuation model. Generally, properties below average standards in condition and repair are not acceptable as security for mortgage loans under the Underwriting Guidelines. Each appraisal includes a market data analysis based on recent sales of comparable homes in the area and, where deemed appropriate, replacement cost analysis based on the current cost of constructing a similar home. Every independent appraisal is reviewed by a representative of the applicable Originator or a fee appraiser before the mortgage loan is funded. The Originators require that all mortgage loans have title insurance. The Originators also require that fire and extended coverage casualty insurance be maintained on the property in an amount equal to the lesser of the principal balance of the mortgage loan or the replacement cost of the property.

Any dwelling unit built on a permanent chassis (including mobile homes) and attached to a permanent foundation system is a "manufactured home" for purposes of the related Originator's guidelines. Any of the following factors would make a manufactured home ineligible under the related Originator's guidelines: manufactured homes located in a mobile home park or on leasehold land; manufactured homes built prior to 1977; manufactured homes with additions; manufactured homes not classified as real property; manufactured homes that have a foundation not acceptable to HUD standards; single wide mobile homes; and manufactured homes located in the following states: Delaware, the District of Columbia, Hawaii, Iowa, Maryland, New Jersey, New York, North Dakota, Oklahoma, Pennsylvania, Rhode Island and Texas. Other factory-built housing, such as modular, prefabricated, panelized, or sectional housing is not considered a "manufactured home" under the related Originator's guidelines.

S-31

WFB.000401

C.    RISK CATEGORIES

Under the Underwriting Guidelines, various Risk Categories are used to grade the likelihood that the mortgagor will satisfy the repayment conditions of the mortgage loan. These Risk Categories establish the maximum permitted loan-to-value ratio and loan amount, given the occupancy status of the mortgaged property and the mortgagor's credit history and debt ratio. In general, higher credit risk mortgage loans are graded in Risk Categories which permit higher debt ratios and more (or more recent) major derogatory credit items such as outstanding judgments or prior bankruptcies; however, the Underwriting Guidelines establish lower maximum loan-to-value ratios and lower maximum loan amounts for loans graded in such Risk Categories.

The Underwriting Guidelines have the following Risk Categories and criteria for grading the potential likelihood that an applicant will satisfy the repayment obligations of a mortgage loan:

RISK CATEGORIES - ARGENT MORTGAGE COMPANY, LLC*

| | I | II | III | IV | V | VI |
|---|---|---|---|---|---|---|
| Mortgage History (Last 12 Months) | no lates | 1 x 30 | 3 x 30 | 1 x 60 | 1 x 90 | > 1 x 90 |
| Bankruptcy or Foreclosure | none in last 36 months | none in last 36 months | none in last 24 months | none in last 12 months | not currently in | current(1) |
| FICO Score | | | | Maximum LTV(2) | | |
| 680 | 100%(5) | 95% | 95% | 90% | 80% | 75% |
| 650 | 100%(5) | 95% | 95% | 90% | 80% | 70% |
| 620 | 100%(5) | 95% | 95% | 90% | 80% | 70% |
| 600 | 100%(5) | 95% | 95% | 90% | 80% | 70% |
| 580 | 95% | 95% | 95% | 90% | 75% | 70% |
| 550 | 90% | 90% | 90% | 90% | 75% | 70% |
| 525 | 85% | 85% | 85% | 80% | 75% | 70% |
| 500 | 80% | 80% | 80% | 80% | 75% | 70% |
| Maximum Debt Ratio(3) | 50% | 50% | 50% | 50% | 50% | 55% |
| Other Credit(4) | max $2,500 open major derogatory credit | max $2,500 open major derogatory credit | max $2,500 open major derogatory credit | max $5,000 open major derogatory credit | | |

(1)  Maximum LTV for applicants currently in bankruptcy or foreclosure is 60%.
(2)  The maximum LTV referenced is for mortgagors providing Full Documentation. The LTV may be reduced up to 5% for each of the following characteristics: non-owner occupancy and second homes. LTV may be reduced up to 10% for each of the following characteristics: Stated Income documentation, three-to-four unit properties, manufactured homes and rural locations.
(3)  Debt ratios may be increased if the LTV ratio is decreased. LTV equal to or less than 75% may have a 55% debt ratio. LTV equal to or less than 95% may have a 50% debt ratio.
(4)  Open major derogatory credit may be increased if the LTV ratio is decreased. LTV equal to or less than 95% may have up to $2,500 open major derogatory credit. LTV equal to or less than 90% may have greater than $5,000 open derogatory credit.
(5)  LTV if originated under the Advantage Matrix Program (allows qualified applicants the ability to borrow up to 100% LTV on a first- lien) or CLTV if originated under the Combo Advantage Program (first lien and second lien mortgage loan closed simultaneously to allow applicants to borrow up to 100% combined CLTV).
*    Jumbo loans (over $500,000-$750,000) are only available for mortgagors providing Full Documentation. In addition, the underwriting guidelines provide for lower maximum debt ratios and LTVs, no bankruptcies in the last 24 months, and mortgaged properties that are owner occupied. Rural properties, manufactured homes and two -to-four unit properties are excluded.

WFB.000402

RISK CATEGORIES - OLYMPUS MORTGAGE COMPANY*

| Credit Risk | LTV (1) (2) | Maximum Loan Amount (1) | LTV (1) (2) | Minimum Credit Score (FICO)(1) | Mortgage History (Last 12 Months) | Bankruptcy or Foreclosure |
|---|---|---|---|---|---|---|
| A+ | 100%(3) | $500,000 | 100%(3) | 650 | 0 x 30 | none in the last 36 months |
| | | | 95% | 580 | | |
| | | | 90% | 550 | | |
| | | | 85% | 525 | | |
| | | | 80% | 500 | | |
| A | 95% | $500,000 | 95% | 580 | 1 x 30 | none in the last 24 months |
| | | | 90% | 550 | | |
| | | | 80% | 500 | | |
| A- | 95% | $500,000 | 95% | 600 | 3 x 30 | none in the last 24 months |
| | | | 90% | 550 | | |
| | | | 80% | 500 | | |
| B | 90% | $500,000 | 90% | 550 | 1 x 60 | none in the last 18 months |
| | | | 80% | 500 | | |
| C | 80% | $500,000 | 80% | 550 | 1 x 90 | not currently in |
| | | | 75% | 500 | | |
| C- | 70% | $400,000 | 70% | 500 | >1 x 90 | current |

(1) The maximum LTVs, maximum loan amounts and minimum credit scores referenced are for mortgagors providing Full Documentation.
(2) Each LTV assumes that the mortgaged property is a single family residence, a condominium, a one- to two- unit property or a unit in a planned unit development. With respect to each Credit Risk (other than C-), the LTV may be reduced up to 5% for a three- to four- unit property and non-owner occupied properties. With respect to each Credit Risk (other than C-), the LTV may be reduced up to 10% for a manufactured home.
(3) 100% LTV if originated as a single mortgage loan or 100% CLTV if originated with a first lien and second lien mortgage loan which closed simultaneously.
* For jumbo loans (over $500,000-$750,000): the underwriting guidelines provide for lower LTVs, up to one late payment in the last 12 months, no bankruptcies in the last 36 months, a FICO score of at least 600 and mortgaged properties that consist of single family residences, condominium units and townhouses that are owner-occupied primary residences.

## YIELD ON THE CERTIFICATES

CERTAIN SHORTFALLS IN COLLECTIONS OF INTEREST

When a principal prepayment in full is made on a Mortgage Loan, the mortgagor is charged interest only for the period from the Due Date of the preceding monthly payment up to (but not including) the date of such prepayment, instead of for a full month. When a partial principal prepayment is made on a Mortgage Loan, the mortgagor is not charged interest on the amount of such prepayment for the month in which such prepayment is made. With respect to any Determination Date and each Mortgage Loan as to which a principal prepayment in full was applied during the portion of the related Prepayment Period occurring in the month preceding the month of such Determination Date, the "Prepayment Interest Shortfall" is an amount equal to the interest at the applicable Mortgage Rate (net of the Servicing Fee) on the amount of such principal prepayment for the number of days from the day after the last date on which interest was due from the related mortgagor through the last day of such preceding calendar month. In addition, the application of the Relief Act to any Mortgage Loan will adversely affect, for an indeterminate period of time, the ability of the Master Servicer to collect full amounts of interest on such Mortgage Loan. See "Legal Aspects of Mortgage Assets--Servicemembers Civil Relief Act" in the prospectus.

The Master Servicer is obligated to pay from its own funds Prepayment Interest Shortfalls, but only up to an amount equal to the product of (x) 0.50% and (y) the principal balance of the Mortgage Loans as of the first day of the related Due Period. See "Pooling and Servicing Agreement--Servicing and Other Compensation and Payment of Expenses" herein. Accordingly, the effect of (i) any Prepayment Interest Shortfall that exceeds any payments made by the Master Servicer from its own funds in respect thereof or (ii) any shortfalls resulting from the application of the Relief Act, will be to reduce the aggregate amount of interest collected that is available for distribution to certificateholders.

WFB.000403

S-33

WFB.000404

Any such shortfalls will be allocated among the Certificates as provided under "Description of the Certificates--Interest Distributions" and "--Overcollateralization Provisions" herein. If these shortfalls are allocated to the Class A and Mezzanine Certificates the amount of interest distributed to those Certificates will be reduced, adversely affecting the yield on your investment. The holders of the Class A and Mezzanine Certificates will not be entitled to reimbursement for any such interest shortfalls.

GENERAL PREPAYMENT AND DEFAULT CONSIDERATIONS

    The yield to maturity on the Class A and Mezzanine Certificates will be sensitive to defaults on the Mortgage Loans. If a purchaser of a Class A or Mezzanine Certificate calculates its anticipated yield based on an assumed rate of default and amount of losses that is lower than the default rate and amount of losses actually incurred, its actual yield to maturity may be lower than that so calculated. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. There can be no assurance as to the delinquency, foreclosure or loss experience with respect to the Mortgage Loans. Because the Mortgage Loans were underwritten in accordance with standards less stringent than those generally acceptable to Fannie Mae and Freddie Mac with regard to a borrower's credit standing and repayment ability, the risk of delinquencies with respect to, and losses on, the Mortgage Loans will be greater than that of mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac standards.

    The rate of principal distributions on the Class A and Mezzanine Certificates, the aggregate amount of distributions on the Class A and Mezzanine Certificates and the yield to maturity on the Class A and Mezzanine Certificates will be related to the rate and timing of payments of principal on the applicable Mortgage Loans and the amount, if any, distributed from the Pre-Funding Accounts at the end of the Funding Period. The rate of principal payments on the adjustable-rate Mortgage Loans will in turn be affected by the amortization schedules for such Mortgage Loans as they change from time to time to accommodate changes in the Mortgage Rates and by the rate of principal prepayments thereon (including for this purpose, payments resulting from refinancings, liquidations of the Mortgage Loans due to defaults, casualties, condemnations and repurchases, whether optional or required, by the Depositor, the Seller or the Master Servicer, as the case may be). The Mortgage Loans generally may be prepaid by the mortgagors at any time; however, a mortgagor principal prepayment may subject that mortgagor to a prepayment charge as described under "The Mortgage Pool--General" herein.

    Prepayments, liquidations and repurchases of the Mortgage Loans will result in distributions in respect of principal to the holders of the class or classes of Class A and Mezzanine Certificates then entitled to receive such distributions that otherwise would be distributed over the remaining terms of the Mortgage Loans. See "Yield and Maturity Considerations" in the prospectus. Since the rates of payment of principal on the Mortgage Loans will depend on future events and a variety of factors (as described more fully herein and in the prospectus under "Yield and Maturity Considerations"), no assurance can be given as to the rate of principal prepayments on the Mortgage Loans. The extent to which the yield to maturity on any class of Class A or Mezzanine Certificates may vary from the anticipated yield will depend upon the degree to which such Certificates are purchased at a discount or premium and the degree to which the timing of distributions thereon is sensitive to prepayments on the Mortgage Loans. Further, an investor should consider, in the case of any Class A or Mezzanine Certificate purchased at a discount, the risk that a slower than anticipated rate of principal payments on the Mortgage Loans could result in an actual yield to such investor that is lower than the anticipated yield and, in the case of any Class A or Mezzanine Certificate purchased at a premium, the risk that a faster than anticipated rate of principal payments could result in an actual yield to such investor that is lower than the anticipated yield.

    The rate of payments (including prepayments) on pools of mortgage loans is influenced by a variety of economic, geographic, social and other factors, including changes in mortgagors' housing needs, job transfers, unemployment, mortgagors' net equity in the mortgaged properties and servicing decisions. If prevailing mortgage rates fall significantly below the Mortgage Rates on the Mortgage Loans, the rate of prepayment (and refinancing) would be expected to increase. Conversely, if prevailing mortgage rates rise significantly above the Mortgage Rates on the Mortgage Loans, the rate of prepayment on the Mortgage Loans would be expected to decrease. The adjustable-rate Mortgage Loans may be subject to greater rates of prepayment as they approach their initial Adjustment Dates even if market interest rates are only slightly higher or lower than their Mortgage Rates as borrowers seek to avoid changes in their monthly payments. In addition, the existence of the applicable Periodic Rate Cap, Maximum Mortgage Rate and

WFB.000405

Minimum Mortgage Rate on the adjustable-rate Mortgage Loans may affect the likelihood of prepayments resulting from refinancings. Moreover, the Group I Mortgage Loans and the Group II Mortgage Loans (which have principal balances that conform to Freddie Mac and Fannie Mae loan limits) may experience prepayment behavior that differs from that experienced by the Group III Mortgage Loans (which have principal balances that may or may not conform to Freddie Mac and Fannie Mae loan limits). There can be no certainty as to the rate of prepayments on the Mortgage Loans during any period or over the life of the Certificates. See "Yield and Maturity Considerations" in the prospectus.

The prepayment experience of any Mortgage Loans secured by second liens will likely differ from that on Mortgage Loans secured by first liens. The smaller principal balances of second lien mortgage loans relative to the principal balances of first lien mortgage loans may reduce the perceived benefits of refinancing. In addition, the reduced equity in the related mortgaged property due to the existence of a second lien mortgage loan may reduce the opportunities for refinancing. The reduced opportunity for refinancing may result in a greater rate of default and will likely result in a greater severity of loss following default. On the other hand, many borrowers do not view second lien mortgage loans as permanent financing and may be more inclined to prepay those mortgage loans as a result. We cannot assure you as to the prepayment experience of any of the Mortgage Loans, including those secured by second liens.

Because principal distributions are made to certain classes of Class A and Mezzanine Certificates before other such classes, holders of classes of Class A and Mezzanine Certificates having a later priority of payment bear a greater risk of losses (because such Certificates will represent an increasing percentage interest in the Trust during the period prior to the commencement of distributions of principal thereon) than holders of classes having earlier priorities for distribution of principal. As described under "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" herein, prior to the Stepdown Date, all principal payments on the Mortgage Loans will be allocated to the Class A Certificates. Thereafter, as further described herein, during certain periods, subject to certain delinquency and loss triggers described herein, all principal payments on the Mortgage Loans will be allocated to the Class A and Mezzanine Certificates in the priorities described under "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" in this prospectus supplement.

In general, defaults on mortgage loans may occur with greater frequency in their early years. In addition, default rates may be higher for mortgage loans used to refinance an existing mortgage loan. In the event of a mortgagor's default on a Mortgage Loan, there can be no assurance that recourse will be available beyond the specific mortgaged property pledged as security for repayment. See "The Mortgage Pool--Underwriting Standards of the Originators" herein.

Furthermore, to the extent that the Original Pre-Funded Amounts have not been fully applied to the purchase of Subsequent Group I Mortgage Loans, Subsequent Group II Mortgage Loans or Subsequent Group III Mortgage Loans, as applicable, by the end of the Funding Period, the holders of the related Class A Certificates will receive on the Distribution Date immediately following the end of the Funding Period a distribution of principal in an amount equal to any amounts remaining in the related Pre-Funding Account. Although no assurance can be given, it is anticipated by the Depositor that the principal amount of Subsequent Mortgage Loans sold to the Trust will require the application of substantially all amounts on deposit in the Pre-Funding Accounts, and that there will be no material amount of principal distribution to holders of the Class A Certificates. However, it is unlikely that the Depositor will be able to deliver Subsequent Mortgage Loans with an aggregate principal balance identical to the Original Pre-Funded Amounts.

SPECIAL YIELD CONSIDERATIONS

The Mortgage Rates on the adjustable-rate Mortgage Loans adjust semi-annually based upon the Index after an initial period of two or three years after origination and the fixed-rate Mortgage Loans do not adjust at all. The Pass- Through Rates on the Class A and Mezzanine Certificates may adjust monthly based upon One-Month LIBOR as described under "Description of the Certificates--Calculation of One-Month LIBOR" herein, subject to the related Net WAC Pass-Through Rate. As a result, increases in the Pass-Through Rates on the Class A and Mezzanine Certificates may be limited for extended periods in a rising interest rate environment. Investors should note that the Mortgage Rates on the adjustable-rate Mortgage Loans will not adjust for an initial period of two or three years after origination. The interest due on the related Mortgage Loans during any Due Period, net of the expenses of the Trust, may not equal the amount of interest that would accrue at One-Month LIBOR plus the applicable margin on the Class A and Mezzanine Certificates during the related Interest Accrual Period. In addition, the Index and One-Month LIBOR may respond

WFB.000406

differently to economic and market factors. Thus, it is possible, for example, that if both One-Month LIBOR and the Index rise during the same period, One-Month LIBOR may rise more rapidly than the Index or may rise higher than the Index, potentially resulting in the application of the related Net WAC Pass-Through Rate on one or more classes of the Class A and Mezzanine Certificates which would adversely affect the yield to maturity on such Certificates. In addition, the Net WAC Pass-Through Rate for a class of Certificates will be reduced by the prepayment of the related Mortgage Loans with relatively higher Mortgage Rates.

If the pass-through rate on any class of Class A or Mezzanine Certificates is limited by the Net WAC Pass- Through Rate for any Distribution Date, the resulting basis risk shortfalls may be recovered by the holders of such Certificates on such Distribution Date or on future Distribution Dates, to the extent that on such Distribution Date or future Distribution Dates there are any available funds remaining after certain other distributions on the Class A and Mezzanine Certificates and the payment of certain fees and expenses of the Trust and to the extent of any payments made under the Cap Contracts with respect to the Class A and Mezzanine Certificates. The ratings on the Class A and Mezzanine Certificates do not address the likelihood of any such recovery of basis risk shortfalls by holders of the Class A or Mezzanine Certificates.

As described under "Description of the Certificates--Allocation of Losses; Subordination" herein, amounts otherwise distributable to holders of the Mezzanine Certificates may be made available to protect the holders of the Class A Certificates against interruptions in distributions due to certain mortgagor delinquencies, to the extent not covered by Advances. Such delinquencies may affect the yield to investors on the Mezzanine Certificates and, even if subsequently cured, will affect the timing of the receipt of distributions by the holders of the Mezzanine Certificates. In addition, the rate of delinquencies or losses will affect the rate of principal payments on each class of Mezzanine Certificates. See "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" herein.

WEIGHTED AVERAGE LIVES

Weighted average life refers to the average amount of time that will elapse from the date of issuance of a security until each dollar of principal of such security will be repaid to the investor. The weighted average lives of the Class A and Mezzanine Certificates will be influenced by the rate at which principal on the Mortgage Loans is paid, which may be in the form of scheduled payments or prepayments (including repurchases by the Seller, or purchases by the Master Servicer and prepayments of principal by the borrower as well as amounts received by virtue of condemnation, insurance or foreclosure with respect to the Mortgage Loans), and the timing thereof.

Prepayments of mortgage loans are commonly measured relative to a prepayment standard or model. The model used with respect to the Mortgage Loans (the "Prepayment Assumption") assumes:

(i)     In the case of the fixed-rate Mortgage Loans, 100% of the Fixed-Rate Vector. In the case of the fixed- rate Mortgage Loans, the "Fixed-Rate Vector" means a constant prepayment rate ("CPR") of 2% per annum of the then unpaid principal balance of such Mortgage Loans in the first month of the life of such Mortgage Loans and an additional 2% per annum in each month thereafter until the 10th month, and then beginning in the 10th month and in each month thereafter during the life of such Mortgage Loans, a CPR of 20% per annum.

(ii)    In the case of the adjustable-rate Mortgage Loans, 100% of the Adjustable-Rate Vector. In the case of the adjustable-rate Mortgage Loans, the "Adjustable-Rate Vector" means (a) a constant prepayment rate ("CPR") of 5% per annum of the then unpaid principal balance of such Mortgage Loans in the first month of the life of such Mortgage Loans and an additional 2% per annum in each month thereafter until the 12th month, and then beginning in the 12th month and in each month thereafter until the 23rd month, a CPR of 27% per annum, (b) beginning in the 24th month and in each month thereafter until the 27th month, a CPR of 60% per annum and (c) beginning in the 28th month and in each month thereafter during the life of such Mortgage Loans, a CPR of 30% per annum. However, the prepayment rate will not exceed 85% CPR per annum in any period for any percentage of the Adjustable-Rate Vector.

WFB.000407

CPR is a prepayment assumption that represents a constant assumed rate of prepayment each month relative to the then outstanding principal balance of a pool of mortgage loans for the life of such mortgage loans. The model does not purport to be either an historical description of the prepayment experience of any pool of mortgage loans or a prediction of the anticipated rate of prepayment of any mortgage loans, including the Mortgage Loans to be included in the Trust. Each of the Prepayment Scenarios in the table below assumes the respective percentages of CPR indicated for such scenario.

The tables entitled "Percent of Original Certificate Principal Balance Outstanding" were prepared on the basis of the following assumptions (the "Modeling Assumptions"):

(i) the Mortgage Loans have the characteristics set forth in the table entitled "Assumed Mortgage Loan Characteristics" in Annex II of this prospectus supplement;

(ii) distributions on the Class A and Mezzanine Certificates are made on the 25th day of each month, commencing in the month after the month of the Cut-off Date and the pass-through rates for the Class A and Mezzanine Certificates are determined as set forth herein;

(iii) the prepayment rates are the percentages of the respective Prepayment Assumption set forth in the table entitled "Prepayment Scenarios";

(iv) no defaults or delinquencies occur in the payment by mortgagors of principal and interest on the Mortgage Loans and no shortfalls in collection of interest are incurred;

(v) none of the Seller, the Originators, the Master Servicer, the NIMS Insurer, if any, or any other person purchases from the Trust any Mortgage Loan pursuant to any obligation or option under the Pooling and Servicing Agreement, except as indicated in the footnotes in the tables below;

(vi) scheduled monthly payments on the Mortgage Loans are received on the first day of each month commencing in the month after the month of the Cut-off Date, and are computed prior to giving effect to any prepayments received in the prior month;

(vii) voluntary principal prepayments representing payment in full of individual Mortgage Loans are received on the last day of each month commencing in the month of the Cut-off Date, and include 30 days' interest thereon;

(viii) the scheduled monthly payment for each Mortgage Loan is calculated based on its principal balance, Mortgage Rate and remaining term to stated maturity such that the Mortgage Loan will amortize in amounts sufficient to repay the remaining principal balance of such Mortgage Loan by its remaining term to stated maturity;

(ix) the Certificates are purchased on November 12, 2004;

(x) with respect to the adjustable-rate Mortgage Loans, the Index remains constant at 2.25% per annum and the Mortgage Rate on each such Mortgage Loan is adjusted on the next Adjustment Date (and on subsequent Adjustment Dates if necessary) to equal the Index plus the applicable Gross Margin, subject to the applicable Initial Periodic Rate Cap, Periodic Rate Cap, Maximum Mortgage Rate and Minimum Mortgage Rate;

(xi) One-Month LIBOR remains constant at 1.94% per annum;

(xii) the monthly payment on each adjustable-rate Mortgage Loan is adjusted on the Due Date immediately following the next Adjustment Date (and on subsequent Adjustment Dates if necessary) to equal a fully amortizing monthly payment as described in clause (viii) above;

(xiii) the Mortgage Rate for each adjustable-rate Mortgage Loan adjusts every six months following its first Adjustment Date;

WFB.000408

(xiv) all amounts in the Pre-Funding Accounts are used to purchase Subsequent Mortgage Loans one month following the Closing Date;

(xv) the initial Certificate Principal Balance of the Class P Certificates is $0.00;

(xvi) the Servicing Fee Rate is equal to 0.5000% per annum and the Custodial Fee Rate is equal to 0.001% per annum; and

(xvii) no Sequential Trigger Event is in effect on any Distribution Date.

PREPAYMENT SCENARIOS(1)

| | I | II | III | IV | V | VI |
|---|---|---|---|---|---|---|
| Fixed-rate Mortgage Loans: | 0% | 50% | 75% | 100% | 125% | 150% |
| Adjustable-rate Mortgage Loans: | 0% | 50% | 75% | 100% | 125% | 150% |

- ---------------

(1) Percentages of the applicable Vector for the fixed-rate Mortgage Loans and for the adjustable-rate Mortgage Loans.

There will be discrepancies between the characteristics of the actual Mortgage Loans and the characteristics included in the Modeling Assumptions. Any such discrepancy may have an effect upon the percentages of the original Certificate Principal Balances outstanding (and the corresponding weighted average lives) of the Class A and Mezzanine Certificates set forth in the tables. In addition, since it is not likely the level of the Index or One-Month LIBOR will remain constant as assumed, the Class A and Mezzanine Certificates may mature earlier or later than indicated by the table. As described under "Description of the Certificates--Principal Distributions on the Class A and Mezzanine Certificates" herein, the occurrence of the Stepdown Date or a Trigger Event will have the effect of accelerating or decelerating the amortization of the Class A and Mezzanine Certificates and affecting the weighted average lives of such Certificates. Neither the prepayment model used herein nor any other prepayment model or assumption purports to be an historical description of prepayment experience or a prediction of the anticipated rate of prepayment of any pool of mortgage loans, including the Mortgage Loans included in the mortgage pool. Variations in the prepayment experience and the balance of the Mortgage Loans that prepay may increase or decrease the percentages of original Certificate Principal Balances (and the corresponding weighted average lives) shown in the following tables. Such variations may occur even if the average prepayment experience of all the Mortgage Loans equals any of the Prepayment Scenarios shown in the immediately following tables.

S-38

WFB.000409

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS A-1A
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | VI |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 98 | 81 | 73 | 64 | 56 | 47 |
| November 25, 2006.......... | 96 | 52 | 32 | 12 | 0 | 0 |
| November 25, 2007.......... | 94 | 24 | 0 | 0 | 0 | 0 |
| November 25, 2008.......... | 92 | 5 | 0 | 0 | 0 | 0 |
| November 25, 2009.......... | 89 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2010.......... | 87 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2011.......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2012.......... | 37 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2013.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2014.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2015.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2016.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2017.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2018.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2019.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2020.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2021.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2022.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2023.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2024.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2025.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2026.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 7.29 | 2.19 | 1.61 | 1.34 | 1.17 | 1.03 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 7.29 | 2.19 | 1.61 | 1.34 | 1.17 | 1.03 |

- ------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

S-38

WFB.000410

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

|  | CLASS A-1B PREPAYMENT SCENARIO | | | | | |
|---|---|---|---|---|---|---|
| DISTRIBUTION DATE | I | II | III | IV | V | VI |
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006......... | 100 | 100 | 100 | 100 | 88 | 60 |
| November 25, 2007......... | 100 | 100 | 93 | 52 | 17 | 0 |
| November 25, 2008......... | 100 | 100 | 73 | 51 | 17 | 0 |
| November 25, 2009......... | 100 | 87 | 58 | 37 | 17 | 0 |
| November 25, 2010......... | 100 | 74 | 45 | 27 | 15 | 0 |
| November 25, 2011......... | 100 | 63 | 35 | 19 | 10 | 0 |
| November 25, 2012......... | 100 | 53 | 28 | 14 | 7 | 0 |
| November 25, 2013......... | 100 | 45 | 22 | 10 | 5 | 0 |
| November 25, 2014......... | 100 | 38 | 17 | 7 | 3 | 0 |
| November 25, 2015......... | 100 | 32 | 13 | 5 | 2 | 0 |
| November 25, 2016......... | 100 | 27 | 11 | 4 | 1 | 0 |
| November 25, 2017......... | 100 | 23 | 8 | 3 | * | 0 |
| November 25, 2018......... | 97 | 19 | 6 | 2 | 0 | 0 |
| November 25, 2019......... | 92 | 16 | 5 | 2 | 0 | 0 |
| November 25, 2020......... | 86 | 13 | 4 | * | 0 | 0 |
| November 25, 2021......... | 80 | 11 | 3 | 0 | 0 | 0 |
| November 25, 2022......... | 74 | 9 | 2 | 0 | 0 | 0 |
| November 25, 2023......... | 67 | 8 | 2 | 0 | 0 | 0 |
| November 25, 2024......... | 60 | 6 | 1 | 0 | 0 | 0 |
| November 25, 2025......... | 52 | 5 | * | 0 | 0 | 0 |
| November 25, 2026......... | 43 | 4 | 0 | 0 | 0 | 0 |
| November 25, 2027......... | 42 | 3 | 0 | 0 | 0 | 0 |
| November 25, 2028......... | 42 | 2 | 0 | 0 | 0 | 0 |
| November 25, 2029......... | 37 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2030......... | 31 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2031......... | 23 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032......... | 16 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033......... | 7 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 22.07 | 9.98 | 6.86 | 4.90 | 3.33 | 2.18 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 22.00 | 9.11 | 6.15 | 4.35 | 2.90 | 2.18 |

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000411

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS A-1C
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 99 | 88 | 83 | 78 | 72 | 67 |
| November 25, 2006.......... | 97 | 70 | 57 | 45 | 33 | 23 |
| November 25, 2007.......... | 96 | 53 | 35 | 20 | 6 | 0 |
| November 25, 2008.......... | 95 | 41 | 28 | 19 | 6 | 0 |
| November 25, 2009.......... | 93 | 33 | 22 | 14 | 6 | 0 |
| November 25, 2010.......... | 92 | 28 | 17 | 10 | 6 | 0 |
| November 25, 2011.......... | 90 | 24 | 13 | 7 | 4 | 0 |
| November 25, 2012.......... | 90 | 20 | 10 | 5 | 3 | 0 |
| November 25, 2013.......... | 90 | 17 | 8 | 4 | 2 | 0 |
| November 25, 2014.......... | 90 | 14 | 6 | 3 | 1 | 0 |
| November 25, 2015.......... | 90 | 12 | 5 | 2 | 1 | 0 |
| November 25, 2016.......... | 90 | 10 | 4 | 1 | * | 0 |
| November 25, 2017.......... | 90 | 9 | 3 | 1 | * | 0 |
| November 25, 2018.......... | 87 | 7 | 2 | 1 | 0 | 0 |
| November 25, 2019.......... | 82 | 6 | 2 | * | 0 | 0 |
| November 25, 2020.......... | 78 | 5 | 1 | * | 0 | 0 |
| November 25, 2021.......... | 72 | 4 | 1 | 0 | 0 | 0 |
| November 25, 2022.......... | 67 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2023.......... | 60 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2024.......... | 54 | 2 | * | 0 | 0 | 0 |
| November 25, 2025.......... | 47 | 2 | * | 0 | 0 | 0 |
| November 25, 2026.......... | 39 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 37 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 37 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 33 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 27 | * | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 21 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 6 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 20.22 | 5.13 | 3.59 | 2.69 | 1.98 | 1.46 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 20.16 | 4.80 | 3.33 | 2.48 | 1.82 | 1.46 |

- ------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000412

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS A-1D
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 99 | 88 | 83 | 78 | 72 | 67 |
| November 25, 2006.......... | 97 | 70 | 57 | 45 | 33 | 23 |
| November 25, 2007.......... | 96 | 53 | 35 | 20 | 6 | 0 |
| November 25, 2008.......... | 95 | 41 | 28 | 19 | 6 | 0 |
| November 25, 2009.......... | 93 | 33 | 22 | 14 | 6 | 0 |
| November 25, 2010.......... | 92 | 28 | 17 | 10 | 6 | 0 |
| November 25, 2011.......... | 90 | 24 | 13 | 7 | 4 | 0 |
| November 25, 2012.......... | 90 | 20 | 10 | 5 | 3 | 0 |
| November 25, 2013.......... | 90 | 17 | 8 | 4 | 2 | 0 |
| November 25, 2014.......... | 90 | 14 | 6 | 3 | 1 | 0 |
| November 25, 2015.......... | 90 | 12 | 5 | 2 | 1 | 0 |
| November 25, 2016.......... | 90 | 10 | 4 | 1 | * | 0 |
| November 25, 2017.......... | 90 | 9 | 3 | 1 | * | 0 |
| November 25, 2018.......... | 87 | 7 | 2 | 1 | 0 | 0 |
| November 25, 2019.......... | 82 | 6 | 2 | * | 0 | 0 |
| November 25, 2020.......... | 78 | 5 | 1 | * | 0 | 0 |
| November 25, 2021.......... | 72 | 4 | 1 | 0 | 0 | 0 |
| November 25, 2022.......... | 67 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2023.......... | 60 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2024.......... | 54 | 2 | * | 0 | 0 | 0 |
| November 25, 2025.......... | 47 | 2 | * | 0 | 0 | 0 |
| November 25, 2026.......... | 39 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 37 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 37 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 33 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 27 | * | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 21 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 6 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 20.22 | 5.13 | 3.59 | 2.69 | 1.98 | 1.46 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 20.16 | 4.80 | 3.33 | 2.48 | 1.82 | 1.46 |

- ------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000413

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

|  | CLASS A-2 PREPAYMENT SCENARIO | | | | | |
|---|---|---|---|---|---|---|
| DISTRIBUTION DATE | I | II | III | IV | V | IV |
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 99 | 88 | 83 | 78 | 72 | 67 |
| November 25, 2006.......... | 97 | 70 | 57 | 45 | 33 | 23 |
| November 25, 2007.......... | 96 | 53 | 35 | 20 | 6 | 0 |
| November 25, 2008.......... | 95 | 41 | 28 | 19 | 6 | 0 |
| November 25, 2009.......... | 93 | 33 | 22 | 14 | 6 | 0 |
| November 25, 2010.......... | 92 | 28 | 17 | 10 | 6 | 0 |
| November 25, 2011.......... | 90 | 24 | 13 | 7 | 4 | 0 |
| November 25, 2012.......... | 90 | 20 | 11 | 5 | 3 | 0 |
| November 25, 2013.......... | 90 | 17 | 8 | 4 | 2 | 0 |
| November 25, 2014.......... | 90 | 14 | 6 | 3 | 1 | 0 |
| November 25, 2015.......... | 90 | 12 | 5 | 2 | 1 | 0 |
| November 25, 2016.......... | 90 | 10 | 4 | 2 | * | 0 |
| November 25, 2017.......... | 90 | 9 | 3 | 1 | * | 0 |
| November 25, 2018.......... | 88 | 7 | 2 | 1 | 0 | 0 |
| November 25, 2019.......... | 84 | 6 | 2 | * | 0 | 0 |
| November 25, 2020.......... | 81 | 5 | 1 | * | 0 | 0 |
| November 25, 2021.......... | 77 | 4 | 1 | 0 | 0 | 0 |
| November 25, 2022.......... | 72 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2023.......... | 68 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2024.......... | 63 | 2 | * | 0 | 0 | 0 |
| November 25, 2025.......... | 57 | 2 | * | 0 | 0 | 0 |
| November 25, 2026.......... | 52 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 36 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 29 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 25 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 20 | * | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 15 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 10 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 5 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 20.40 | 5.13 | 3.60 | 2.69 | 1.99 | 1.46 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 20.36 | 4.80 | 3.33 | 2.48 | 1.83 | 1.46 |

- -------------------------

(1) Rounded to the nearest whole percentage except where otherwise indicated.
    If applicable, an * represents less than one-half of one percent but
    greater than zero percent.

(2) The weighted average life of any class of Class A and Mezzanine
    Certificates is determined by (i) multiplying the assumed net reduction, if
    any, in the Certificate Principal Balance on each Distribution Date of such
    class of Certificates by the number of years from the date of issuance of
    the Certificates to the related Distribution Date, (ii) summing the results
    and (iii) dividing the sum by the aggregate amount of the assumed net
    reductions in Certificate Principal Balance of such class of Certificates.

(3) Assumes an optional purchase of the Mortgage Loans on the earliest
    Distribution Date on which it is permitted.

WFB.000414

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS A-3
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 99 | 88 | 83 | 78 | 72 | 67 |
| November 25, 2006.......... | 97 | 70 | 57 | 45 | 33 | 23 |
| November 25, 2007.......... | 96 | 53 | 35 | 20 | 6 | 0 |
| November 25, 2008.......... | 95 | 41 | 28 | 19 | 6 | 0 |
| November 25, 2009.......... | 93 | 33 | 22 | 14 | 6 | 0 |
| November 25, 2010.......... | 92 | 28 | 17 | 10 | 6 | 0 |
| November 25, 2011.......... | 90 | 24 | 13 | 7 | 4 | 0 |
| November 25, 2012.......... | 90 | 20 | 11 | 5 | 3 | 0 |
| November 25, 2013.......... | 90 | 17 | 8 | 4 | 2 | 0 |
| November 25, 2014.......... | 90 | 14 | 6 | 3 | 1 | 0 |
| November 25, 2015.......... | 90 | 12 | 5 | 2 | 1 | 0 |
| November 25, 2016.......... | 90 | 10 | 4 | 2 | * | 0 |
| November 25, 2017.......... | 90 | 9 | 3 | 1 | * | 0 |
| November 25, 2018.......... | 88 | 7 | 2 | 1 | 0 | 0 |
| November 25, 2019.......... | 84 | 6 | 2 | * | 0 | 0 |
| November 25, 2020.......... | 81 | 5 | 1 | * | 0 | 0 |
| November 25, 2021.......... | 77 | 4 | 1 | 0 | 0 | 0 |
| November 25, 2022.......... | 72 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2023.......... | 68 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2024.......... | 63 | 2 | * | 0 | 0 | 0 |
| November 25, 2025.......... | 57 | 2 | * | 0 | 0 | 0 |
| November 25, 2026.......... | 52 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 36 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 29 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 25 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 20 | * | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 15 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 10 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 5 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 20.40 | 5.13 | 3.60 | 2.69 | 1.99 | 1.46 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 20.36 | 4.80 | 3.33 | 2.48 | 1.83 | 1.46 |

- -------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000415

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

| DISTRIBUTION DATE | CLASS A-5 PREPAYMENT SCENARIO | | | | | |
|---|---|---|---|---|---|---|
| | I | II | III | IV | V | IV |
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005......... | 99 | 88 | 83 | 78 | 72 | 67 |
| November 25, 2006......... | 97 | 70 | 58 | 45 | 34 | 23 |
| November 25, 2007......... | 96 | 53 | 36 | 20 | 7 | 0 |
| November 25, 2008......... | 95 | 41 | 28 | 20 | 7 | 0 |
| November 25, 2009......... | 93 | 33 | 22 | 14 | 7 | 0 |
| November 25, 2010......... | 91 | 28 | 17 | 10 | 6 | 0 |
| November 25, 2011......... | 90 | 24 | 14 | 7 | 4 | 0 |
| November 25, 2012......... | 90 | 20 | 11 | 5 | 3 | 0 |
| November 25, 2013......... | 90 | 17 | 8 | 4 | 2 | 0 |
| November 25, 2014......... | 90 | 15 | 7 | 3 | 1 | 0 |
| November 25, 2015......... | 90 | 12 | 5 | 2 | 1 | 0 |
| November 25, 2016......... | 90 | 10 | 4 | 2 | * | 0 |
| November 25, 2017......... | 90 | 9 | 3 | 1 | * | 0 |
| November 25, 2018......... | 87 | 7 | 3 | 1 | 0 | 0 |
| November 25, 2019......... | 84 | 6 | 2 | * | 0 | 0 |
| November 25, 2020......... | 80 | 5 | 2 | * | 0 | 0 |
| November 25, 2021......... | 77 | 4 | 1 | 0 | 0 | 0 |
| November 25, 2022......... | 72 | 4 | 1 | 0 | 0 | 0 |
| November 25, 2023......... | 68 | 3 | 1 | 0 | 0 | 0 |
| November 25, 2024......... | 63 | 2 | * | 0 | 0 | 0 |
| November 25, 2025......... | 57 | 2 | * | 0 | 0 | 0 |
| November 25, 2026......... | 52 | 2 | 0 | 0 | 0 | 0 |
| November 25, 2027......... | 36 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2028......... | 29 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2029......... | 25 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2030......... | 21 | * | 0 | 0 | 0 | 0 |
| November 25, 2031......... | 16 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032......... | 11 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033......... | 5 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 20.39 | 5.17 | 3.63 | 2.72 | 2.02 | 1.47 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 20.34 | 4.83 | 3.35 | 2.50 | 1.85 | 1.47 |

--------------------------

(1) Rounded to the nearest whole percentage except where otherwise indicated. If applicable, an * represents less than one-half of one percent but greater than zero percent.

(2) The weighted average life of any class of Class A and Mezzanine Certificates is determined by (i) multiplying the assumed net reduction, if any, in the Certificate Principal Balance on each Distribution Date of such class of Certificates by the number of years from the date of issuance of the Certificates to the related Distribution Date, (ii) summing the results and (iii) dividing the sum by the aggregate amount of the assumed net reductions in Certificate Principal Balance of such class of Certificates.

(3) Assumes an optional purchase of the Mortgage Loans on the earliest Distribution Date on which it is permitted.

S-45

WFB.000416

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-1
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005........... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006........... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007........... | 100 | 100 | 100 | 100 | 100 | 83 |
| November 25, 2008........... | 100 | 100 | 78 | 54 | 100 | 83 |
| November 25, 2009........... | 100 | 92 | 61 | 39 | 100 | 83 |
| November 25, 2010........... | 100 | 78 | 48 | 28 | 16 | 83 |
| November 25, 2011........... | 100 | 66 | 38 | 20 | 11 | 83 |
| November 25, 2012........... | 100 | 56 | 30 | 15 | 7 | 83 |
| November 25, 2013........... | 100 | 48 | 23 | 11 | 5 | 59 |
| November 25, 2014........... | 100 | 40 | 18 | 8 | 3 | 20 |
| November 25, 2015........... | 100 | 34 | 14 | 6 | 1 | 0 |
| November 25, 2016........... | 100 | 29 | 11 | 4 | 0 | 0 |
| November 25, 2017........... | 100 | 24 | 9 | 3 | 0 | 0 |
| November 25, 2018........... | 100 | 20 | 7 | 1 | 0 | 0 |
| November 25, 2019........... | 100 | 17 | 5 | 0 | 0 | 0 |
| November 25, 2020........... | 100 | 14 | 4 | 0 | 0 | 0 |
| November 25, 2021........... | 100 | 12 | 3 | 0 | 0 | 0 |
| November 25, 2022........... | 100 | 10 | 3 | 0 | 0 | 0 |
| November 25, 2023........... | 100 | 8 | 0 | 0 | 0 | 0 |
| November 25, 2024........... | 100 | 7 | 0 | 0 | 0 | 0 |
| November 25, 2025........... | 100 | 5 | 0 | 0 | 0 | 0 |
| November 25, 2026........... | 100 | 4 | 0 | 0 | 0 | 0 |
| November 25, 2027........... | 100 | 3 | 0 | 0 | 0 | 0 |
| November 25, 2028........... | 100 | 3 | 0 | 0 | 0 | 0 |
| November 25, 2029........... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030........... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031........... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032........... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033........... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034........... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.67 | 10.30 | 7.08 | 5.64 | 6.01 | 8.39 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.55 | 9.40 | 6.35 | 5.08 | 5.51 | 4.10 |

- --------------------------
(1) Rounded to the nearest whole percentage except where otherwise indicated.
    If applicable, an * represents less than one-half of one percent but
    greater than zero percent.

(2) The weighted average life of any class of Class A and Mezzanine
    Certificates is determined by (i) multiplying the assumed net reduction, if
    any, in the Certificate Principal Balance on each Distribution Date of such
    class of Certificates by the number of years from the date of issuance of
    the Certificates to the related Distribution Date, (ii) summing the results
    and (iii) dividing the sum by the aggregate amount of the assumed net
    reductions in Certificate Principal Balance of such class of Certificates.

(3) Assumes an optional purchase of the Mortgage Loans on the earliest
    Distribution Date on which it is permitted.

S-46

WFB.000417

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-2
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2008.......... | 100 | 100 | 78 | 54 | 100 | 100 |
| November 25, 2009.......... | 100 | 92 | 61 | 39 | 40 | 77 |
| November 25, 2010.......... | 100 | 78 | 48 | 28 | 16 | 41 |
| November 25, 2011.......... | 100 | 66 | 38 | 20 | 11 | 19 |
| November 25, 2012.......... | 100 | 56 | 30 | 15 | 7 | 6 |
| November 25, 2013.......... | 100 | 48 | 23 | 11 | 5 | 0 |
| November 25, 2014.......... | 100 | 40 | 18 | 8 | 3 | 0 |
| November 25, 2015.......... | 100 | 34 | 14 | 6 | 0 | 0 |
| November 25, 2016.......... | 100 | 29 | 11 | 4 | 0 | 0 |
| November 25, 2017.......... | 100 | 24 | 9 | 3 | 0 | 0 |
| November 25, 2018.......... | 100 | 20 | 7 | 0 | 0 | 0 |
| November 25, 2019.......... | 100 | 17 | 5 | 0 | 0 | 0 |
| November 25, 2020.......... | 100 | 14 | 4 | 0 | 0 | 0 |
| November 25, 2021.......... | 100 | 12 | 3 | 0 | 0 | 0 |
| November 25, 2022.......... | 100 | 10 | 1 | 0 | 0 | 0 |
| November 25, 2023.......... | 100 | 8 | 0 | 0 | 0 | 0 |
| November 25, 2024.......... | 100 | 7 | 0 | 0 | 0 | 0 |
| November 25, 2025.......... | 100 | 5 | 0 | 0 | 0 | 0 |
| November 25, 2026.......... | 100 | 4 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 100 | 3 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 89 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.62 | 10.29 | 7.06 | 5.54 | 5.38 | 6.04 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.50 | 9.40 | 6.35 | 4.98 | 4.95 | 4.37 |

- ------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000418

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-3
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2008.......... | 100 | 100 | 78 | 54 | 100 | 100 |
| November 25, 2009.......... | 100 | 92 | 61 | 39 | 24 | 14 |
| November 25, 2010.......... | 100 | 78 | 48 | 28 | 16 | 9 |
| November 25, 2011.......... | 100 | 66 | 38 | 20 | 11 | 5 |
| November 25, 2012.......... | 100 | 56 | 30 | 15 | 7 | 3 |
| November 25, 2013.......... | 100 | 48 | 23 | 11 | 5 | 0 |
| November 25, 2014.......... | 100 | 40 | 18 | 8 | 3 | 0 |
| November 25, 2015.......... | 100 | 34 | 14 | 6 | 0 | 0 |
| November 25, 2016.......... | 100 | 29 | 11 | 4 | 0 | 0 |
| November 25, 2017.......... | 100 | 24 | 9 | * | 0 | 0 |
| November 25, 2018.......... | 100 | 20 | 7 | 0 | 0 | 0 |
| November 25, 2019.......... | 100 | 17 | 5 | 0 | 0 | 0 |
| November 25, 2020.......... | 100 | 14 | 4 | 0 | 0 | 0 |
| November 25, 2021.......... | 100 | 12 | 2 | 0 | 0 | 0 |
| November 25, 2022.......... | 100 | 10 | 0 | 0 | 0 | 0 |
| November 25, 2023.......... | 100 | 8 | 0 | 0 | 0 | 0 |
| November 25, 2024.......... | 100 | 7 | 0 | 0 | 0 | 0 |
| November 25, 2025.......... | 100 | 5 | 0 | 0 | 0 | 0 |
| November 25, 2026.......... | 100 | 4 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 100 | 3 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.58 | 10.27 | 7.04 | 5.45 | 4.96 | 4.78 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.46 | 9.40 | 6.35 | 4.91 | 4.54 | 4.36 |

- ------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

S-48

WFB.000419

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-4
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2008.......... | 100 | 100 | 78 | 54 | 38 | 53 |
| November 25, 2009.......... | 100 | 92 | 61 | 39 | 24 | 14 |
| November 25, 2010.......... | 100 | 78 | 48 | 28 | 16 | 9 |
| November 25, 2011.......... | 100 | 66 | 38 | 20 | 11 | 5 |
| November 25, 2012.......... | 100 | 56 | 30 | 15 | 7 | * |
| November 25, 2013.......... | 100 | 48 | 23 | 11 | 5 | 0 |
| November 25, 2014.......... | 100 | 40 | 18 | 8 | 0 | 0 |
| November 25, 2015.......... | 100 | 34 | 14 | 6 | 0 | 0 |
| November 25, 2016.......... | 100 | 29 | 11 | 4 | 0 | 0 |
| November 25, 2017.......... | 100 | 24 | 9 | 0 | 0 | 0 |
| November 25, 2018.......... | 100 | 20 | 7 | 0 | 0 | 0 |
| November 25, 2019.......... | 100 | 17 | 5 | 0 | 0 | 0 |
| November 25, 2020.......... | 100 | 14 | 4 | 0 | 0 | 0 |
| November 25, 2021.......... | 100 | 12 | 0 | 0 | 0 | 0 |
| November 25, 2022.......... | 100 | 10 | 0 | 0 | 0 | 0 |
| November 25, 2023.......... | 100 | 8 | 0 | 0 | 0 | 0 |
| November 25, 2024.......... | 100 | 7 | 0 | 0 | 0 | 0 |
| November 25, 2025.......... | 100 | 5 | 0 | 0 | 0 | 0 |
| November 25, 2026.......... | 100 | 4 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.56 | 10.25 | 7.02 | 5.40 | 4.79 | 4.45 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.44 | 9.40 | 6.35 | 4.88 | 4.39 | 4.11 |

- ------------------------

(1) Rounded to the nearest whole percentage except where otherwise indicated.
    If applicable, an * represents less than one-half of one percent but
    greater than zero percent.

(2) The weighted average life of any class of Class A and Mezzanine
    Certificates is determined by (i) multiplying the assumed net reduction, if
    any, in the Certificate Principal Balance on each Distribution Date of such
    class of Certificates by the number of years from the date of issuance of
    the Certificates to the related Distribution Date, (ii) summing the results
    and (iii) dividing the sum by the aggregate amount of the assumed net
    reductions in Certificate Principal Balance of such class of Certificates.

(3) Assumes an optional purchase of the Mortgage Loans on the earliest
    Distribution Date on which it is permitted.

S-49

WFB.000420

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-5
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2008.......... | 100 | 100 | 78 | 54 | 36 | 23 |
| November 25, 2009.......... | 100 | 92 | 61 | 39 | 24 | 14 |
| November 25, 2010.......... | 100 | 78 | 48 | 28 | 16 | 9 |
| November 25, 2011.......... | 100 | 66 | 38 | 20 | 11 | 5 |
| November 25, 2012.......... | 100 | 56 | 30 | 15 | 7 | 0 |
| November 25, 2013.......... | 100 | 48 | 23 | 11 | 5 | 0 |
| November 25, 2014.......... | 100 | 40 | 18 | 8 | 0 | 0 |
| November 25, 2015.......... | 100 | 34 | 14 | 6 | 0 | 0 |
| November 25, 2016.......... | 100 | 29 | 11 | 1 | 0 | 0 |
| November 25, 2017.......... | 100 | 24 | 9 | 0 | 0 | 0 |
| November 25, 2018.......... | 100 | 20 | 7 | 0 | 0 | 0 |
| November 25, 2019.......... | 100 | 17 | 5 | 0 | 0 | 0 |
| November 25, 2020.......... | 100 | 14 | 1 | 0 | 0 | 0 |
| November 25, 2021.......... | 100 | 12 | 0 | 0 | 0 | 0 |
| November 25, 2022.......... | 100 | 10 | 0 | 0 | 0 | 0 |
| November 25, 2023.......... | 100 | 8 | 0 | 0 | 0 | 0 |
| November 25, 2024.......... | 100 | 7 | 0 | 0 | 0 | 0 |
| November 25, 2025.......... | 100 | 5 | 0 | 0 | 0 | 0 |
| November 25, 2026.......... | 100 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.55 | 10.22 | 6.99 | 5.35 | 4.65 | 4.19 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.43 | 9.40 | 6.35 | 4.85 | 4.26 | 3.87 |

-------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000421

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-6
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage........ | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2008......... | 100 | 100 | 78 | 54 | 36 | 23 |
| November 25, 2009......... | 100 | 92 | 61 | 39 | 24 | 14 |
| November 25, 2010......... | 100 | 78 | 48 | 28 | 16 | 9 |
| November 25, 2011......... | 100 | 66 | 38 | 20 | 11 | 5 |
| November 25, 2012......... | 100 | 56 | 30 | 15 | 7 | 0 |
| November 25, 2013......... | 100 | 48 | 23 | 11 | 1 | 0 |
| November 25, 2014......... | 100 | 40 | 18 | 8 | 0 | 0 |
| November 25, 2015......... | 100 | 34 | 14 | 6 | 0 | 0 |
| November 25, 2016......... | 100 | 29 | 11 | 0 | 0 | 0 |
| November 25, 2017......... | 100 | 24 | 9 | 0 | 0 | 0 |
| November 25, 2018......... | 100 | 20 | 7 | 0 | 0 | 0 |
| November 25, 2019......... | 100 | 17 | 5 | 0 | 0 | 0 |
| November 25, 2020......... | 100 | 14 | 0 | 0 | 0 | 0 |
| November 25, 2021......... | 100 | 12 | 0 | 0 | 0 | 0 |
| November 25, 2022......... | 100 | 10 | 0 | 0 | 0 | 0 |
| November 25, 2023......... | 100 | 8 | 0 | 0 | 0 | 0 |
| November 25, 2024......... | 100 | 7 | 0 | 0 | 0 | 0 |
| November 25, 2025......... | 100 | 4 | 0 | 0 | 0 | 0 |
| November 25, 2026......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2027......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2028......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.53 | 10.19 | 6.97 | 5.31 | 4.56 | 4.05 |
| Weighted Average Life (years) to Optional Termination(2)(3)......... | 26.42 | 9.40 | 6.35 | 4.84 | 4.19 | 3.74 |

- ------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000422

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-7
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2008.......... | 100 | 100 | 78 | 54 | 36 | 23 |
| November 25, 2009.......... | 100 | 92 | 61 | 39 | 24 | 14 |
| November 25, 2010.......... | 100 | 78 | 48 | 28 | 16 | 9 |
| November 25, 2011.......... | 100 | 66 | 38 | 20 | 11 | 0 |
| November 25, 2012.......... | 100 | 56 | 30 | 15 | 7 | 0 |
| November 25, 2013.......... | 100 | 48 | 23 | 11 | 0 | 0 |
| November 25, 2014.......... | 100 | 40 | 18 | 8 | 0 | 0 |
| November 25, 2015.......... | 100 | 34 | 14 | 2 | 0 | 0 |
| November 25, 2016.......... | 100 | 29 | 11 | 0 | 0 | 0 |
| November 25, 2017........:. | 100 | 24 | 9 | 0 | 0 | 0 |
| November 25, 2018.......... | 100 | 20 | 7 | 0 | 0 | 0 |
| November 25, 2019.......... | 100 | 17 | 0 | 0 | 0 | 0 |
| November 25, 2020.......... | 100 | 14 | 0 | 0 | 0 | 0 |
| November 25, 2021.......... | 100 | 12 | 0 | 0 | 0 | 0 |
| November 25, 2022.......... | 100 | 10 | 0 | 0 | 0 | 0 |
| November 25, 2023.......... | 100 | 8 | 0 | 0 | 0 | 0 |
| November 25, 2024.......... | 100 | 6 | 0 | 0 | 0 | 0 |
| November 25, 2025.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2026.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.52 | 10.15 | 6.93 | 5.27 | 4.48 | 3.93 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.41 | 9.40 | 6.35 | 4.82 | 4.13 | 3.65 |

- -------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000423

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-8
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage........ | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2008.......... | 100 | 100 | 78 | 54 | 36 | 23 |
| November 25, 2009.......... | 100 | 92 | 61 | 39 | 24 | 14 |
| November 25, 2010.......... | 100 | 78 | 48 | 28 | 16 | 9 |
| November 25, 2011.......... | 100 | 66 | 38 | 20 | 11 | 0 |
| November 25, 2012.......... | 100 | 56 | 30 | 15 | 4 | 0 |
| November 25, 2013.......... | 100 | 48 | 23 | 11 | 0 | 0 |
| November 25, 2014.......... | 100 | 40 | 18 | 8 | 0 | 0 |
| November 25, 2015.......... | 100 | 34 | 14 | 0 | 0 | 0 |
| November 25, 2016.......... | 100 | 29 | 11 | 0 | 0 | 0 |
| November 25, 2017.......... | 100 | 24 | 9 | 0 | 0 | 0 |
| November 25, 2018.......... | 100 | 20 | 2 | 0 | 0 | 0 |
| November 25, 2019.......... | 100 | 17 | 0 | 0 | 0 | 0 |
| November 25, 2020.......... | 100 | 14 | 0 | 0 | 0 | 0 |
| November 25, 2021.......... | 100 | 12 | 0 | 0 | 0 | 0 |
| November 25, 2022.......... | 100 | 10 | 0 | 0 | 0 | 0 |
| November 25, 2023.......... | 100 | 8 | 0 | 0 | 0 | 0 |
| November 25, 2024.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2025.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2026.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.51 | 10.09 | 6.88 | 5.22 | 4.40 | 3.83 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.41 | 9.40 | 6.35 | 4.81 | 4.09 | 3.56 |

- ------------------------

(1)  Rounded to the nearest whole percentage except where otherwise indicated.
     If applicable, an * represents less than one-half of one percent but
     greater than zero percent.

(2)  The weighted average life of any class of Class A and Mezzanine
     Certificates is determined by (i) multiplying the assumed net reduction, if
     any, in the Certificate Principal Balance on each Distribution Date of such
     class of Certificates by the number of years from the date of issuance of
     the Certificates to the related Distribution Date, (ii) summing the results
     and (iii) dividing the sum by the aggregate amount of the assumed net
     reductions in Certificate Principal Balance of such class of Certificates.

(3)  Assumes an optional purchase of the Mortgage Loans on the earliest
     Distribution Date on which it is permitted.

WFB.000424

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-9
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage......... | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007.......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2008.......... | 100 | 100 | 78 | 54 | 36 | 23 |
| November 25, 2009.......... | 100 | 92 | 61 | 39 | 24 | 14 |
| November 25, 2010.......... | 100 | 78 | 48 | 28 | 16 | 5 |
| November 25, 2011.......... | 100 | 66 | 38 | 20 | 11 | 0 |
| November 25, 2012.......... | 100 | 56 | 30 | 15 | 0 | 0 |
| November 25, 2013.......... | 100 | 48 | 23 | 11 | 0 | 0 |
| November 25, 2014.......... | 100 | 40 | 18 | 1 | 0 | 0 |
| November 25, 2015.......... | 100 | 34 | 14 | 0 | 0 | 0 |
| November 25, 2016.......... | 100 | 29 | 11 | 0 | 0 | 0 |
| November 25, 2017.......... | 100 | 24 | 5 | 0 | 0 | 0 |
| November 25, 2018.......... | 100 | 20 | 0 | 0 | 0 | 0 |
| November 25, 2019.......... | 100 | 17 | 0 | 0 | 0 | 0 |
| November 25, 2020.......... | 100 | 14 | 0 | 0 | 0 | 0 |
| November 25, 2021.......... | 100 | 12 | 0 | 0 | 0 | 0 |
| November 25, 2022.......... | 100 | 10 | 0 | 0 | 0 | 0 |
| November 25, 2023.......... | 100 | 2 | 0 | 0 | 0 | 0 |
| November 25, 2024.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2025.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2026.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2027.......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2028.......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029.......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030.......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031.......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032.......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033.......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034.......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.50 | 10.02 | 6.82 | 5.16 | 4.33 | 3.74 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.40 | 9.40 | 6.35 | 4.80 | 4.05 | 3.50 |

- -------------------------

(1) Rounded to the nearest whole percentage except where otherwise indicated.
    If applicable, an * represents less than one-half of one percent but
    greater than zero percent.

(2) The weighted average life of any class of Class A and Mezzanine
    Certificates is determined by (i) multiplying the assumed net reduction, if
    any, in the Certificate Principal Balance on each Distribution Date of such
    class of Certificates by the number of years from the date of issuance of
    the Certificates to the related Distribution Date, (ii) summing the results
    and (iii) dividing the sum by the aggregate amount of the assumed net
    reductions in Certificate Principal Balance of such class of Certificates.

(3) Assumes an optional purchase of the Mortgage Loans on the earliest
    Distribution Date on which it is permitted.

S-54

WFB.000425

PERCENT OF ORIGINAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING(1)

CLASS M-10
PREPAYMENT SCENARIO

| DISTRIBUTION DATE | I | II | III | IV | V | IV |
|---|---|---|---|---|---|---|
| Initial Percentage........ | 100% | 100% | 100% | 100% | 100% | 100% |
| November 25, 2005......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2006......... | 100 | 100 | 100 | 100 | 100 | 100 |
| November 25, 2007......... | 100 | 100 | 100 | 100 | 100 | 94 |
| November 25, 2008......... | 100 | 100 | 78 | 54 | 36 | 23 |
| November 25, 2009......... | 100 | 92 | 61 | 39 | 24 | 14 |
| November 25, 2010......... | 100 | 78 | 48 | 28 | 16 | 0 |
| November 25, 2011......... | 100 | 66 | 38 | 20 | 6 | 0 |
| November 25, 2012......... | 100 | 56 | 30 | 15 | 0 | 0 |
| November 25, 2013......... | 100 | 48 | 23 | 7 | 0 | 0 |
| November 25, 2014......... | 100 | 40 | 18 | 0 | 0 | 0 |
| November 25, 2015......... | 100 | 34 | 14 | 0 | 0 | 0 |
| November 25, 2016......... | 100 | 29 | 10 | 0 | 0 | 0 |
| November 25, 2017......... | 100 | 24 | 0 | 0 | 0 | 0 |
| November 25, 2018......... | 100 | 20 | 0 | 0 | 0 | 0 |
| November 25, 2019......... | 100 | 17 | 0 | 0 | 0 | 0 |
| November 25, 2020......... | 100 | 14 | 0 | 0 | 0 | 0 |
| November 25, 2021......... | 100 | 12 | 0 | 0 | 0 | 0 |
| November 25, 2022......... | 100 | 1 | 0 | 0 | 0 | 0 |
| November 25, 2023......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2024......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2025......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2026......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2027......... | 100 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2028......... | 81 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2029......... | 70 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2030......... | 57 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2031......... | 44 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2032......... | 29 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2033......... | 14 | 0 | 0 | 0 | 0 | 0 |
| November 25, 2034......... | 0 | 0 | 0 | 0 | 0 | 0 |
| Weighted Average Life (years) to Maturity(2)..... | 26.48 | 9.92 | 6.74 | 5.10 | 4.25 | 3.66 |
| Weighted Average Life (years) to Optional Termination(2)(3).......... | 26.40 | 9.40 | 6.35 | 4.80 | 4.02 | 3.47 |

- ------------------------

(1) Rounded to the nearest whole percentage except where otherwise indicated. If applicable, an * represents less than one-half of one percent but greater than zero percent.

(2) The weighted average life of any class of Class A and Mezzanine Certificates is determined by (i) multiplying the assumed net reduction, if any, in the Certificate Principal Balance on each Distribution Date of such class of Certificates by the number of years from the date of issuance of the Certificates to the related Distribution Date, (ii) summing the results and (iii) dividing the sum by the aggregate amount of the assumed net reductions in Certificate Principal Balance of such class of Certificates.

(3) Assumes an optional purchase of the Mortgage Loans on the earliest Distribution Date on which it is permitted.

WFB.000426

There is no assurance that prepayments of the Mortgage Loans will conform to any of the levels of CPR reflected in the Prepayment Scenarios indicated in the tables above, or to any other level, or that the actual weighted average lives of the Class A and Mezzanine Certificates will conform to any of the weighted average lives set forth in the tables above. Furthermore, the information contained in the table with respect to the weighted average lives of the Class A and Mezzanine Certificates is not necessarily indicative of the weighted average lives that might be calculated or projected under different or varying prepayment, Index or One-Month LIBOR level assumptions.

The characteristics of the Mortgage Loans will differ from those assumed in preparing the tables above. In addition, it is unlikely that any Mortgage Loan will prepay at any constant percentage until maturity, that all of the Mortgage Loans will prepay at the same rate or that the level of the Index or One-Month LIBOR will remain constant or at any level for any period of time. The timing of changes in the rate of prepayments may significantly affect the actual yield to maturity to investors, even if the average rate of principal prepayments and the level of the Index or One-Month LIBOR is consistent with the expectations of investors.

YIELD SENSITIVITY OF THE MEZZANINE CERTIFICATES

If the Overcollateralized Amount and each class of Mezzanine Certificates with a lower distribution priority have been reduced to zero, the yield to maturity on the class of Mezzanine Certificates with the lowest distribution priority will become extremely sensitive to losses on the Mortgage Loans (and the timing thereof), because the entire amount of any Realized Losses (to the extent not covered by Net Monthly Excess Cashflow) will be allocated to that class of Certificates. Investors in the Mezzanine Certificates should fully consider the risk that Realized Losses on the Mortgage Loans could result in the failure of such investors to fully recover their investments. Once a Realized Loss is allocated to a Mezzanine Certificate, such written down amount will not bear interest and will not be reinstated (except in the case of Subsequent Recoveries). However, the amount of any Realized Losses allocated to the Mezzanine Certificates may be distributed to the holders of such Certificates according to the priorities set forth under "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement.

The Mezzanine Certificates will not be entitled to any principal distributions until the Stepdown Date or on any Distribution Date on which a Trigger Event is in effect (unless the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero).

As a result, the weighted average lives of the Mezzanine Certificates will be longer than would otherwise be the case if distributions of principal were allocated on a PRO RATA basis among the Class A and Mezzanine Certificates. As a result of the longer weighted average lives of the Mezzanine Certificates, the holders of such Certificates have a greater risk of suffering a loss on their investments. Further, because a Trigger Event may be based on delinquencies, it is possible for the Mezzanine Certificates to receive no principal distributions (unless the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero) on and after the Stepdown Date even if no losses have occurred on the mortgage pool. For additional considerations relating to the yield on the Mezzanine Certificates, see "Yield and Maturity Considerations" in the prospectus.

WFB.000427

DESCRIPTION OF THE CERTIFICATES

GENERAL

The Park Place Securities, Inc., Asset-Backed Pass-Through Certificates, Series 2004-WWF1 (the "Certificates") will consist of twenty-four classes of certificates, designated as: (i) the Class A-1A, Class A-1B, Class A-1C, Class A-1D, Class A-2, Class A-3, Class A-4 and Class A-5 Certificates (collectively, the "Class A Certificates"); (ii) the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9 and Class M-10 Certificates (collectively, the "Offered Mezzanine Certificates"); (iii) the Class M-11 Certificates (together with the Offered Mezzanine Certificates, the "Mezzanine Certificates"); (iv) the Class A-IO-S Certificates; (v) the Class CE Certificates (together with the Mezzanine Certificates, the "Subordinate Certificates"); (vi) the Class P Certificates; and (vii) the Class R Certificates and the Class R-X Certificates (the "Residual Certificates"). Only the Class A (other than the Class A-4 Certificates) and Offered Mezzanine Certificates are offered hereby (the "Offered Certificates"). The Class A-4, Class A-IO-S, Class M-11, Class CE, Class P and Residual Certificates are not offered by this prospectus supplement. Such certificates may be delivered to the Seller as partial consideration for the Mortgage Loans or alternatively, the Depositor may sell all or a portion of such certificates to one or more third-party investors.

Distributions on the Class A and Mezzanine Certificates will be made on the 25th day of each month, or, if such day is not a business day, on the next succeeding business day, beginning in December 2004 (each, a "Distribution Date").

The Certificates will represent in the aggregate the entire beneficial ownership interest in a trust (the "Trust") consisting primarily of the mortgage pool and funds deposited by the Depositor in the Pre-Funding Accounts and the Interest Coverage Accounts, if any, as of the Closing Date. Each class of Class A and Mezzanine Certificates will have the approximate original Certificate Principal Balances as set forth in the table under "Summary of Prospectus Supplement --The Certificates" in this prospectus supplement. The Pass-Through Rates on the Class A and Mezzanine Certificates will be calculated for each Distribution Date as described under "--Pass-Through Rates" below.

The Class A, Mezzanine and Class CE Certificates evidence the following initial undivided interests in the Trust:

| Class | Percentage Interest (1) |
|-------|-------------------------|
| A | 77.65% |
| M-1 | 1.00% |
| M-2 | 5.15% |
| M-3 | 1.50% |
| M-4 | 2.55% |
| M-5 | 1.70% |
| M-6 | 1.30% |
| M-7 | 1.60% |
| M-8 | 1.10% |
| M-9 | 1.30% |
| M-10 | 0.80% |
| M-11 | 0.75% |
| CE | 3.60% |

----------

(1) Approximate

The Offered Certificates will be issued, maintained and transferred on the book-entry records of The Depository Trust Company ("DTC") and its participants in minimum denominations of $25,000 and integral multiples of $1.00 in excess thereof. If the use of book-entry facilities for the Class A and Mezzanine Certificates is terminated, then any definitive certificates issued in respect of the Class A and Mezzanine Certificates will be transferable and exchangeable at the offices of the Trust Administrator designated for such purposes. No service charge will be imposed for any registration of transfer or exchange, but the Trust Administrator may require payment of a sum sufficient to cover any tax or other governmental charge imposed in connection therewith.

WFB.000428

All distributions to holders of the Certificates will be made by the Trust Administrator to the persons in whose names such Certificates are registered at the close of business on each Record Date, which will be DTC or its nominee unless definitive certificates are issued. The "Record Date" for each Distribution Date (i) with respect to any book-entry certificate will be the close of business on the business day immediately preceding such Distribution Date or (ii) with respect to any definitive certificates, will be the close of business on the last business day of the month preceding the month in which such Distribution Date occurs. Such distributions will be made by wire transfer in immediately available funds to the account of each certificateholder specified in writing to the Trust Administrator at least five business days prior to the relevant Record Date by such holder of Certificates or, if such instructions are not received, then by check mailed to the address of each such certificateholder as it appears in the Certificate Register. The final distribution on any class of Certificates will be made in like manner, but only upon presentment and surrender of such Certificates at the offices of the Trust Administrator designated for such purposes or such other location specified in the notice to certificateholders of such final distribution. As of the Closing Date, the Trust Administrator so designates its Corporate Trust Office located at 6th Street and Marquette Avenue, Minneapolis, Minnesota 55479 for such purpose.

BOOK-ENTRY CERTIFICATES

The Class A and Mezzanine Certificates will be book-entry certificates. Persons acquiring beneficial ownership interests in the Class A and Mezzanine Certificates, or certificate owners, will hold the Class A and Mezzanine Certificates through DTC in the United States, or, except with respect to the Class M-11 Certificates, Clearstream Banking Luxembourg, or Clearstream, formerly known as Cedelbank SA, or Euroclear in Europe, if they are participants of these systems, or indirectly through organizations which are participants in these systems. See "Description of the Securities--Book Entry Certificates" in the prospectus.

PASS-THROUGH RATES

The "Pass-Through Rate" on any Distribution Date with respect to each class of the Class A and Mezzanine Certificates will equal the lesser of (a) the related Formula Rate and (b) the related Net WAC Pass-Through Rate for such class for such Distribution Date. With respect to the Class A and Mezzanine Certificates, interest in respect of any Distribution Date will accrue during the related Interest Accrual Period on the basis of a 360-day year and the actual number of days elapsed.

The "Formula Rate" for each class of Class A and Mezzanine Certificates will be the lesser of (a) one-month LIBOR determined as described under "--Calculation of One-Month LIBOR" in this prospectus supplement plus the related Certificate Margin and (b) the related Maximum Cap Rate.

The "Certificate Margin" with respect to each class of Class A and Mezzanine Certificates will be the percentages set forth below.

WFB.000429

| | Margin | |
|---|---|---|
| Class | (1) (%) | (2) (%) |
| A-1A | 0.1700 | 0.3400 |
| A-1B | 0.5000 | 1.0000 |
| A-1C | 0.3625 | 0.7250 |
| A-1D | 0.4600 | 0.9200 |
| A-2 | 0.3700 | 0.7400 |
| A-3 | 0.4500 | 0.9000 |
| A-4 | 0.3700 | 0.7400 |
| A-5 | 0.4700 | 0.9400 |
| M-1 | 0.6300 | 0.9450 |
| M-2 | 0.6800 | 1.0200 |
| M-3 | 0.7400 | 1.1100 |
| M-4 | 1.1000 | 1.6500 |
| M-5 | 1.2000 | 1.8000 |
| M-6 | 1.3500 | 2.0250 |
| M-7 | 1.8000 | 2.7000 |
| M-8 | 1.9500 | 2.9250 |
| M-9 | 3.4000 | 5.1000 |
| M-10 | 2.5000 | 3.7500 |
| M-11 | 2.5000 | 3.7500 |

----------
(1) For the Interest Accrual Period for each Distribution Date on or prior to Optional Termination Date. (2) For each other Interest Accrual Period.

The "Net WAC Pass-Through Rate" for any Distribution Date and

(a) each class of Group I Certificates, will be a per annum rate (subject to adjustment based on the actual number of days elapsed in the related Interest Accrual Period) equal to the weighted average of the Expense Adjusted Net Mortgage Rates of the Group I Mortgage Loans;

(b) each class of Group II Certificates, will be a per annum rate (subject to adjustment based on the actual number of days elapsed in the related Interest Accrual Period) equal to the weighted average of the Expense Adjusted Net Mortgage Rates of the Group II Mortgage Loans;

(c) each class of Group III Certificates, will be a per annum rate (subject to adjustment based on the actual number of days elapsed in the related Interest Accrual Period) equal to the weighted average of the Expense Adjusted Net Mortgage Rates of the Group III Mortgage Loans; and

(d) each class of Mezzanine Certificates, will be a per annum rate (subject to adjustment based on the actual number of days elapsed in the related Interest Accrual Period) equal to the weighted average (weighted on the basis of the results of subtracting from the aggregate principal balance of each loan group plus any amounts on deposit in the related Pre-Funding Account the current aggregate Certificate Principal Balance of the related Class A Certificates) of (i) the weighted average of the Expense Adjusted Net Mortgage Rates of the Group I Mortgage Loans, (ii) the weighted average of the Expense Adjusted Net Mortgage Rates of the Group II Mortgage Loans and (iii) the weighted average of the Expense Adjusted Net Mortgage Rates of the Group III Mortgage Loans.

The "Expense Adjusted Net Mortgage Rate" for any Mortgage Loan for any Distribution Date will be a per annum rate equal to the applicable Mortgage Rate for such Mortgage Loan as of the first day of the month preceding the month in which such Distribution Date occurs minus the sum of (i) 0.50% per annum and (ii) the Custodial Fee expressed as a per annum rate (the "Custodial Fee Rate").

The "Maximum Cap Rate" for any Distribution Date and each class of Class A and Mezzanine Certificates is calculated in the same manner as the related Net WAC Pass-Through Rate, but based on the Expense Adjusted Net

S-59

WFB.000430

Maximum Mortgage Rates of the applicable Mortgage Loans rather than the Expense Adjusted Net Mortgage Rates of the applicable Mortgage Loans plus the excess, if any, of the then applicable maximum rate set forth in the related Cap Contract over the then applicable strike rate set forth in such Cap Contract (such excess to be adjusted if the Certificate Principal Balance of the applicable Certificates exceeds the applicable notional balance for such Distribution Date).

The "Expense Adjusted Net Maximum Mortgage Rate" for any Distribution Loan for any Distribution Date will be a per annum rate equal to the applicable Maximum Mortgage Rate (or the Mortgage Rate for such Mortgage Loan in the case of any fixed-rate Mortgage Loans) as of the first day of the month preceding the month in which the Distribution Date occurs minus the sum of (i) 0.50% per annum and (iii) the Custodial Fee Rate.

The Pass-Through Rates on the Class A and Mezzanine Certificates for the Interest Accrual Period beginning on a Distribution Date, to the extent it has been determined, and for the immediately preceding Interest Accrual Period will be made available via the Trust Administrator's internet website, together with the monthly statements required by the Pooling and Servicing Agreement. The Trust Administrator's internet website will initially be located at www.ctslink.com and assistance in using the website can be obtained by calling the Trust Administrator's customer service desk at (301) 815-6600. In connection with providing access to its internet website, the Trust Administrator may require the use of an assigned log-on identification number and the acceptance of a disclaimer. Parties that are unable to use the above distribution method are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such.

The Pass-Through Rate on any Distribution Date with respect to the Class A-IO-S Certificates will equal the Excess Servicing Fee Rate.

NET WAC RATE CARRYOVER AMOUNTS

On the Closing Date, the Trust Administrator will establish a segregated trust account (the "Net WAC Rate Carryover Reserve Account") from which distributions in respect of Net WAC Rate Carryover Amounts on the Class A and Mezzanine Certificates will be made. The Net WAC Rate Carryover Reserve Account will be an asset of the Trust but not of any REMIC. On each Distribution Date, to the extent required following the distribution of the Available Funds as described under "--Overcollateralization Provisions" in this prospectus supplement, the Trust Administrator will withdraw from amounts in the Net WAC Rate Carryover Reserve Account to distribute to the Class A and Mezzanine Certificates any Net WAC Rate Carryover Amounts in the following order of priority, in each case to the extent of amounts remaining in the Net WAC Rate Carryover Reserve Account:

FIRST, concurrently, to each class of Class A Certificates, the related Cap Amount, in each case up to a maximum amount equal to the related Net WAC Rate Carryover Amount for such Distribution Date;

SECOND, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, the related Cap Amount, in each case up to a maximum amount equal to the related Net WAC Rate Carryover Amount for such Distribution Date;

THIRD, concurrently, to each class of Class A Certificates, the related Net WAC Rate Carryover Amount remaining undistributed pursuant to clause FIRST above, on a PRO RATA basis based on such respective remaining Net WAC Rate Carryover Amounts; and

FOURTH, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, the related Net WAC Rate Carryover Amount remaining undistributed pursuant to clause SECOND above.

The "Cap Amount" for any class of Class A (other than the Class A-2 Certificates) or Mezzanine Certificates is equal to (i) the aggregate amount received by the trust from the related Cap Contract multiplied by (ii) a fraction equal to (a) the Certificate Principal Balance of such class immediately prior to the applicable Distribution Date divided by (b) the aggregate Certificate Principal Balance immediately prior to the applicable Distribution Date of all classes of Certificates directly benefitted by such Cap Contract.

WFB.000431

THE CAP CONTRACTS

The following Certificates will have the benefit of an interest rate corridor: (i) the Class A-1A Certificates, (ii) the Class A-1B and Class A-1C Certificates, (iii) the Class A-1D Certificates, (iv) the Class A-3 Certificates, (iv) the Group III Certificates and (v) the Mezzanine Certificates (collectively, the "Cap Contracts"). Pursuant to the Cap Contracts, Bear, Stearns Financial Products, Inc. (together with any successor, the "Counterparty" or "Cap Provider") will agree to pay to the Trust a monthly payment in an amount equal to the product of: (1) for the Distribution Date in January 2005 through the Distribution Date in January 2008 (in the case of the Class A-1A Certificates), April 2008 (in the case of the Class A-1B, Class A-1C, Group III and Mezzanine Certificates), November 2007 (in the case of the Class A-1D Certificates) and October 2007 (in the case of the Class A-3 Certificates), the excess, if any, of one-month LIBOR over the rate set forth in the related Cap Contract, up to a maximum rate set forth in the related Cap Contract; (2) the lesser of (i) the notional amount for such interest accrual period set forth in the related Cap Contract and (ii) the aggregate Certificate Principal Balance of the related Certificates; and (3) a fraction, the numerator of which is the actual number of days in the related Interest Accrual Period, and the denominator of which is 360. The notional amount declines in accordance with a schedule set forth in the related Cap Contract. The Cap Contracts will terminate after the final Distribution Date set forth above.

The Counterparty is "AAA" by S&P and "Aaa" by Moody's.

CALCULATION OF ONE-MONTH LIBOR

With respect to each Interest Accrual Period (other than the first Interest Accrual Period) and the Class A and Mezzanine Certificates, on the second business day preceding such Interest Accrual Period (each such date, an "Interest Determination Date"), the Trust Administrator will determine one-month LIBOR for the next Interest Accrual Period. With respect to the first Interest Accrual Period, on the Closing Date, the Trust Administrator will determine one-month LIBOR for such Interest Accrual Period based on the information available on the second business day preceding the Closing Date. "One-Month LIBOR" means, as of any Interest Determination Date, the London interbank offered rate for one-month U.S. dollar deposits which appears on Telerate Page 3750 (as defined herein) as of 11:00 a.m. (London time) on such date. If such rate does not appear on Telerate Page 3750, the rate for that day will be determined on the basis of the offered rates of the Reference Banks for one-month U.S. dollar deposits, as of 11:00 a.m. (London time) on such Interest Determination Date. The Trust Administrator will request the principal London office of each of the Reference Banks to provide a quotation of its rate. If on such Interest Determination Date two or more Reference Banks provide such offered quotations, One-Month LIBOR for the related Interest Accrual Period will be the arithmetic mean of such offered quotations (rounded upwards if necessary to the nearest whole multiple of 0.0625%). If on such Interest Determination Date fewer than two Reference Banks provide such offered quotations, One-Month LIBOR for the related Interest Accrual Period will be the higher of (x) One-Month LIBOR as determined on the previous Interest Determination Date and (y) the Reserve Interest Rate.

As used in this section, "business day" means a day on which banks are open for dealing in foreign currency and exchange in London and New York City; "Telerate Page 3750" means the display page currently so designated on Moneyline Telerate (or such other page as may replace that page on that service for the purpose of displaying comparable rates or prices); "Reference Banks" means leading banks selected by the Trust Administrator (after consultation with the Depositor) and engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) which have been designated as such by the Trust Administrator and (iii) not controlling, controlled by, or under common control with, the Depositor or the Seller; and "Reserve Interest Rate" will be the rate per annum that the Trust Administrator determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 0.0625%) of the one-month U.S. dollar lending rates which New York City banks selected by the Trust Administrator (after consultation with the Depositor) are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or, (ii) in the event that the Trust Administrator can determine no such arithmetic mean, the lowest one-month U.S. dollar lending rate which New York City banks selected by the Trust Administrator (after consultation with the Depositor) are quoting on such Interest Determination Date to leading European banks.

S-61

WFB.000432

The establishment of One-Month LIBOR on each Interest Determination Date by the Trust Administrator and the Trust Administrator's calculation of the rate of interest applicable to the Class A and Mezzanine Certificates for the related Interest Accrual Period will (in the absence of manifest error) be final and binding.

INTEREST DISTRIBUTIONS

Holders of the Class A and Mezzanine Certificates will be entitled to receive on each Distribution Date, the applicable Interest Distribution Amount, in the priorities set forth below.

I. On each Distribution Date, the Group I Interest Remittance Amount will be distributed in the following order of priority:

(i) to the holders of the Class A-IO-S Certificates (to the extent of the Excess Servicing Fee on the Group I Mortgage Loans), the Senior Interest Distribution Amount related to such Certificates;

(ii) concurrently, to the holders of each class of Group I Certificates, on a PRO RATA basis based on the entitlement of each such class, the Senior Interest Distribution Amount related to such Certificates; and

(iii) concurrently, to the holders of each class of Group II Certificates and Group III Certificates, on a PRO RATA basis based on the entitlement of each such class, the Senior Interest Distribution Amount related to such Certificates, to the extent remaining undistributed after the distribution of the Group II Interest Remittance Amount and the Group III Interest Remittance Amount, as set forth in clause II and clause III below.

II. On each Distribution Date, the Group II Interest Remittance Amount will be distributed in the following order of priority:

(i) to the holders of the Class A-IO-S Certificates (to the extent of the Excess Servicing Fee on the Group II Mortgage Loans), the Senior Interest Distribution Amount related to such Certificates;

(ii) concurrently, to the holders of each class of Group II Certificates, on a PRO RATA basis based on the entitlement of each such class, the Senior Interest Distribution Amount related to such Certificates; and

(iii) concurrently, to the holders of each class of Group I Certificates and Group III Certificates, on a PRO RATA basis based on the entitlement of each such class, the Senior Interest Distribution Amount related to such Certificates, to the extent remaining undistributed after the distribution of the Group I Interest Remittance Amount and the Group III Interest Remittance Amount, as set forth in clause I above and clause III below.

III. On each Distribution Date, the Group III Interest Remittance Amount will be distributed in the following order of priority:

(i) to the holders of the Class A-IO-S Certificates (to the extent of the Excess Servicing Fee on the Group III Mortgage Loans), the Senior Interest Distribution Amount related to such Certificates;

(ii) concurrently, to the holders of each class of Group III Certificates, on a PRO RATA basis based on the entitlement of each such class, the Senior Interest Distribution Amount related to such Certificates; and

(iii) concurrently, to the holders of each class of Group I Certificates and Group II Certificates, on a PRO RATA basis based on the entitlement of each such class, the Senior Interest Distribution Amount related to such Certificates, to the extent remaining undistributed after the distribution of the Group I Interest Remittance Amount and the Group II Interest Remittance Amount, as set forth in clause I and clause II above.

IV. On each Distribution Date, following the distributions of interest to the holders of each class of the Class A Certificates, the sum of the Group I Interest Remittance Amount, the Group II Interest Remittance Amount and the Group III Interest Remittance Amount remaining will be distributed sequentially to the Class M-1, Class M-2, Class

S-62

WFB.000433

M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, in an amount equal to the Interest Distribution Amount for each such class.

On any Distribution Date, any shortfalls resulting from application of the Relief Act and any Prepayment Interest Shortfalls to the extent not covered by Compensating Interest paid by the Master Servicer, in each case regardless of which loan group experienced the shortfall, will be allocated first, to reduce the interest accrued on the Class CE Certificates, and thereafter, to reduce the Interest Distribution Amounts with respect to the Class A and Mezzanine Certificates on a PRO RATA basis based on the respective amounts of interest accrued on such Certificates for such Distribution Date. The holders of the Class A and Mezzanine Certificates will not be entitled to reimbursement for any such interest shortfalls.

PRINCIPAL DISTRIBUTIONS ON THE CLASS A AND MEZZANINE CERTIFICATES

I. On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, distributions in respect of principal to the extent of the Group I Principal Distribution Amount will be made in the following amounts and order of priority:

(i) to the holders of the Group I Certificates (allocated among the classes of Group I Certificates in the priority described below), until the Certificate Principal Balances thereof have been reduced to zero; and

(ii) concurrently, to the holders of the Group II Certificates (allocated among the classes of Group II Certificates in the priority described below) and the Group III Certificates (allocated among the classes of Group III Certificates in the priority described below), on a PRO RATA basis based on the aggregate Certificate Principal Balance of each such group, after taking into account the distribution of the Group II Principal Distribution Amount and the Group III Principal Distribution Amount already distributed, as described herein, until the Certificate Principal Balances thereof have been reduced to zero.

II. On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, distributions in respect of principal to the extent of the Group II Principal Distribution Amount will be made in the following amounts and order of priority:

(i) to the holders of the Group II Certificates (allocated among the classes of Group II Certificates in the priority described below), until the Certificate Principal Balances thereof have been reduced to zero; and

(ii) concurrently, to the holders of the Group I Certificates (allocated among the classes of Group I Certificates in the priority described below) and the Group III Certificates (allocated among the classes of Group III Certificates in the priority described below), on a PRO RATA basis based on the aggregate Certificate Principal Balance of each such group, after taking into account the distribution of the Group I Principal Distribution Amount and the Group III Principal Distribution Amount already distributed, as described herein, until the Certificate Principal Balances thereof have been reduced to zero.

III. On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, distributions in respect of principal to the extent of the Group III Principal Distribution Amount will be made in the following amounts and order of priority:

(i) to the holders of the Group III Certificates (allocated among the classes of Group III Certificates in the priority described below), until the Certificate Principal Balances thereof have been reduced to zero; and

(ii) concurrently, to the holders of the Group I Certificates (allocated among the classes of Group I Certificates in the priority described below) and the Group II Certificates (allocated among the classes of Group II Certificates in the priority described below), on a PRO RATA basis based on the aggregate Certificate Principal Balance of each such group, after taking into account the distribution of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount already distributed, as described herein, until the Certificate Principal Balances thereof have been reduced to zero.

WFB.000434

IV. On each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, distributions in respect of principal to the extent of the sum of the Group I Principal Distribution Amount, the Group II Principal Distribution Amount and the Group III Principal Distribution Amount remaining undistributed for such Distribution Date will be made sequentially to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, in each case, until the Certificate Principal Balance of each such class has been reduced to zero.

V. On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, distributions in respect of principal to the extent of the Group I Principal Distribution Amount will be made in the following amounts and order of priority:

(i) to the holders of the Group I Certificates, the Senior Group I Principal Distribution Amount (allocated among the classes of Group I Certificates in the priority described below), until the Certificate Principal Balances thereof have been reduced to zero; and

(ii) concurrently, to the holders of the Group II Certificates (allocated among the classes of Group II Certificates in the priority described below) and the Group III Certificates (allocated among the classes of Group III Certificates in the priority described below), on a PRO RATA basis based on the remaining undistributed Senior Group II Principal Distribution Amount and Senior Group III Principal Distribution Amount, after taking into account the distribution of the Group II Principal Distribution Amount and the Group III Principal Distribution Amount as described herein, up to an amount equal to the Senior Group II Principal Distribution Amount and the Senior Group III Principal Distribution Amount remaining undistributed, until the Certificate Principal Balances thereof have been reduced to zero.

VI. On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, distributions in respect of principal to the extent of the Group II Principal Distribution Amount will be made in the following amounts and order of priority:

(i) to the holders of the Group II Certificates, the Senior Group II Principal Distribution Amount (allocated among the classes of Group II Certificates in the priority described below), until the Certificate Principal Balances thereof have been reduced to zero; and

(ii) concurrently, to the holders of the Group I Certificates (allocated among the classes of Group I Certificates in the priority described below) and the Group III Certificates (allocated among the classes of Group III Certificates in the priority described below), on a PRO RATA basis based on the remaining undistributed Senior Group I Principal Distribution Amount and Senior Group III Principal Distribution Amount, after taking into account the distribution of the Group I Principal Distribution Amount and the Group III Principal Distribution Amount as described herein, up to an amount equal to the Senior Group I Principal Distribution Amount and the Senior Group III Principal Distribution Amount remaining undistributed, until the Certificate Principal Balances thereof have been reduced to zero.

VII. On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, distributions in respect of principal to the extent of the Group III Principal Distribution Amount will be made in the following amounts and order of priority:

(i) to the holders of the Group III Certificates, the Senior Group III Principal Distribution Amount (allocated among the classes of Group III Certificates in the priority described below), until the Certificate Principal Balances thereof have been reduced to zero; and

(ii) concurrently, to the holders of the Group I Certificates (allocated among the classes of Group I Certificates in the priority described below) and the Group II Certificates (allocated among the classes of Group II Certificates in the priority described below), on a PRO RATA basis based on the remaining undistributed Senior Group I Principal Distribution Amount and Senior Group II Principal Distribution Amount, after taking into account the distribution of the Group I Principal Distribution Amount and the Group II Principal Distribution Amount as described herein, up to an amount equal to the Senior Group I Principal Distribution Amount and the Senior Group II Principal Distribution Amount remaining undistributed, until the Certificate Principal Balances thereof have been reduced to zero.

WFB.000435

VIII. On each Distribution Date (a) on or after the Stepdown Date and (b) on which a Trigger Event is not in effect, distributions in respect of principal to the extent of the sum of the Group I Principal Distribution Amount, the Group II Principal Distribution Amount and the Group III Principal Distribution Amount remaining undistributed for such Distribution Date will be made in the following amounts and order of priority:

(i) to the holders of the Class M-1 Certificates, the Class M-1 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(ii) to the holders of the Class M-2 Certificates, the Class M-2 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(iii) to the holders of the Class M-3 Certificates, the Class M-3 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(iv) to the holders of the Class M-4 Certificates, the Class M-4 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(v) to the holders of the Class M-5 Certificates, the Class M-5 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(vi) to the holders of the Class M-6 Certificates, the Class M-6 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(vii) to the holders of the Class M-7 Certificates, the Class M-7 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(viii) to the holders of the Class M-8 Certificates, the Class M-8 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(ix) to the holders of the Class M-9 Certificates, the Class M-9 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero;

(x) to the holders of the Class M-10 Certificates, the Class M-10 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero; and

(xi) to the holders of the Class M-11 Certificates, the Class M-11 Principal Distribution Amount, until the Certificate Principal Balance thereof has been reduced to zero.

With respect to the Group I Certificates, all principal distributions will be distributed concurrently, on a PRO RATA basis (based on (i) the aggregate Certificate Principal Balance of the Class A-1A and Class A-1B Certificates, (ii) the Certificate Principal Balance of the Class A-1C Certificates and (iii) the Certificate Principal Balance of the Class A-1D Certificates, respectively) (a) sequentially, to the Class A-1A and Class A-1B Certificates, in that order, until their respective Certificate Principal Balances have been reduced to zero, (b) the Class A-1C Certificates and (c) the Class A-1D Certificates, with the exception that:

(A) if a Sequential Trigger Event is in effect, principal distributions will be distributed first, concurrently, on a PRO RATA basis (based on (i) the aggregate Certificate Principal Balance of the Class A-1A and Class A-1B Certificates and (ii) the Certificate Principal Balance of the Class A-1C Certificates, respectively), (a) sequentially, to the Class A-1A and Class A-1B Certificates, in that order, until their respective Certificate Principal Balances have been reduced to zero and (b) the Class A-1C Certificates, until its Certificate Principal Balance has been reduced to zero and second, to the Class A-1D Certificates;

(B) on any Distribution Date on which the aggregate Certificate Principal Balance of the Subordinate Certificates has been reduced to zero and a Class A-1A Accelerated Amortization Event is in effect, principal

WFB.000436

distributions will be distributed first, to the Class A-1A Certificates, until the Certificate Principal Balance of the Class A-1A Certificates has been reduced to zero and second, concurrently, to the Class A-1B, Class A-1C and Class A-1D Certificates, on a PRO RATA basis based on the Certificate Principal Balance of each such class; and

(C) on any Distribution Date on which the aggregate Certificate Principal Balance of the Subordinate Certificates has been reduced to zero and a Class A-1A Accelerated Amortization Event is in effect, principal distributions will be distributed to the Group I Certificates on a PRO RATA basis based on the Certificate Principal Balance of each such class.

With respect to the Group II Certificates, all principal distributions will be distributed on a PRO RATA basis based on the Certificate Principal Balance of each such class, with the exception that if a Sequential Trigger Event is in effect, principal distributions will be allocated sequentially, to the Class A-2 and Class A-3 Certificates, in that order, until their respective Certificate Principal Balances have been reduced to zero.

With respect to the Group III Certificates, all principal distributions will be distributed on a PRO RATA basis based on the Certificate Principal Balance of each such class, with the exception that if a Sequential Trigger Event is in effect, principal distributions will be allocated sequentially, to the Class A-4 and Class A-5 Certificates, in that order, until their respective Certificate Principal Balances have been reduced to zero.

CREDIT ENHANCEMENT

The credit enhancement provided for the benefit of the holders of the Class A and Mezzanine Certificates consists of subordination, as described below, excess interest and overcollateralization, as described under "--Overcollateralization Provisions" herein.

The rights of the holders of the Subordinate Certificates to receive distributions will be subordinated, to the extent described herein, to the rights of the holders of the Class A Certificates. This subordination is intended to enhance the likelihood of regular receipt by the holders of the Class A Certificates of the full amount of their scheduled monthly distributions of interest and principal and to afford such holders protection against Realized Losses.

The protection afforded to the holders of the Class A Certificates by means of the subordination of the Subordinate Certificates will be accomplished by the preferential right of the holders of the Class A Certificates to receive on any Distribution Date, prior to distributions of interest on the Subordinate Certificates, distributions in respect of interest and prior to distributions of principal on the Subordinate Certificates, distributions in respect of principal, subject to available funds.

The allocation of distributions in respect of principal to the Class A Certificates on each Distribution Date (a) prior to the Stepdown Date or (b) on which a Trigger Event is in effect, will have the effect of accelerating the amortization of the Class A Certificates while, in the absence of Realized Losses, increasing the respective percentage interest in the principal balance of the Mortgage Loans evidenced by the Subordinate Certificates. Increasing the respective percentage interest in the Trust of the Subordinate Certificates relative to that of the Class A Certificates is intended to preserve the availability of the subordination provided by the Subordinate Certificates.

In addition, the rights of the holders of Mezzanine Certificates with lower numerical class designations will be senior to the rights of holders of Mezzanine Certificates with higher numerical class designations, and the rights of the holders of the Mezzanine Certificates to receive distributions in respect of the Mortgage Loans will be senior to the rights of the holders of the Class CE Certificates, in each case to the extent described herein. This subordination is intended to enhance the likelihood of regular receipt by the holders of more senior Certificates of distributions in respect of interest and principal and to afford such holders protection against Realized Losses.

S-66

WFB.000437

OVERCOLLATERALIZATION PROVISIONS

The weighted average Expense Adjusted Net Mortgage Rate for the Mortgage Loans is generally expected to be higher than the weighted average of the Pass-Through Rates on the Class A and Mezzanine Certificates, thus generating excess interest collections which, in the absence of Realized Losses, will not be necessary to fund interest distributions on the Class A and Mezzanine Certificates. The Pooling and Servicing Agreement will require that, on each Distribution Date, the Net Monthly Excess Cashflow, if any be distributed as follows:

FIRST, to the holders of the class or classes of Certificates then entitled to receive distributions in respect of principal, in an amount equal to the Overcollateralization Increase Amount, distributable as part of the Group I Principal Distribution Amount, the Group II Principal Distribution Amount or the Group III Principal Distribution Amount as described under "--Principal Distributions on the Class A and Mezzanine Certificates";

SECOND, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, in each case up to the Interest Carry Forward Amount for each such class of Mezzanine Certificates for such Distribution Date;

THIRD, sequentially, to the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates, in that order, in each case up to the Allocated Realized Loss Amount for each such class of Mezzanine Certificates for such Distribution Date;

FOURTH, to make payments to the Net WAC Rate Carryover Reserve Account, to the extent required to distribute to the holders of the Class A or Mezzanine Certificates any Net WAC Rate Carryover Amounts for such classes, after taking into account amounts, if any, received under the Cap Contracts;

FIFTH, in the event that a Class A-1A Accelerated Amortization Event is in effect, to the holders of the Class A-1A Certificates, in an amount equal to the Class A-1A Accelerated Amortization Amount, until the Certificate Principal Balance of the Class A-1A Certificates has been reduced to zero; and

SIXTH, to the holders of the Class CE Certificates as provided in the Pooling and Servicing Agreement; and

SEVENTH, to the holders of the Residual Certificates, any remaining amounts; provided that if such Distribution Date is the Distribution Date immediately following the expiration of the latest prepayment charge term or any Distribution Date thereafter, then any such remaining amounts will be distributed FIRST, to the holders of the Class P Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and SECOND, to the holders of the Residual Certificates.

On each Distribution Date, after making the distributions of the remainder of the Net Monthly Excess Cashflow as described above, the Trust Administrator will withdraw from the Net WAC Rate Carryover Reserve Account the amounts on deposit therein and will distribute these amounts to the holders of the Class A and Mezzanine Certificates in the order and priority set forth under "--Net WAC Rate Carryover Amounts" herein.

On each Distribution Date, the Trust Administrator will withdraw from the distribution account all amounts representing prepayment charges in respect of the Mortgage Loans received during the related Prepayment Period and will distribute these amounts to the holders of the Class P Certificates.

In the event that Realized Losses are incurred on the Mortgage Loans, such Realized Losses could result in an overcollateralization deficiency since such Realized Losses would reduce the principal balance of the Mortgage Loans without a corresponding reduction to the aggregate Certificate Principal Balances of the Class A and Mezzanine Certificates. In such event, the Pooling and Servicing Agreement will require the distribution from Net Monthly Excess Cashflow, if any on such Distribution Date, of an amount equal to the Overcollateralization Increase Amount, which will constitute a principal distribution on the Class A and Mezzanine Certificates in reduction of the Certificate Principal Balances thereof in order to eliminate such overcollateralization deficiency. This will have the effect of accelerating the

WFB.000438

amortization of the Class A and Mezzanine Certificates relative to the amortization of the Mortgage Loans, and of increasing the Overcollateralized Amount.

In the event that the Overcollateralization Target Amount is permitted to step down on any Distribution Date, the Pooling and Servicing Agreement provides that a portion of the principal which would otherwise be distributed to the holders of the Class A and Mezzanine Certificates on such Distribution Date will be distributed to the holders of the Class CE Certificates pursuant to the priorities set forth above. This will have the effect of decelerating the amortization of the Class A and Mezzanine Certificates than under the amortization of the Mortgage Loans, and of reducing the Overcollateralized Amount. However, if on any Distribution Date a Trigger Event is in effect, the Overcollateralization Target Amount will not be permitted to step down on such Distribution Date.

ALLOCATION OF LOSSES; SUBORDINATION

Any Realized Losses on the Mortgage Loans incurred during a Due Period will first, reduce the Net Monthly Excess Cashflow for the related Distribution Date and second, reduce the Overcollateralized Amount, if any, for such Distribution Date. If after all distributions are made by the Trust Administrator on a Distribution Date, the aggregate Certificate Principal Balance of the Class A, Mezzanine and Class P Certificates exceeds the sum of (i) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period and (ii) any amounts remaining on deposit in the Pre-Funding Accounts, the amount of such excess will be allocated to reduce the Certificate Principal Balances of the Mezzanine Certificates in reverse numerical order, beginning with the class of Mezzanine Certificates then outstanding with the highest numerical class designation, until the Certificate Principal Balance of each such class has been reduced to zero. The Pooling and Servicing Agreement does not permit the allocation of any Realized Losses to the Class A or Class P Certificates. Investors in the Class A Certificates should note, however, that although Realized Losses cannot be allocated to such Certificates, under certain loss scenarios, there may not be enough principal and interest on the Mortgage Loans to distribute to the holders of the Class A Certificates all principal and interest amounts to which they are then entitled.

Once Realized Losses have been allocated to the Mezzanine Certificates, such amounts with respect to such Certificates will no longer accrue interest and such amounts will not be reinstated thereafter (except in the case of Subsequent Recoveries). However, Allocated Realized Loss Amounts may be distributed to the holders of the Mezzanine Certificates from Net Monthly Excess Cashflow, according to the priorities set forth under "--Overcollateralization Provisions" above.

Any allocation of a Realized Loss to a Mezzanine Certificate will be made by reducing the Certificate Principal Balance thereof by the amount so allocated as of the Distribution Date in the month following the calendar month in which such Realized Loss was incurred. Notwithstanding anything to the contrary described herein, in no event will the Certificate Principal Balance of any Mezzanine Certificate be reduced more than once in respect of any particular amount both (i) allocable to such Certificate in respect of Realized Losses and (ii) distributable as principal to the holder of such Certificate from Net Monthly Excess Cashflow.

"Subsequent Recoveries" are unanticipated amounts received on a liquidated Mortgage Loan that resulted in a Realized Loss in a prior month, net of amounts reimbursable to the Master Servicer therefrom. If Subsequent Recoveries are received, they will be included as part of the Principal Remittance Amount for the following Distribution Date and distributed in accordance with the priorities described in this prospectus supplement. In addition, after giving effect to all distributions on a Distribution Date, if any Allocated Realized Loss Amounts are outstanding, the Allocated Realized Loss Amount for the class of Mezzanine Certificates then outstanding with the highest distribution priority will be decreased by the amount of such Subsequent Recoveries until reduced to zero (with any remaining Subsequent Recoveries applied to reduce the Allocated Realized Loss Amount of the class with the next highest distribution priority), and the Certificate Principal Balance of such class or classes of Mezzanine Certificates will be increased by the same amount. Thereafter, such class or classes of Mezzanine Certificates will accrue interest on the increased Certificate Principal Balance.

S-68

WFB.000439

DEFINITIONS

An "Allocated Realized Loss Amount" with respect to any class of the Mezzanine Certificates and any Distribution Date will be an amount equal to (x) the sum of any Realized Loss allocated to that class of Certificates on the Distribution Date as described above in "--Allocation of Losses; Subordination" and any Allocated Realized Loss Amount for that class remaining undistributed from the previous Distribution Date minus (y) the amount of the increase in the related Certificate Principal Balance due to the receipt of Subsequent Recoveries.

The "Available Funds" for any Distribution Date will be equal to the sum, net of amounts reimbursable or payable therefrom to the Master Servicer, the Trust Administrator, the Trustee or the Custodian, of (i) the aggregate amount of scheduled monthly payments on the Mortgage Loans due on the related Due Date and received on or prior to the related Determination Date, after deduction of the Servicing Fee for such Distribution Date, (ii) unscheduled payments in respect of the Mortgage Loans, including prepayments, insurance proceeds, liquidation proceeds, Subsequent Recoveries and proceeds from repurchases or purchases of and substitutions for the Mortgage Loans occurring during the related Prepayment Period, (iii) proceeds from the purchase of the Mortgage Loans due to the optional termination of the Trust, (iv) all Advances with respect to the Mortgage Loans received for such Distribution Date, (v) any Compensating Interest paid by the Master Servicer, (vi) with respect to the Distribution Date immediately following the end of the Funding Period, any amounts remaining in the Pre-Funding Accounts after giving effect to any purchase of Subsequent Mortgage Loans and (vii) with respect to each Distribution Date during the Funding Period and on the Distribution Date immediately following the end of the Funding Period, any amounts required to be withdrawn by the Trust Administrator from the Interest Coverage Accounts for distribution on the Certificates. The holders of the Class P Certificates will be entitled to all prepayment charges received on the Mortgage Loans and such amounts will not be available for distribution to the Class A and Mezzanine Certificates.

A "Bankruptcy Loss" is a Deficient Valuation or a Debt Service Reduction.

The "Certificate Principal Balance" of the Class A, Mezzanine and Class P Certificates as of any date of determination will be equal to the initial Certificate Principal Balance thereof reduced by the aggregate of (a) all amounts allocable to principal previously distributed with respect to such Certificate and (b) with respect to any Mezzanine Certificate, any reductions in the Certificate Principal Balance thereof deemed to have occurred in connection with allocations of Realized Losses in the manner described herein (taking into account any increases in the Certificate Principal Balance thereof due to the receipt of Subsequent Recoveries). The "Certificate Principal Balance" of the Class CE Certificates as of any date of determination will be equal to the excess, if any, of (a) the then aggregate principal balance of the Mortgage Loans and any amounts on deposit in the Pre-Funding Accounts over (b) the then aggregate Certificate Principal Balance of the Class A, Mezzanine and Class P Certificates.

The "Class A Principal Distribution Amount" will be an amount equal to the sum of (i) the Senior Group I Principal Distribution Amount, (ii) the Senior Group II Principal Distribution Amount and (iii) the Senior Group III Principal Distribution Amount.

The "Class A-1A Accelerated Amortization Amount" with respect to any Distribution Date on which a Class A-1A Accelerated Amortization Event is in effect, the lesser of (a) the amount of Available Funds remaining after making distributions pursuant to clause FOURTH under "--Overcollateralization Provisions" and (b) the Certificate Principal Balance of the Class A-1A Certificates (after application of the Group I Principal Distribution Amount, the Group II Principal Distribution Amount and the Group III Principal Distribution Amount on such Distribution Date).

A "Class A-1A Accelerated Amortization Event" with respect to any Distribution Date beginning with the Distribution Date in November 2011, until the Certificate Principal Balance of the Class A-1A Certificates has been reduced to zero, the circumstance in which the Certificate Principal Balance of the Class A-1A Certificates (after application of the Group I Principal Distribution Amount, the Group II Principal Distribution Amount and the Group III Principal Distribution Amount on such Distribution Date assuming no Class A-1A Accelerated Amortization Event is in effect on such Distribution Date) would exceed the specified target amount for such Distribution Date, as set forth on the schedule below:

WFB.000440

```
                    TARGET CERTIFICATE PRINCIPAL
          DISTRIBUTION DATE                     BALANCE
- -------------------------------------------------------------------

November 2011...........................    $59,167,211.58
December 2011...........................    $54,053,493.54
January 2012............................    $48,970,481.20
February 2012...........................    $43,917,982.18
March 2012..............................    $38,895,805.34
April 2012..............................    $33,903,760.72
May 2012................................    $28,941,659.58
June 2012...............................    $24,009,314.34
July 2012...............................    $19,106,538.62
August 2012.............................    $14,233,147.21
September 2012..........................    $ 9,388,956.06
October 2012............................    $ 4,573,782.28
November 2012 and thereafter............    $ 0.00
```

        The "Class M-1 Principal Distribution Amount" for any Distribution Date
will be an amount, not less than zero, equal to the lesser of (I) the
Certificate Principal Balance of the Class M-1 Certificates immediately prior to
such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate
Certificate Principal Balance of the Class A Certificates (after taking into
account the distribution of the Class A Principal Distribution Amount on such
Distribution Date) and (ii) the Certificate Principal Balance of the Class M-1
Certificates immediately prior to such Distribution Date over (y) the lesser of
(A) the product of (i) approximately 57.30% and (ii) the aggregate principal
balance of the Mortgage Loans as of the last day of the related Due Period
(after giving effect to scheduled payments of principal due during the related
Due Period, to the extent received or advanced, and unscheduled collections of
principal received during the related Prepayment Period) and (B) the aggregate
principal balance of the Mortgage Loans as of the last day of the related Due
Period (after giving effect to scheduled payments of principal due during the
related Due Period, to the extent received or advanced, and unscheduled
collections of principal received during the related Prepayment Period) minus
approximately $21,500,005.

        The "Class M-2 Principal Distribution Amount" for any Distribution Date
will be an amount, not less than zero, equal to the lesser of (I) the
Certificate Principal Balance of the Class M-2 Certificates immediately prior to
such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate
Certificate Principal Balance of the Class A Certificates (after taking into
account the distribution of the Class A Principal Distribution Amount on such
Distribution Date), (ii) the Certificate Principal Balance of the Class M-1
Certificates (after taking into account the distribution of the Class M-1
Principal Distribution Amount on such date) and (iii) the Certificate Principal
Balance of the Class M-2 Certificates immediately prior to such Distribution
Date over (y) the lesser of (A) the product of (i) approximately 67.60% and (ii)
the aggregate principal balance of the Mortgage Loans as of the last day of the
related Due Period (after giving effect to scheduled payments of principal due
during the related Due Period, to the extent received or advanced, and
unscheduled collections of principal received during the related Prepayment
Period) and (B) the aggregate principal balance of the Mortgage Loans as of the
last day of the related Due Period (after giving effect to scheduled payments of
principal due during the related Due Period, to the extent received or advanced,
and unscheduled collections of principal received during the related Prepayment
Period) minus approximately $21,500,005.

        The "Class M-3 Principal Distribution Amount" for any Distribution Date
will be an amount, not less than zero, equal to the lesser of (I) the
Certificate Principal Balance of the Class M-3 Certificates immediately prior to
such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate
Certificate Principal Balance of the Class A Certificates (after taking into
account the distribution of the Class A Principal Distribution Amount on such
Distribution Date), (ii) the Certificate Principal Balance of the Class M-1
Principal Distribution Amount on such date), (iii) the Certificate Principal
Balance of the Class M-2 Certificates (after taking into account the
distribution of the Class M-2 Principal Distribution Amount on such date) and
(iv) the Certificate Principal Balance of the Class M-3 Certificates immediately
prior to such Distribution Date over (y) the lesser of (A) the product of (i)
approximately 70.60% and (ii) the aggregate principal balance of the Mortgage
Loans as of the last day of the related Due Period (after giving effect to
scheduled payments of principal due during the related Due Period, to the extent
received or advanced, and unscheduled collections of principal received during
the related

WFB.000441

Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Class M-4 Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the lesser of (I) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (ii) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such date), (iii) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such date), (iv) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such date) and (v) the Certificate Principal Balance of the Class M-4 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 75.70% and (ii) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Class M-5 Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the lesser of (I) the Certificate Principal Balance of the Class M-5 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (ii) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such date), (iii) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such date), (iv) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such date), (v) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such date) and (vi) the Certificate Principal Balance of the Class M-5 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 79.10% and (ii) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Class M-6 Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the lesser of (I) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (ii) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such date), (iii) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such date), (iv) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such date), (v) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such date), (vi) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such date) and (vii) the Certificate Principal Balance of the Class M-6 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 81.70% and (ii) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled

WFB.000442

S-71

WFB.000443

payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Class M-7 Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the lesser of (I) the Certificate Principal Balance of the Class M-7 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (ii) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such date), (iii) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such date), (iv) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such date), (v) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such date), (vi) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such date), (vii) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such date) and (viii) the Certificate Principal Balance of the Class M-7 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 84.90% and (ii) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Class M-8 Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the lesser of (I) the Certificate Principal Balance of the Class M-8 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (ii) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such date), (iii) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such date), (iv) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such date), (v) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such date), (vi) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such date), (vii) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such date), (viii) the Certificate Principal Balance of the Class M-7 Certificates (after taking into account the distribution of the Class M-7 Principal Distribution Amount on such date) and (ix) the Certificate Principal Balance of the Class M-8 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 87.10% and (ii) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Class M-9 Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the lesser of (I) the Certificate Principal Balance of the Class M-9 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution

WFB.000444

S-72

WFB.000445

Date), (ii) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such date), (iii) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such date), (iv) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such date), (v) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such date), (vi) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such date), (vii) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such date), (viii) the Certificate Principal Balance of the Class M-7 Certificates (after taking into account the distribution of the Class M-7 Principal Distribution Amount on such date), (ix) the Certificate Principal Balance of the Class M-8 Certificates (after taking into account the distribution of the Class M-8 Principal Distribution Amount on such date) and (x) the Certificate Principal Balance of the Class M-9 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 89.70% and (ii) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Class M-10 Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the lesser of (I) the Certificate Principal Balance of the Class M-10 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (ii) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such date), (iii) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such date), (iv) the Certificate Principal Balance of the Class M-3 Certificates (after taking into account the distribution of the Class M-3 Principal Distribution Amount on such date), (v) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such date), (vi) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such date), (vii) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such date), (viii) the Certificate Principal Balance of the Class M-7 Certificates (after taking into account the distribution of the Class M-7 Principal Distribution Amount on such date), (ix) the Certificate Principal Balance of the Class M-8 Certificates (after taking into account the distribution of the Class M-8 Principal Distribution Amount on such date), (x) the Certificate Principal Balance of the Class M-9 Certificates (after taking into account the distribution of the Class M-9 Principal Distribution Amount on such date) and (xi) the Certificate Principal Balance of the Class M-10 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 91.30% and (ii) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Class M-11 Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the lesser of (I) the Certificate Principal Balance of the Class M-11 Certificates immediately prior to such Distribution Date and (II) the excess of (x) the sum of (i) the aggregate Certificate Principal Balance of the Class A Certificates (after taking into account the distribution of the Class A Principal Distribution Amount on such Distribution Date), (ii) the Certificate Principal Balance of the Class M-1 Certificates (after taking into account the distribution of the Class M-1 Principal Distribution Amount on such date), (iii) the Certificate Principal Balance of the Class M-2 Certificates (after taking into account the distribution of the Class M-2 Principal Distribution Amount on such date), (iv) the Certificate Principal Balance of the Class M-3 Certificates (after taking

into account the distribution of the Class M-3

S-73

WFB.000447

Principal Distribution Amount on such date), (v) the Certificate Principal Balance of the Class M-4 Certificates (after taking into account the distribution of the Class M-4 Principal Distribution Amount on such date), (vi) the Certificate Principal Balance of the Class M-5 Certificates (after taking into account the distribution of the Class M-5 Principal Distribution Amount on such date), (vii) the Certificate Principal Balance of the Class M-6 Certificates (after taking into account the distribution of the Class M-6 Principal Distribution Amount on such date), (viii) the Certificate Principal Balance of the Class M-7 Certificates (after taking into account the distribution of the Class M-7 Principal Distribution Amount on such date), (ix) the Certificate Principal Balance of the Class M-8 Certificates (after taking into account the distribution of the Class M-8 Principal Distribution Amount on such date), (x) the Certificate Principal Balance of the Class M-9 Certificates (after taking into account the distribution of the Class M-9 Principal Distribution Amount on such date), and (xi) the Certificate Principal Balance of the Class M-10 Certificates (after taking into account the distribution of the Class M-10 Principal Distribution Amount on such date) and (xii) the Certificate Principal Balance of the Class M- 11 Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 92.80% and (ii) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $21,500,005.

The "Credit Enhancement Percentage" for any Distribution Date and class will be the percentage obtained by dividing (x) the aggregate Certificate Principal Balance of the classes of Certificates with a lower distribution priority than such class, in each case calculated after distribution of the Group I Principal Distribution Amount, the Group II Principal Distribution Amount and the Group III Principal Distribution Amount to the holders of the Certificates then entitled to distributions of principal on such Distribution Date by (y) the aggregate principal balance of the Mortgage Loans and any amounts on deposit in the Pre-Funding Accounts, calculated after taking into account distributions of principal on the Mortgage Loans during the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced and unscheduled collections of principal received during the related Prepayment Period).

A "Debt Service Reduction" is any reduction in the amount which a mortgagor is obligated to pay on a monthly basis with respect to a Mortgage Loan as a result of any proceeding initiated under the United States Bankruptcy Code, other than a reduction attributable to a Deficient Valuation.

A "Deficient Valuation" with respect to any Mortgage Loan is a valuation by a court of competent jurisdiction of the mortgaged property in an amount less than the then outstanding indebtedness under the Mortgage Loan, which valuation results from a proceeding initiated under the United States Bankruptcy Code.

The "Determination Date" with respect to any Distribution Date will be the 18th day of the calendar month in which such Distribution Date occurs or, if such 18th day is not a business day, the business day immediately preceding such 18th day.

The "Due Period" with respect to any Distribution Date commences on the second day of the month immediately preceding the month in which such Distribution Date occurs and ends on the first day of the month in which such Distribution Date occurs.

The "Excess Servicing Fee" with respect to any loan group and any Distribution Date is an amount equal to the product of (i) one-twelfth of the Excess Servicing Fee Rate and (ii) the aggregate principal balance of the Mortgage Loans in such loan group as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period).

The "Excess Servicing Fee Rate" with respect to any Distribution Date is the excess of (i) 0.50% and (ii) the Servicing Fee Rate.

WFB.000448

The "Group I Allocation Percentage" for any Distribution Date will be the percentage equivalent of a fraction, the numerator of which will be (x) the Group I Principal Remittance Amount for such Distribution Date and the denominator of which will be (y) the Principal Remittance Amount for such Distribution Date.

The "Group I Interest Remittance Amount" for any Distribution Date will be that portion of the Available Funds for such Distribution Date that represents interest received or advanced on the Group I Mortgage Loans.

The "Group I Principal Distribution Amount" for any Distribution Date will be the sum of (i) the principal portion of all scheduled monthly payments on the Group I Mortgage Loans due during the related Due Period, to the extent received on or prior to the related Determination Date or advanced prior to such Distribution Date; (ii) the principal portion of all proceeds received in respect of the repurchase of a Group I Mortgage Loan (or, in the case of a substitution, certain amounts representing a principal adjustment) as required by the Pooling and Servicing Agreement during the related Prepayment Period; (iii) the principal portion of all other unscheduled collections, including insurance proceeds, liquidation proceeds, Subsequent Recoveries and all full and partial principal prepayments, received during the related Prepayment Period, to the extent applied as recoveries of principal on the Group I Mortgage Loans; (iv) in the case of the Distribution Date immediately following the end of the Funding Period, any amounts remaining in the Group I Pre-Funding Account and not used by the Trust Administrator to purchase Subsequent Group I Mortgage Loans and (v) the Group I Allocation Percentage of the amount of any Overcollateralization Increase Amount for such Distribution Date; MINUS (vi) the Group I Allocation Percentage of the amount of any Overcollateralization Reduction Amount for such Distribution Date. In no event will the Group I Principal Distribution Amount with respect to any Distribution Date be (x) less than zero or (y) greater than the then outstanding aggregate Certificate Principal Balance of the Class A and Mezzanine Certificates.

The "Group I Principal Remittance Amount" for any Distribution Date will be the sum of the amounts described in clauses (i) through (iv) of the definition of Group I Principal Distribution Amount.

The "Group II Allocation Percentage" for any Distribution Date will be the percentage equivalent of a fraction, the numerator of which will be (x) the Group II Principal Remittance Amount for such Distribution Date and the denominator of which will be (y) the Principal Remittance Amount for such Distribution Date.

The "Group II Interest Remittance Amount" for any Distribution Date will be that portion of the Available Funds for such Distribution Date that represents interest received or advanced on the Group II Mortgage Loans.

The "Group II Principal Distribution Amount" for any Distribution Date will be the sum of (i) the principal portion of all scheduled monthly payments on the Group II Mortgage Loans due during the related Due Period, to the extent received on or prior to the related Determination Date or advanced prior to such Distribution Date; (ii) the principal portion of all proceeds received in respect of the repurchase of a Group II Mortgage Loan (or, in the case of a substitution, certain amounts representing a principal adjustment) as required by the Pooling and Servicing Agreement during the related Prepayment Period; (iii) the principal portion of all other unscheduled collections, including insurance proceeds, liquidation proceeds, Subsequent Recoveries and all full and partial principal prepayments, received during the related Prepayment Period, to the extent applied as recoveries of principal on the Group II Mortgage Loans;(iv) in the case of the Distribution Date immediately following the end of the Funding Period, any amounts remaining in the Group II Pre-Funding Account and not used by the Trust Administrator to purchase Subsequent Group II Mortgage Loans and (v) the Group II Allocation Percentage of the amount of any Overcollateralization Increase Amount for such Distribution Date; MINUS (vi) the Group II Allocation Percentage of the amount of any Overcollateralization Reduction Amount for such Distribution Date. In no event will the Group II Principal Distribution Amount with respect to any Distribution Date be (x) less than zero or (y) greater than the then outstanding aggregate Certificate Principal Balance of the Class A and Mezzanine Certificates.

The "Group II Principal Remittance Amount" for any Distribution Date will be the sum of the amounts described in clauses (i) through (iv) of the definition of Group II Principal Distribution Amount.

WFB.000449

The "Group III Allocation Percentage" for any Distribution Date will be the percentage equivalent of a fraction, the numerator of which will be (x) the Group III Principal Remittance Amount for such Distribution Date and the denominator of which will be (y) the Principal Remittance Amount for such Distribution Date.

The "Group III Interest Remittance Amount" for any Distribution Date will be that portion of the Available Funds for such Distribution Date that represents interest received or advanced on the Group III Mortgage Loans.

The "Group III Principal Distribution Amount" for any Distribution Date will be the sum of (i) the principal portion of all scheduled monthly payments on the Group III Mortgage Loans due during the related Due Period, to the extent received on or prior to the related Determination Date or advanced prior to such Distribution Date; (ii) the principal portion of all proceeds received in respect of the repurchase of a Group III Mortgage Loan (or, in the case of a substitution, certain amounts representing a principal adjustment) as required by the Pooling and Servicing Agreement during the related Prepayment Period; (iii) the principal portion of all other unscheduled collections, including insurance proceeds, liquidation proceeds, Subsequent Recoveries and all full and partial principal prepayments, received during the related Prepayment Period, to the extent applied as recoveries of principal on the Group III Mortgage Loans; (iv) in the case of the Distribution Date immediately following the end of the Funding Period, any amounts remaining in the Group III Pre-Funding Account and not used by the Trust Administrator to purchase Subsequent Group III Mortgage Loans and (v) the Group III Allocation Percentage of the amount of any Overcollateralization Increase Amount for such Distribution Date; MINUS (vi) the Group III Allocation Percentage of the amount of any Overcollateralization Reduction Amount for such Distribution Date. In no event will the Group III Principal Distribution Amount with respect to any Distribution Date be (x) less than zero or (y) greater than the then outstanding aggregate Certificate Principal Balance of the Class A and Mezzanine Certificates.

The "Group III Principal Remittance Amount" for any Distribution Date will be the sum of the amounts described in clauses (i) through (iv) of the definition of Group III Principal Distribution Amount.

The "Interest Accrual Period" for any Distribution Date and the Class A and Mezzanine Certificates will be the period commencing on the Distribution Date in the month immediately preceding the month in which such Distribution Date occurs (or, in the case of the first period, commencing on the Closing Date) and ending on the day preceding such Distribution Date, and all distributions of interest on the Class A and Mezzanine Certificates will be based on a 360-day year and the actual number of days in the applicable Interest Accrual Period.

The "Interest Carry Forward Amount" with respect to any class of Class A, Class A-IO-S and Mezzanine Certificates and any Distribution Date will be equal to the amount, if any, by which the Interest Distribution Amount for such class of Certificates for the immediately preceding Distribution Date exceeded the actual amount distributed on such Certificates in respect of interest on such immediately preceding Distribution Date, together with any Interest Carry Forward Amount with respect to such Certificates remaining undistributed from the previous Distribution Date plus interest accrued thereon at the related Pass-Through Rate on such Certificates for the most recently ended Interest Accrual Period. The Interest Carry Forward Amount with respect to the Class A and Class A-IO-S Certificates, if any, will be distributed as part of the Senior Interest Distribution Amount on each Distribution Date. The Interest Carry Forward Amount with respect to the Mezzanine Certificates, to the extent not distributed from Net Monthly Excess Cashflow on such Distribution Date, will be carried forward to succeeding Distribution Dates and, subject to available funds, will be distributed in the manner set forth in "--Overcollateralization Provisions" herein.

The "Interest Distribution Amount" for the Class A and Mezzanine Certificates of any class on any Distribution Date will be equal to interest accrued during the related Interest Accrual Period on the Certificate Principal Balance of that class immediately prior to such Distribution Date at the then applicable Pass-Through Rate for such class and reduced (to not less than zero), in the case of each such class, by the allocable share, if any, for such class of Prepayment Interest Shortfalls not covered by Compensating Interest and shortfalls resulting from the application of the Relief Act, in each case to the extent not allocated to interest accrued on the Class CE Certificates.

The "Net Monthly Excess Cashflow" for any Distribution Date will be equal to the sum of (a) any Overcollateralization Reduction Amount and (b) the excess of (x) the Available Funds for such Distribution Date over (y) the sum for such Distribution Date of (i) the Senior Interest Distribution Amount distributable to the Class A and

WFB.000450

Class A-IO-S Certificates, (ii) the Interest Distribution Amounts distributable to the holders of the Mezzanine Certificates and (iii) the Principal Remittance Amount.

The "Net WAC Rate Carryover Amount" for any Distribution Date and for any class of Class A and Mezzanine Certificates is an amount equal to the sum of (i) the excess, if any, of (x) the amount of interest such class of Certificates would have accrued for such Distribution Date had the applicable Pass-Through Rate been the related Formula Rate, over (y) the amount of interest such class of Certificates accrued for such Distribution Date at the related Net WAC Pass-Through Rate and (ii) the undistributed portion of any related Net WAC Pass-Through Rate Carryover Amount from the prior Distribution Date together with interest accrued on such undistributed portion for the most recently ended Interest Accrual Period at the related Formula Rate.

The "Overcollateralization Increase Amount" with respect to any Distribution Date equals the lesser of (i) the amount, if any, by which the Overcollateralization Target Amount exceeds the Overcollateralized Amount on such Distribution Date (calculated for this purpose only after assuming that 100% of the Principal Remittance Amount on such Distribution Date has been distributed) and (ii) the Net Monthly Excess Cashflow for such Distribution Date.

The "Overcollateralization Reduction Amount" with respect to any Distribution Date will be the lesser of (A) the Principal Remittance Amount on such Distribution Date or (B) the excess, if any, of (i) the Overcollateralized Amount for such Distribution Date (calculated for this purpose only after assuming that 100% of the Principal Remittance Amount on such Distribution Date has been distributed) over (ii) the Overcollateralization Target Amount for such Distribution Date.

The "Overcollateralization Target Amount" means, with respect to any Distribution Date, (i) prior to the Stepdown Date, an amount equal to approximately 3.60% of the sum of the aggregate principal balance of the Initial Mortgage Loans as of the Cut-off Date and the Original Pre-Funded Amounts, (ii) on or after the Stepdown Date, provided a Trigger Event is not in effect, the greater of (x) approximately 7.20% of the then current aggregate outstanding principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (y) approximately $21,500,005 or (iii) on or after the Stepdown Date and if a Trigger Event is in effect, the Overcollateralization Target Amount for the immediately preceding Distribution Date.

The "Overcollateralized Amount" with respect to any Distribution Date will be the excess, if any, of (a) the sum of (i) the aggregate principal balance of the Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (ii) any amounts remaining on deposit in the Pre-Funding Accounts as of the last day of the related Due Period over (b) the sum of the aggregate Certificate Principal Balance of the Class A, Mezzanine and Class P Certificates, after giving effect to distributions to be made on such Distribution Date.

The "Prepayment Period" with respect to any Distribution Date will be the period commencing on the 16th day in the month preceding the month in which such Distribution Date falls (or, in the case of the first Distribution Date, commencing November 1, 2004) and ending on the 15th day of the calendar month in which such Distribution Date falls.

The "Principal Remittance Amount" for any Distribution Date will be the sum of (i) the Group I Principal Remittance Amount, (ii) the Group II Principal Remittance Amount and (iii) the Group III Principal Remittance Amount.

A "Realized Loss" is (a) the amount of any Bankruptcy Loss or (b) with respect to any defaulted Mortgage Loan that is finally charged off by the Master Servicer or liquidated through foreclosure sale, disposition of the related mortgaged property (if acquired on behalf of the certificateholders by foreclosure or deed in lieu of foreclosure) or otherwise, is the amount of loss realized, if any, equal to the portion of the unpaid principal balance remaining, if any, plus interest thereon through the last day of the month in which such Mortgage Loan was finally charged off by the Master Servicer or liquidated, after application of all amounts recovered (net of amounts reimbursable to the Master Servicer for Advances, servicing advances and other related expenses, including attorney's fees) towards interest and principal owing on the Mortgage Loan.

WFB.000451

The "Senior Group I Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the excess of (x) the Certificate Principal Balance of the Group I Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 55.30% and (ii) the aggregate principal balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Group I Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $14,090,845

The "Senior Group II Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the excess of (x) the aggregate Certificate Principal Balance of the Group II Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 55.30% and (ii) the aggregate principal balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Group II Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $2,935,672.

The "Senior Group III Principal Distribution Amount" for any Distribution Date will be an amount, not less than zero, equal to the excess of (x) the aggregate Certificate Principal Balance of the Group III Certificates immediately prior to such Distribution Date over (y) the lesser of (A) the product of (i) approximately 55.30% and (ii) the aggregate principal balance of the Group III Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) and (B) the aggregate principal balance of the Group III Mortgage Loans as of the last day of the related Due Period (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) minus approximately $4,473,488.

The "Senior Interest Distribution Amount" on any Distribution Date will be equal to the sum of the Interest Distribution Amount for such Distribution Date for the Class A and Class A-IO-S Certificates and the Interest Carry Forward Amount, if any, for that Distribution Date for the Class A and Class A-IO-S Certificates.

A "Sequential Trigger Event" is in effect on any Distribution Date if, before the 37th Distribution Date, the aggregate amount of Realized Losses incurred since the Cut-off Date through the last day of the related Due Period (after giving effect to scheduled payments received or advanced on or before the related Determination Date and principal prepayments received during the related Prepayment Period) divided by the sum of (i) the aggregate principal balance of the Mortgage Loans as of the Cut-off Date and (ii) the amounts on deposit in the Pre-Funding Accounts as of the Closing Date exceeds 3.25%, or if, on or after the 37th Distribution Date, a Trigger Event is in effect.

The "Stepdown Date" for any Distribution Date will be the earlier of (i) the first Distribution Date on which the aggregate Certificate Principal Balance of the Class A Certificates has been reduced to zero and (ii) the later to occur of (x) the Distribution Date occurring in December 2007 and (y) the first Distribution Date on which the Credit Enhancement Percentage for the Class A Certificates (calculated for this purpose only after taking into account distributions of principal on the Mortgage Loans, but prior to any distribution of the Group I Principal Distribution Amount, the Group II Principal Distribution Amount and the Group III Principal Distribution Amount to the holders of the Certificates then entitled to distributions of principal on such Distribution Date) is greater than or equal to approximately 44.70%.

A "Trigger Event" is in effect with respect to any Distribution Date if:

(a) the percentage obtained by dividing (x) the principal amount of Mortgage Loans delinquent 60 days or more (including Mortgage Loans in foreclosure, Mortgage Loans with respect to which the related Mortgaged Properties have been acquired by the Trust and Mortgage Loans discharged due to bankruptcy) by (y) the aggregate

WFB.000452

S-78

WFB.000453

principal balance of the Mortgage Loans, in each case, as of the last day of the previous calendar month, exceeds the applicable percentages of the Credit Enhancement Percentage for the prior Distribution Date as set forth below for the most senior Class of Class A and Mezzanine Certificates then outstanding:

| CLASS | PERCENTAGE |
| --- | --- |
| Class A Certificates | 35.80% |
| Class M-1 Certificates | 37.50% |
| Class M-2 Certificates | 49.40% |
| Class M-3 Certificates | 54.40% |
| Class M-4 Certificates | 65.85% |
| Class M-5 Certificates | 76.60% |
| Class M-6 Certificates | 87.45% |
| Class M-7 Certificates | 106.00% |
| Class M-8 Certificates | 124.05% |
| Class M-9 Certificates | 155.35% |
| Class M-10 Certificates | 183.95% |
| Class M-11 Certificates | 222.25% |

or

(b) the aggregate amount of Realized Losses incurred since the Cut-off Date through the last day of the related Due Period (reduced by the aggregate amount of Subsequent Recoveries received since the Cut-off Date through the last day of the related Due Period) divided by the sum of (i) the aggregate principal balance of the Initial Mortgage Loans as of the Cut-off Date and (ii) the Original Pre-Funded Amounts exceeds the applicable percentages set forth below with respect to such Distribution Date:

| DISTRIBUTION DATE OCCURRING IN | PERCENTAGE |
| --- | --- |
| December 2007 through November 2008 | 3.50% |
| December 2008 through November 2009 | 5.50% |
| December 2009 through November 2010 | 7.00% |
| December 2010 and thereafter | 7.75% |

MANDATORY PRINCIPAL DISTRIBUTIONS ON CLASS A CERTIFICATES

One or more classes of Class A Certificates will receive a principal distribution on the Distribution Date immediately following the end of the Funding Period to the extent of any amounts remaining on deposit in the related Pre-Funding Account on such Distribution Date. Although no assurance can be given, it is anticipated by the Depositor that the principal amount of Subsequent Mortgage Loans sold to the Trust will require the application of substantially all of the Original Pre-Funded Amounts and that there will be no material amount of principal distribution to the holders of any class of Class A Certificates from the related Pre-Funding Account. It is unlikely, however, that the Depositor will be able to deliver Subsequent Mortgage Loans with an aggregate Principal Balance identical to the Original Pre-Funded Amounts. Accordingly, a small amount of principal is likely to be distributed on the related Class A Certificates on the Distribution Date immediately following the end of the Funding Period.

INTEREST COVERAGE ACCOUNTS

The Trust Administrator, on behalf of the Trustee, may establish for the benefit of the Certificateholders one or more non-interest bearing trust accounts (the "Interest Coverage Accounts"), as required in the Pooling and Servicing Agreement and on the Closing Date, the Depositor may deliver to the Trust Administrator for deposit in the Interest Coverage Accounts cash amounts as specified in the Pooling and Servicing Agreement. On each Distribution Date during, and the Distribution Date immediately following, the Funding Period, funds on deposit in the Interest Coverage Accounts, if any, will be applied by the Trust Administrator to cover certain shortfalls in the amount of interest generated by the assets of the Trust attributable to the pre-funding feature. Such shortfall may exist during the Funding Period because the interest accruing on the aggregate Principal Balance of the related Mortgage Loans during such period will

WFB.000454

be less than the amount of interest which would have accrued on the Mortgage Loans if the related Subsequent Mortgage Loans were included in the Trust as of the Closing Date. On the first Distribution Date following the termination of the Funding Period (after the distribution on the Certificates to be made on such Distribution Date), funds on deposit in the related Interest Coverage Account, if any, to the extent not needed to fund any shortfall of the kind described above, will be released by the Trust Administrator to the Depositor or its designee. The Interest Coverage Accounts will not be assets of any REMIC.

ADVANCES

Subject to the following limitations, the Master Servicer will be obligated to advance or cause to be advanced on or before each Distribution Date from its own funds (or from funds in the distribution account that are not included in the Available Funds for such Distribution Date or a combination of both) an amount equal to the aggregate of all payments of principal and interest (net of the Servicing Fee) that were due during the related Due Period on the Mortgage Loans and that were delinquent on the related Determination Date, plus certain amounts representing assumed payments not covered by any current net income on the Mortgaged Properties acquired by foreclosure or deed in lieu of foreclosure (any such advance, an "Advance" and together, the "Advances"). Advances are required to be made only to the extent they are deemed by the Master Servicer to be recoverable from related late collections, insurance proceeds, condemnation proceeds and liquidation proceeds. The purpose of making such Advances is to maintain a regular cash flow to the Certificateholders, rather than to guarantee or insure against losses. The Master Servicer will not be required, however, to make any Advances with respect to reductions in the amount of the monthly payments on the Mortgage Loans due to bankruptcy proceedings or the application of the Relief Act. Subject to the recoverability standard above, the Master Servicer's obligation to make Advances as to any Mortgage Loan will continue until the Mortgage Loan is paid in full, charged off or until the recovery of all Liquidation Proceeds thereon.

All Advances will be reimbursable to the Master Servicer from late collections, insurance proceeds, condemnation proceeds and liquidation proceeds from the Mortgage Loan as to which such unreimbursed Advance was made. The Master Servicer may recover at any time from amounts in the collection account the amount of any Advance that the Master Servicer deems nonrecoverable or that remains unreimbursed to the Master Servicer from the related liquidation proceeds after the final liquidation of the related Mortgage Loan. In addition, the Master Servicer may, at any time, withdraw from the collection account funds that were not included in the Available Funds for the preceding Distribution Date to reimburse itself for Advances previously made by the Master Servicer. In the event the Master Servicer fails in its obligation to make any required Advance, Ameriquest Mortgage Company, in its capacity as successor Master Servicer, will be obligated to make any such Advance, to the extent required in the Pooling and Servicing Agreement. In the event that Ameriquest Mortgage Company cannot act as successor Master Servicer, the Trustee, as successor Master Servicer, will be obligated to make such Advance, to the extent required in the Pooling and Servicing Agreement.

In the course of performing its servicing obligations, the Master Servicer will pay all reasonable and customary "out-of-pocket" costs and expenses incurred in the performance of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration, inspection and protection of the Mortgaged Properties, (ii) any environmental audit, (iii) any enforcement or judicial proceedings, including foreclosures and (iv) the management and liquidation of Mortgaged Properties acquired in satisfaction of the related mortgage. Each such expenditure will constitute a "Servicing Advance."

The Master Servicer's right to reimbursement for Servicing Advances is limited to late collections on the related Mortgage Loan, including liquidation proceeds, released mortgaged property proceeds, insurance proceeds, condemnation proceeds and such other amounts as may be collected by the Master Servicer from the related mortgagor or otherwise relating to the Mortgage Loan in respect of which such unreimbursed amounts are owed. The Master Servicer may recover at any time from amounts in the collection account the amount of any Servicing Advance that the Master Servicer deems nonrecoverable or that remains unreimbursed to the Master Servicer from the related liquidation proceeds after the final liquidation of the related Mortgage Loan. See "Description of the Certificates--Allocation of Available Funds."

The Pooling and Servicing Agreement provides that the Master Servicer, the Trustee or the Trust Administrator, on behalf of the Trust, may enter into a facility with any person which provides that such person (an "Advancing

WFB.000455

Person") may directly or indirectly fund Advances and/or Servicing Advances, although no such facility will reduce or otherwise affect the Master Servicer's obligation to fund such Advances and/or Servicing Advances. Such facility will not require the consent of the certificateholders. Any Advances and/or Servicing Advances made by an Advancing Person would be reimbursed to the Advancing Person in the same manner as reimbursements would be made to the Master Servicer if such advances were funded by the Master Servicer.

POOLING AND SERVICING AGREEMENT

GENERAL

The Certificates will be issued pursuant to the Pooling and Servicing Agreement, a form of which is filed as an exhibit to the Registration Statement. A Current Report on Form 8-K relating to the Certificates containing a copy of the Pooling and Servicing Agreement as executed will be filed by the Depositor with the Securities and Exchange Commission following the initial issuance of the Certificates. In addition, a Current Report on Form 8-K will be filed following the purchase of Subsequent Mortgage Loans. The Trust created under the Pooling and Servicing Agreement will consist of (i) all of the Depositor's right, title and interest in the Mortgage Loans, the related Mortgage Notes, Mortgages and other related documents, (ii) all payments on or collections in respect of the Mortgage Loans due after the Cut-off Date, together with any proceeds thereof, (iii) any Mortgaged Properties acquired on behalf of certificateholders by foreclosure or by deed in lieu of foreclosure, and any revenues received thereon, (iv) the rights of the Trustee under all insurance policies required to be maintained pursuant to the Pooling and Servicing Agreement, (v) the Net WAC Rate Carryover Reserve Account, (vi) the rights of the Depositor under the Mortgage Loan Purchase Agreement, (vii) the rights of the Trust Administrator under the Cap Contracts, (viii) the Pre-Funding Accounts and the Interest Coverage Accounts, if any, and (ix) the rights of the Depositor under any related Subsequent Transfer Instrument.

Deutsche Bank National Trust Company will act as custodian (the "Custodian") for the Trustee under the Pooling and Servicing Agreement pursuant to a Custodial Agreement, dated as of the Closing Date, among the Master Servicer, the Trustee and the Custodian. The Custodian will be paid a fee as set forth in the Pooling and Servicing Agreement in respect of its duties as custodian (the "Custodial Fee").

The NIMS Insurer, if any, will each be a third party beneficiary of the Pooling and Servicing Agreement to the extent set forth in the Pooling and Servicing Agreement. In addition, the NIMS Insurer, if any, will have several rights under the Pooling and Servicing Agreement including, but not limited to, the rights set forth under "Risk Factors--Rights of the NIMS Insurer May Negatively Impact the Class A and Mezzanine Certificates" in this prospectus supplement.

Reference is made to the prospectus for important information in addition to that set forth herein regarding the Trust, the terms and conditions of the Pooling and Servicing Agreement and the Class A and Mezzanine Certificates. The Depositor will provide to a prospective or actual certificateholder without charge, on written request, a copy (without exhibits) of the Pooling and Servicing Agreement. Requests should be addressed to Park Place Securities, Inc., 1100 Town & Country Road, Suite 1100, Orange, California 92868, Attention: Capital Markets.

ASSIGNMENT OF THE MORTGAGE LOANS

The Depositor will deliver to the Custodian, on behalf of the Trustee, with respect to each Mortgage Loan (i) the mortgage note endorsed without recourse in blank to reflect the transfer of the Mortgage Loan, (ii) the original mortgage with evidence of recording indicated thereon and (iii) an assignment of the mortgage in recordable form endorsed in blank without recourse, reflecting the transfer of the Mortgage Loan. The Depositor will not cause to be recorded any assignment of mortgage which relates to a Mortgage Loan in any jurisdiction (except with respect to any Mortgage Loan located in the State of Maryland) unless such failure to record would result in a withdrawal or a downgrading by any Rating Agency of the rating on any class of Certificates; provided, however, upon the occurrence of certain events set forth in the Pooling and Servicing Agreement, each such assignment of mortgage will be recorded, or submitted for recording by the Seller, at the Seller's expense (or, if the Seller is unable to pay the cost of recording the assignments of mortgage, such expense will be paid by the Trust Administrator, which expense will be reimbursed by the Trust) as set forth in the Pooling and Servicing Agreement.

WFB.000456

The Seller will make certain representations and warranties as of the Closing Date as to the accuracy in all material respects of certain information furnished to the Trustee with respect to each Initial Mortgage Loan (e.g., the Principal Balance and the Mortgage Rate). In addition, the Seller will represent and warrant, among other things that at the time of transfer to the Depositor: (i) the Seller has transferred or assigned all of its right, title and interest in each Mortgage Loan and the related documents, free of any lien; (ii) each Mortgage Loan complied, at the time of origination, in all material respects with applicable local, state and/or federal laws; (iii) the Mortgage Loans are not subject to the requirements of the Homeownership Act and no Mortgage Loan is subject to, or in violation of, any applicable state or local law, ordinance or regulation similar to the Homeownership Act; (iv) no proceeds from any Mortgage Loan were used to purchase single premium credit insurance policies as part of the origination of, or as a condition to closing, such Mortgage Loan; (v) the Master Servicer for such Mortgage Loan has accurately and fully reported and will continue to accurately and fully report its mortgagor credit files to each of the credit repositories in a timely manner; (vi) no Mortgage Loan originated before October 1, 2002 has a prepayment charge term longer than five years after its date of origination and no Mortgage Loan originated on or after October 1, 2002 has a prepayment charge term longer than three years after its date of origination; and (vii) no Mortgage Loan originated from and including October 1, 2002 to and including March 6, 2003, is secured by property located in the State of Georgia. Upon discovery of a breach of any such representation and warranty which materially and adversely affects the interests of the Certificateholders in the related Mortgage Loan and related documents, the Seller will have a period of 90 days after the earlier of discovery or receipt of written notice of the breach to effect a cure. If the breach cannot be cured within the 90 day period, the Seller will be obligated to repurchase or replace the affected Mortgage Loan in the manner described in the prospectus, the Pooling and Servicing Agreement and the Mortgage Loan Purchase Agreement. The same procedure and limitations that are set forth above for the substitution or repurchase of Deleted Mortgage Loans as a result of deficient documentation relating thereto will apply to the substitution or repurchase of a Deleted Mortgage Loan as a result of a breach of a representation or warranty in the Mortgage Loan Purchase Agreement that materially and adversely affects the interests of the Certificateholders.

Mortgage Loans required to be transferred to the Seller as described in the preceding paragraphs are referred to as "Deleted Mortgage Loans."

THE SELLER

Ameriquest Mortgage Company provided the information set forth in the following paragraphs. None of the Depositor, the Trustee, the Trust Administrator, the Originators, the Underwriters, the Master Servicer, or any of their respective affiliates have made or will make any representation as to the accuracy or completeness of such information.

Ameriquest Mortgage Company (sometimes referred to herein as "Ameriquest" or the "Seller"), a Delaware corporation, is a specialty finance company engaged in the business of originating, purchasing and selling retail and wholesale sub-prime mortgage loans secured by one- to four-family residences. Ameriquest's mortgage business was begun in 1979 as a savings and loan association and later as a federal savings bank. In 1994 Ameriquest ceased depository operations to focus entirely on its mortgage banking business. In May 1997, Ameriquest sold its wholesale operations and reorganized its retail lending and servicing operations under the name of "Ameriquest Mortgage Company" (the "Reorganization"). In January of 2000, Ameriquest recommenced wholesale lending as a separate division (a.k.a. Argent Mortgage Company, LLC) while continuing its retail and servicing operations. As of January 1, 2003, the wholesale lending division of Ameriquest reorganized its business as a wholly owned subsidiary of Ameriquest under the name of Argent Mortgage Company, LLC. Approximately 90.84% and approximately 9.16%, of the Collateral Selection Date Mortgage Loans, by aggregate scheduled principal balance as of the Cut-off Date, were originated by the Seller's wholesale lending affiliates, Argent Mortgage Company, LLC and Olympus Mortgage Company, respectively. Argent Mortgage Company, LLC is currently an affiliate of Ameriquest but is no longer a subsidiary of Ameriquest.

LENDING ACTIVITIES AND LOAN SALES. Ameriquest Mortgage Company currently originates real estate loans through its network of retail branches and purchases retail and wholesale sub-prime mortgage loans from its four affiliates, Argent Mortgage Company, LLC (wholesale), Town & Country Credit Corp. (retail), Olympus Mortgage Company (wholesale) and Bedford Home Loans, Inc. (retail Alt-A). Ameriquest also participates in secondary market activities by originating and selling mortgage loans while continuing to service the majority of the loans sold. In other cases Ameriquest's whole loan sale agreements provide for the transfer of servicing rights.

WFB.000457

Ameriquest's primary lending activity is funding loans to enable mortgagors to purchase or refinance residential real property, which loans are secured by first or second liens on the related real property. Ameriquest's single-family real estate loans are predominantly "conventional" mortgage loans, meaning that they are not insured by the Federal Housing Administration or partially guaranteed by the U.S. Department of Veterans Affairs.

WHOLESALE ORIGINATIONS. The following table summarizes Ameriquest's wholesale originated one- to four-family residential mortgage loan origination and sales activity for the periods shown below. Sales activity may include sales of mortgage loans purchased by Ameriquest from other loan originators.

WHOLESALE ORIGINATIONS - ARGENT MORTGAGE COMPANY, LLC

| | YEAR ENDED DECEMBER 31, | | | SIX MONTHS ENDING JUNE 30, |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 |
| | | (DOLLARS IN THOUSANDS) | | |
| Originations............ | $736,928 | $4,733,927 | $19,792,602 | $19,282,770 |
| Sales................... | $570,244 | $3,879,907 | $15,425,641 | $17,137,503 |

WHOLESALE ORIGINATIONS - OLYMPUS MORTGAGE COMPANY

| | YEAR ENDED DECEMBER 31, | | | SIX MONTHS ENDING JUNE 30, |
|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 |
| | | | (DOLLARS IN THOUSANDS) | |
| Originations............ | $0 | $99,024 | $1,347,554 | $1,351,559 |
| Sales................... | $0 | $37,525 | $1,036,187 | $1,044,260 |

THE MASTER SERVICER

The information set forth in the following paragraphs has been provided by Wells Fargo Bank, N.A. ("Wells Fargo"). None of the Depositor, the Trustee, the Originator, the Seller, the Underwriters or any of their affiliates has made or will make any representation as to the accuracy or completeness of such information.

Wells Fargo is an indirect, wholly owned subsidiary of Wells Fargo & Company. Wells Fargo is engaged in the business of (i) originating, purchasing and selling residential mortgage loans in its own name and through its affiliates and (ii) servicing residential mortgage loans for its own account and for the account of others. Wells Fargo is an approved servicer of Fannie Mae and Freddie Mac. Wells Fargo's principal office for servicing functions is located at One Home Campus, Des Moines, Iowa 50328-0001.

The following table sets forth certain information regarding the delinquency experience of Wells Fargo with respect to all subprime mortgage loans serviced by its residential mortgage lending division:

WFB.000458

WELLS FARGO DELINQUENCY EXPERIENCE SUBPRIME PORTFOLIO(1)

| (Dollar Amounts in Thousands) | BY NUMBER OF LOANS | BY DOLLAR AMOUNT OF LOANS | BY NUMBER OF LOANS | BY DOLLAR AMOUNT OF LOANS | BY NUMBER OF LOANS | BY DOLLAR AMOUNT OF LOANS |
|---|---|---|---|---|---|---|
| | AS OF DECEMBER 31, 2002 | | AS OF DECEMBER 31, 2003 | | AS OF JUNE 30, 2004 | |
| Total Portfolio......... | 52,340 | $6,415,015 | 94,737 | $12,728,304 | 116,266 | $16,101,801 |
| | ====== | ========== | ====== | =========== | ====== | =========== |
| Period of Delinquency(2) | | | | | | |
| 30-59 Days.............. | 2,898 | $299,792 | 3,648 | $409,364 | 4,186 | $481,948 |
| 60-89 Days.............. | 782 | $ 82,751 | 1,007 | $105,760 | 1,256 | $141,425 |
| 90 or more Days......... | 1,017 | $ 93,518 | 1,260 | $121,418 | 1,386 | $136,193 |
| | ----- | -------- | ----- | -------- | ----- | -------- |
| Total Delinquent Loans... | 4,697 | $476,061 | 5,915 | $636,542 | 6,828 | $759,566 |
| | ===== | ======== | ===== | ======== | ===== | ======== |
| Percent of Total Loans... | 8.97% | 7.42% | 6.24% | 5.00% | 5.87% | 4.72% |
| Foreclosures(3).......... | 1,472 | $144,595 | 1,747 | $171,637 | 1,741 | $181,352 |
| Foreclosure Ratio(4)..... | | 2.25% | | 1.35% | | 1.13% |
| REO...................... | 872 | $ 76,212 | 973 | 90,497 | 1,201 | 108,315 |
| REO Ratio(5)............. | | 1.19% | | 0.71% | | 0.67% |

- --------------

(1)  The reported levels of delinquencies, foreclosures and REO do not reflect
     the performance of a substantial number of non-performing assets which are
     regularly sold on a servicing-released basis from Wells Fargo's portfolio.
(2)  The indicated periods of delinquency are based on the number of days past
     due, based on a 30-day month. No mortgage loan is considered delinquent for
     these purposes until one month has passed since its contractual due date. A
     mortgage loan is no longer considered delinquent once foreclosure
     proceedings have commenced. Delinquent Bankruptcies are included in the
     respective delinquent buckets.
(3)  Includes loans in the applicable portfolio for which foreclosure
     proceedings had been instituted as of the dates indicated. (4) Foreclosure
     as a percentage of total loans in the applicable portfolio at the end of
     each period. (5) REO as a percentage of total loans in the applicable
     portfolio at the end of each period.

     There can be no assurance that the delinquency and loss experience of
the Mortgage Loans will correspond to the loss experience of Wells Fargo's
subprime servicing portfolio set forth in the foregoing table. The statistics
shown above represent the delinquency and loss experience for Wells Fargo's
total subprime servicing portfolio only for the periods presented, whereas the
aggregate delinquency and loss experience on the Mortgage Loans will depend on
the results obtained over the life of the Trust. Wells Fargo's subprime
servicing portfolio includes mortgage loans with payment and other
characteristics that are not representative of the payment and other
characteristics of the Mortgage Loans. In particular, investors should note that
newly originated mortgage loans will not be added to the Mortgage Pool after the
Funding Period, and the Mortgage Pool will therefore consist of a static pool of
Mortgage Loans, whereas new mortgage loans are continually being originated and
added to the pool for which such statistics above are compiled. Accordingly, the
actual loss and delinquency percentages with respect to the Mortgage Pool are
likely to be substantially higher than those indicated in the tables above. If
the residential real estate market should experience an overall decline in
property values, the actual rates of delinquencies, foreclosures and losses
could be higher than those previously experienced by Wells Fargo. In addition,
adverse economic conditions (which may or may not affect real property values)
may affect the timely payment by mortgagors of scheduled payments of principal
and interest on the Mortgage Loans and, accordingly, the actual rates of
delinquencies, foreclosures and losses with respect to the Mortgage Loans.

THE TRUST ADMINISTRATOR

     Wells Fargo Bank, N.A., a national banking association, will act as
Trust Administrator for the Certificates pursuant to the Pooling and Servicing
Agreement. The Trust Administrator will perform certain administrative functions
with respect to the Certificates and will act as initial paying agent and

WFB.000459

certificate registrar. The Trust Administrator, in performing its duties under the Pooling and Servicing Agreement, will act on behalf of the Trust in connection with any third-party contracts.

S-84

WFB.000460

The principal compensation to be paid to the Trust Administrator in respect of its obligations under the Pooling and Servicing Agreement will be equal to any interest or other income earned on funds held in the distribution account as provided in the Pooling and Servicing Agreement.

The Pooling and Servicing Agreement will provide that the Trust Administrator and any director, officer, employee or agent of the Trust Administrator will be indemnified by the Trust and will be held harmless against any loss, liability or expense (not including expenses, disbursements and advances incurred or made by the Trust Administrator, including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of the Trust Administrator's performance in accordance with the provisions of the Pooling and Servicing Agreement) incurred by the Trust Administrator in connection with the acceptance or administration of its obligations and duties under the Pooling and Servicing Agreement, other than any loss, liability or expense (i) resulting from a breach of the Master Servicer's or the Trustee's obligations and duties under the Pooling and Servicing Agreement (for which the Trust Administrator has received indemnity from the Master Servicer or the Trustee, as applicable), (ii) that constitutes a specific liability of the Trust Administrator under the Pooling and Servicing Agreement or (iii) incurred by reason of willful misfeasance, bad faith or negligence in the performance of the Trust Administrator's duties under the Pooling and Servicing Agreement or as a result of a breach, or by reason of reckless disregard, of the Trust Administrator's obligations and duties under the Pooling and Servicing Agreement.

THE TRUSTEE

Wachovia Bank, National Association, a national banking association, will act as Trustee for the Certificates pursuant to the Pooling and Servicing Agreement. The principal compensation to be paid to the Trustee in respect of its obligations under the Pooling and Servicing Agreement will be a portion of the compensation paid to the Trust Administrator on each Distribution Date.

The Pooling and Servicing Agreement will provide that the Trustee and any director, officer, employee or agent of the Trustee will be indemnified by the Trust and will be held harmless against any loss, liability or expense (not including expenses, disbursements and advances incurred or made by the Trustee, including the compensation and the expenses and disbursements of its agents and counsel, in the ordinary course of the Trustee's performance in accordance with the provisions of the Pooling and Servicing Agreement) incurred by the Trustee in connection with the acceptance or administration of its obligations and duties under the Pooling and Servicing Agreement, other than any loss, liability or expense (i) resulting from a breach of the Master Servicer's or the Trust Administrator's obligations and duties under the Pooling and Servicing Agreement (for which the Trustee has received indemnity from the Master Servicer or the Trust Administrator, as applicable), (ii) that constitutes a specific liability of the Trustee under the Pooling and Servicing Agreement or (iii) incurred by reason of willful misfeasance, bad faith or negligence in the performance of the Trustee's duties under the Pooling and Servicing Agreement or as a result of a breach, or by reason of reckless disregard, of the Trustee's obligations and duties under the Pooling and Servicing Agreement. In addition, the Pooling and Servicing Agreement will provide that the Trustee and any director, officer, employee or agent of the Trustee will be reimbursed from the Trust for all costs associated with the transfer of servicing in the event of a Master Servicer Event of Default (as defined in the Pooling and Servicing Agreement).

SERVICING AND OTHER COMPENSATION AND PAYMENT OF EXPENSES

The principal compensation to be paid to the Master Servicer in respect of its servicing activities for the Certificates will be equal to accrued interest at the Servicing Fee Rate (as negotiated between the Seller and the Master Servicer but which will not exceed 0.50% per annum) with respect to each Mortgage Loan for each calendar month on the same principal balance on which interest on such Mortgage Loan accrues for such calendar month (the "Servicing Fee"). As additional servicing compensation, the Master Servicer is entitled to retain all ancillary income, including late charges, NSF fees, reconveyance fees and assumption fees (with the exception of prepayment charges, which will be distributed to the holders of the Class P Certificates) to the extent collected from mortgagors, together with any interest or other income earned on funds held in the collection account and any escrow accounts.

The Master Servicer is obligated to offset any Prepayment Interest Shortfall on any Distribution Date but only up to an amount equal to the product of (x) 0.50% and (y) the principal balance of the Mortgage Loans as of the first day of the related Due Period (such amount is referred to herein as "Compensating Interest"). The Master Servicer is

WFB.000461

obligated to pay certain insurance premiums and certain ongoing expenses
associated with the mortgage pool and incurred by the Master Servicer in
connection with its responsibilities under the Pooling and Servicing Agreement
and is entitled to reimbursement therefor as provided in the Pooling and
Servicing Agreement. See "Description of the Securities--Retained Interest;
Servicing or Administration Compensation and Payment of Expenses" in the
prospectus for information regarding expenses payable by the Master Servicer and
"Federal Income Tax Consequences" herein regarding certain taxes payable by the
Master Servicer.

EVENTS OF DEFAULT

     The Master Servicer may be removed as Master Servicer of the Mortgage
Loans upon the occurrence of certain events in accordance with the terms of the
Pooling and Servicing Agreement.

     Any successor to the Master Servicer appointed under the Pooling and
Servicing Agreement must be a residential mortgage loan servicing institution
acceptable to each Rating Agency (as defined in the prospectus) with a net worth
at the time of such appointment of at least $15,000,000. Ameriquest Mortgage
Company will initially act as successor Master Servicer. See "Description of the
Securities--Events of Default under the Governing Agreement and Rights Upon
Events of Default" in the prospectus.

VOTING RIGHTS

     At all times, 97% of all voting rights will be allocated among the
holders of the Class A, Mezzanine and Class CE Certificates in proportion to the
then outstanding Certificate Principal Balances of their respective
Certificates, 1% of all voting rights will be allocated among the holders of the
Class P Certificates, 1% of all voting rights will be allocated among the
holders of the Class A-IO-S Certificates and 1% of all voting rights will be
allocated among the holders of the Residual Certificates in proportion to the
percentage interests in such classes evidenced by their respective Certificates.

TERMINATION

     The circumstances under which the obligations created by the Pooling
and Servicing Agreement will terminate in respect of the Certificates are
described in "Description of the Securities--Termination of the Trust Fund and
Disposition of Trust Fund Assets" in the prospectus. The holders of at least 76%
of the voting rights of the Class CE Certificates, or if the holders of at least
76% of the voting rights of the Class CE Certificates fail to exercise such
option, the Master Servicer or the NIMS Insurer, if any, will have the right to
purchase all remaining Mortgage Loans and any properties acquired in respect
thereof and thereby effect early retirement of the Certificates on any
Distribution Date following the Due Period during which the aggregate principal
balance of the Mortgage Loans (and properties acquired in respect thereof)
remaining in the Trust at the time of purchase is reduced to an amount less than
10% of the sum of (i) the aggregate principal balance of the Initial Mortgage
Loans as of the Cut-off Date and (ii) the Original Pre-Funded Amounts (such
date, the "Optional Termination Date"). In the event the holders of at least 76%
of the voting rights of the Class CE Certificates, the Master Servicer or the
NIMS Insurer, if any, exercise such option, the purchase price payable in
connection therewith generally will be equal to the fair market value of the
Mortgage Loans and such properties, plus accrued interest for each Mortgage Loan
at the related Mortgage Rate to but not including the first day of the month in
which such repurchase price is distributed, together with any amounts due to the
Master Servicer for servicing compensation at the Servicing Fee Rate and any
unreimbursed Advances and servicing advances. However, this option may be
exercised only if (i) the fair market value of the Mortgage Loans and REO
Properties is at least equal to the aggregate principal balance of the Mortgage
Loans and the appraised value of the REO Properties and (ii) the termination
price is sufficient to pay all interest accrued on, as well as amounts necessary
to retire the principal balance of, the notes guaranteed by the NIMS Insurer and
any amounts owed to the NIMS Insurer at the time the option is exercised.
Proceeds from such repurchase will be included in Available Funds and will be
distributed to the holders of the Certificates in accordance with the Pooling
and Servicing Agreement.

     In the event such option is exercised, the portion of the purchase
price allocable to the Class A and Mezzanine Certificates of each class will be,
to the extent of available funds:

          (i)      100% of the then outstanding Certificate Principal Balance of
                   the Class A and Mezzanine Certificates, plus

S-86

WFB.000462

    (ii)      one month's interest on the then outstanding Certificate Principal Balance thereof at the then applicable Pass-Through Rate for such class, plus

    (iii)    any previously accrued but undistributed interest thereon to which the holders of such Certificates are entitled, together with the amount of any Net WAC Rate Carryover Amounts (payable to and from the Net WAC Rate Carryover Reserve Account); plus

    (iv)    in the case of the Mezzanine Certificates, any previously undistributed Allocated Realized Loss Amount.

The holders of the Residual Certificates will pledge any amount received by such holders in a termination in excess of par to the holders of the Class CE Certificates. In no event will the Trust created by the Pooling and Servicing Agreement continue beyond the expiration of 21 years from the death of the survivor of the persons named in the Pooling and Servicing Agreement. See "Description of the Securities--Termination of the Trust Fund and Disposition of Trust Fund Assets" in the prospectus.

SERVICING OF DELINQUENT MORTGAGE LOANS

The Master Servicer will be required to act with respect to delinquent Mortgage Loans in accordance with procedures set forth in the Pooling and Servicing Agreement. These procedures, as followed with respect to any delinquent Mortgage Loan, may, among other things, result in (i) foreclosing on such Mortgage Loan, (ii) accepting the deed to the related mortgaged property in lieu of foreclosure, (iii) granting the borrower under such Mortgage Loan a modification or forbearance or (iv) accepting payment from the borrower under such Mortgage Loan of an amount less than the Principal Balance of such Mortgage Loan in final satisfaction of such Mortgage Loan. HOWEVER, FOLLOWING THESE PROCEDURES MAY NOT LEAD TO THE ALTERNATIVE THAT WOULD RESULT IN THE RECOVERY BY THE TRUST OF THE HIGHEST NET PRESENT VALUE OF PROCEEDS ON SUCH MORTGAGE LOAN OR OTHERWISE TO THE ALTERNATIVE THAT IS IN THE BEST INTERESTS OF THE CERTIFICATEHOLDERS.

OPTIONAL PURCHASE OF DELINQUENT MORTGAGE LOANS

As to any Mortgage Loan which is delinquent in payment by 90 days or more, the NIMS Insurer, if any, may, at its option and in accordance with the terms of the Pooling and Servicing Agreement, purchase such Mortgage Loan from the Trust at a purchase price for such Mortgage Loan generally equal to par plus accrued interest. In addition, the Master Servicer will have the option to purchase from the Trust Mortgage Loans that are delinquent in payment 90 days or more at a purchase price for such Mortgage Loan generally equal to par plus accrued interest, under certain circumstances set forth in the Pooling and Servicing Agreement and, with respect to each such delinquent Mortgage Loan, during certain prescribed time periods relating to the length of time such Mortgage Loan has been delinquent, in each case as set forth in the Pooling and Servicing Agreement.

FEDERAL INCOME TAX CONSEQUENCES

One or more elections will be made to treat designated portions of the Trust (exclusive of the Pre-Funding Accounts, the Interest Coverage Accounts, if any, the Net WAC Rate Carryover Reserve Account and the Cap Contracts) as a real estate mortgage investment conduit (a "REMIC") for federal income tax purposes. Upon the issuance of the Class A and Mezzanine Certificates, Thacher Proffitt & Wood LLP, counsel to the Depositor, will deliver its opinion generally to the effect that, assuming compliance with all provisions of the Pooling and Servicing Agreement, for federal income tax purposes, each REMIC elected by the Trust will qualify as a REMIC under Sections 860A through 860G of the Internal Revenue Code of 1986 (the "Code").

For federal income tax purposes, (i) the Residual Certificates will consist of components, each of which will represent the sole class of "residual interests" in each REMIC elected by the Trust and (ii) the Class A and Mezzanine Certificates (exclusive of any right of the holder of the Class A and Mezzanine Certificates to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount), the Class A-IO-S, Class CE and Class P Certificates will represent the "regular interests" in, and generally will be treated as debt instruments of, a REMIC. See "Federal Income Tax Consequences--REMICs" in the prospectus.

WFB.000463

For federal income tax reporting purposes, (i) the Class A, Class M-2 and Class M-4 Certificates will not, (ii) the Class M-1, Class M-3, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Certificates may and (iii) the Class M-10 Certificates will, be treated as having been issued with original issue discount. The prepayment assumption that will be used in determining the rate of accrual of original issue discount, premium and market discount, if any, for federal income tax purposes will be based on the assumption that subsequent to the date of any determination the Mortgage Loans will prepay at the Prepayment Assumption. No representation is made that the Mortgage Loans will prepay at such rate or at any other rate. See "Federal Income Tax Consequences--REMICs" in the prospectus.

The Internal Revenue Service (the "IRS") has issued regulations (the "OID Regulations") under Sections 1271 to 1275 of the Code generally addressing the treatment of debt instruments issued with original issue discount. See "Federal Income Tax Consequences--REMICs" in the prospectus.

Each holder of a Class A or Mezzanine Certificate is deemed to own an undivided beneficial ownership interest in a REMIC regular interest and the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount. The Net WAC Rate Carryover Reserve Account is not an asset of any REMIC.

The treatment of amounts received by a holder of a Class A or Mezzanine Certificate under such holder's right to receive the Net WAC Rate Carryover Amount, will depend on the portion, if any, of such holder's purchase price allocable thereto. Under the REMIC Regulations, each holder of a Class A or Mezzanine Certificate must allocate its purchase price for the Class A or Mezzanine Certificates among its undivided interest in the regular interest of the related REMIC and its undivided interest in the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount in accordance with the relative fair market values of each property right. The Trust Administrator will, as required, treat payments made to the holders of the Class A and Mezzanine Certificates with respect to the Net WAC Rate Carryover Amount, as includible in income based on the regulations relating to notional principal contracts (the "Notional Principal Contract Regulations"). The OID Regulations provide that the Trust's allocation of the issue price is binding on all holders unless the holder explicitly discloses on its tax return that its allocation is different from the Trust's allocation. For tax reporting purposes, the Trust Administrator may, as required, treat the right to receive payments from the Reserve Account in respect of Net WAC Rate Carryover Amounts as having more than a DE MINIMIS value. Upon request, the Trust Administrator will make available information regarding such amounts as has been provided to it. Under the REMIC Regulations, the Trust Administrator is required to account for the REMIC regular interest, the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount as discrete property rights. Holders of the Class A and Mezzanine Certificates are advised to consult their own tax advisors regarding the allocation of issue price, timing, character and source of income and deductions resulting from the ownership of such Certificates. Treasury regulations have been promulgated under Section 1275 of the Code generally providing for the integration of a "qualifying debt instrument" with a hedge if the combined cash flows of the components are substantially equivalent to the cash flows on a variable rate debt instrument. However, such regulations specifically disallow integration of debt instruments subject to Section 1272(a)(6) of the Code. Therefore, holders of the Class A and Mezzanine Certificates will be unable to use the integration method provided for under such regulations with respect to those Certificates. If the Trust Administrator's treatment of payments of the Net WAC Rate Carryover Amount is respected, ownership of the right to the Net WAC Rate Carryover Amount will entitle the owner to amortize the price paid for the right to the Net WAC Rate Carryover Amount under the Notional Principal Contract Regulations.

Upon the sale of a Class A or Mezzanine Certificate the amount of the sale allocated to the selling certificateholder's right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount would be considered a "termination payment" under the Notional Principal Contract Regulations allocable to the related Class A or Mezzanine Certificate, as the case may be. A holder of a Class A or Mezzanine Certificate will have gain or loss from such a termination of the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount equal to (i) any termination payment it received or is deemed to have received minus (ii) the unamortized portion of any amount paid (or deemed paid) by the certificateholder upon entering into or acquiring its interest in the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount.

S-88

WFB.000464

Gain or loss realized upon the termination of the right to receive payments from the Net WAC Rate Carryover Reserve Account in respect of the Net WAC Rate Carryover Amount will generally be treated as capital gain or loss. Moreover, in the case of a bank or thrift institution, Code Section 582(c) would likely not apply to treat such gain or loss as ordinary.

It is possible that the right to receive payments in respect of the Net WAC Rate Carryover Amounts could be treated as a partnership among the holders of all of the Certificates, in which case holders of such Certificates potentially would be subject to different timing of income and foreign holders of such Certificates could be subject to withholding in respect of any related Net WAC Rate Carryover Amount. Holders of the Class A and Mezzanine Certificates are advised to consult their own tax advisors regarding the allocation of issue price, timing, character and source of income and deductions resulting from the ownership of their Certificates.

With respect to the Class A and Mezzanine Certificates, this paragraph is relevant to such Certificates exclusive of the rights of the holders of such Certificates to receive certain payments in respect of the Net WAC Rate Carryover Amount. The Class A and Mezzanine Certificates will be treated as assets described in Section 7701(a)(19)(C) of the Code and "real estate assets" under Section 856(c)(4)(A) of the Code, generally in the same proportion that the assets in the Trust would be so treated. In addition, interest on the Class A and Mezzanine Certificates will be treated as "interest on obligations secured by mortgages on real property" under Section 856(c)(3)(B) of the Code, generally to the extent that the Class A and Mezzanine Certificates are treated as "real estate assets" under Section 856(c)(4)(A) of the Code. Amounts held in the Pre-Funding Accounts and the Interest Coverage Accounts, if any, may not be treated as assets described in the foregoing sections of the Code. The Class A and Mezzanine Certificates will also be treated as "qualified mortgages" under Section 860G(a)(3) of the Code. See "Federal Income Tax Consequences--REMICs" in the prospectus.

Because the Net WAC Rate Carryover Amount is treated as separate rights of the Class A and Mezzanine Certificates not payable by any REMIC elected by the Trust, such rights will not be treated as qualifying assets for any certificateholder that is a mutual savings bank, domestic building and loan association, real estate investment trust, or REMIC. In addition, any amounts received from the Net WAC Rate Carryover Reserve Account will not be qualifying real estate income for real estate investment trusts or qualifying income for REMICs.

It is not anticipated that any REMIC elected by the Trust will engage in any transactions that would subject it to the prohibited transactions tax as defined in Section 860F(a)(2) of the Code, the contributions tax as defined in Section 860G(d) of the Code or the tax on net income from foreclosure property as defined in Section 860C(c) of the Code. However, in the event that any such tax is imposed on any REMIC elected by the Trust, such tax will be borne (i) by the Trustee, if the Trustee has breached its obligations with respect to REMIC compliance under the Pooling and Servicing Agreement, (ii) by the Trust Administrator, if the Trust Administrator has breached its obligations with respect to REMIC compliance under the Pooling and Servicing Agreement, (iii) by the Master Servicer, if the Master Servicer has breached its obligations with respect to REMIC compliance under the Pooling and Servicing Agreement and (iv) otherwise by the Trust, with a resulting reduction in amounts otherwise distributable to holders of the Class A and Mezzanine Certificates. See "Description of the Securities" and "Federal Income Tax Consequences REMICs" in the prospectus. The responsibility for filing annual federal information returns and other reports will be borne by the Trust Administrator. See "Federal Income Tax Consequences--REMICs" in the prospectus.

For further information regarding the federal income tax consequences of investing in the Class A and Mezzanine Certificates, see "Federal Income Tax Consequences--REMICs" in the prospectus.

## METHOD OF DISTRIBUTION

Subject to the terms and conditions set forth in the Underwriting Agreement, dated the date hereof (the "Underwriting Agreement"), the Depositor has agreed to sell, and each Underwriter severally has agreed to purchase a portion of the Offered Certificates set forth opposite their respective names. Each Underwriter is obligated to purchase all of its allocated portion of the Offered Certificates if it purchases any.

WFB.000465

| Underwriters | Original Certificate Principal Balance of the Class A-1A Certificates | Original Certificate Principal Balance of the Class A-1B Certificates | Original Certificate Principal Balance of the Class A-1C Certificates | Original Certificate Principal Balance of the Class A-1D Certificates | Original Certificate Principal Balance of the Class A-2 Certificates | Original Certifica Principa Balance of Class A-3 Certificat |
|---|---|---|---|---|---|---|
| Morgan Stanley & Co. Incorporated | $540,000,000 | $326,977,200 | $900,000,000 | $202,500,000 | $328,255,200 | $82,063,80 |
| Bear, Stearns & Co. Inc. | $30,000,000 | $18,165,400 | $50,000,000 | $11,250,000 | $18,236,400 | $4,559,10 |
| Goldman, Sachs & Co. | $30,000,000 | $18,165,400 | $50,000,000 | $11,250,000 | $18,236,400 | $4,559,10 |

| Underwriters | Original Certificate Principal Balance of the Class A-5 Certificates | Original Certificate Principal Balance of the Class M-1 Certificates | Original Certificate Principal Balance of the Class M-2 Certificates | Original Certificate Principal Balance of the Class M-3 Certificates | Original Certificate Principal Balance of the Class M-4 Certificates | Original Certificat Principal Balance o the Class M Certificate |
|---|---|---|---|---|---|---|
| Morgan Stanley & Co. Incorporated | $62,526,600 | $38,700,000 | $199,305,000 | $58,050,000 | $98,685,000 | $65,790,000 |
| Bear, Stearns & Co. Inc. | $3,473,700 | $2,150,000 | $11,072,500 | $3,225,000 | $5,482,500 | $3,655,000 |
| Goldman, Sachs & Co. | $3,473,700 | $2,150,000 | $11,072,500 | $3,225,000 | $5,482,500 | $3,655,000 |

| Underwriters | Original Certificate Principal Balance of the Class M-6 Certificates | Original Certificate Principal Balance of the Class M-7 Certificates | Original Certificate Principal Balance of the Class M-8 Certificates | Original Certificate Principal Balance of the Class M-9 Certificates | Original Certificate Principal Balance of the Class M-10 Certificates |
|---|---|---|---|---|---|
| Morgan Stanley & Co. Incorporated | $50,310,000 | $61,920,000 | $42,570,000 | $50,310,000 | $30,960,000 |
| Bear, Stearns & Co. Inc. | $ 2,795,000 | $ 3,440,000 | $ 2,365,000 | $ 2,795,000 | $ 1,720,000 |
| Goldman, Sachs & Co. | $ 2,795,000 | $ 3,440,000 | $ 2,365,000 | $ 2,795,000 | $ 1,720,000 |

The Depositor has been advised by the Underwriters that they propose initially to offer the Offered Certificates of each class to the public at the offering price set forth on the cover page and to certain dealers at such price less a selling concession, not in excess of the percentage set forth in the table below of the Certificate Principal Balance of the related class of Offered Certificates. The Underwriters may allow and such dealers may reallow a reallowance discount, not in excess of the percentage set forth in the table below of the Certificate Principal Balance of the related class of Offered Certificates, to certain other dealers. After the initial public offering, the public offering prices, such concessions and such discounts may be changed.

| CLASS OF CERTIFICATES | SELLING CONCESSION | REALLOWANCE DISCOUNT |
|---|---|---|
| Class A-1A.................. | 0.1500% | 0.0750% |
| Class A-1B.................. | 0.1200% | 0.0600% |
| Class A-1C.................. | 0.1140% | 0.0570% |
| Class A-1D.................. | 0.1500% | 0.0750% |
| Class A-2................... | 0.1200% | 0.0600% |
| Class A-3................... | 0.1500% | 0.0750% |
| Class A-5................... | 0.1500% | 0.0750% |
| Class M-1................... | 0.1500% | 0.0750% |
| Class M-2................... | 0.1500% | 0.0750% |
| Class M-3................... | 0.1500% | 0.0750% |
| Class M-4................... | 0.1500% | 0.0750% |
| Class M-5................... | 0.1500% | 0.0750% |
| Class M-6................... | 0.1500% | 0.0750% |
| Class M-7................... | 0.1500% | 0.0750% |
| Class M-8................... | 0.1500% | 0.0750% |
| Class M-9................... | 0.1500% | 0.0750% |
| Class M-10.................. | 0.1500% | 0.0750% |

Until the distribution of the Offered Certificates is completed, rules of the SEC may limit the ability of the Underwriters and certain selling group members to bid for and purchase the Offered Certificates. As an exception to these rules, the Underwriters are permitted to engage in certain transactions that stabilize the price of the Offered

WFB.000466

Certificates. Such transactions consist of bids or purchases for the purpose of pegging, fixing or maintaining the price of the Offered Certificates.

In general, purchases of a security for the purpose of stabilization or to reduce a short position could cause the price of the security to be higher than it might be in the absence of such purchases.

Neither the Depositor nor any of the Underwriters makes any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the prices of the Offered Certificates. In addition, neither the Depositor nor any of the Underwriters makes any representation that the Underwriters will engage in such transactions or that such transactions, once commenced, will not be discontinued without notice.

The Offered Certificates are offered subject to receipt and acceptance by the Underwriters, to prior sale and to each Underwriter's right to reject any order in whole or in part and to withdraw, cancel or modify the offer without notice. It is expected that delivery of the Offered Certificates will be made through the facilities of DTC, Clearstream and the Euroclear System on or about the Closing Date. The Offered Certificates will be offered in Europe and the United States of America.

The Underwriting Agreement provides that the Depositor and the Seller will indemnify each Underwriter against certain civil liabilities, including liabilities under the Securities Act of 1933, as amended, or will contribute to payments an Underwriter may be required to make in respect thereof.

The Underwriters or their affiliates have ongoing banking relationships with affiliates of the Depositor and a portion of the proceeds received from the sale of the Offered Certificates will be used by the Depositor to satisfy obligations under financing facilities in place with affiliates of the Underwriters with respect to some of the Mortgage Loans.

SECONDARY MARKET

There is currently no secondary market for the Class A and Mezzanine Certificates and there can be no assurance that a secondary market for the Class A and Mezzanine Certificates will develop or, if it does develop, that it will continue. Each Underwriter intends to establish a market in the classes of Class A and Mezzanine Certificates purchased by it, but it is not obligated to do so. The primary source of information available to investors concerning the Class A and Mezzanine Certificates will be the monthly reports made available via the Trust Administrator's internet website, initially located at www.ctslink.com, which will include information as to the outstanding Certificate Principal Balance of the Class A and Mezzanine Certificates and the status of the applicable form of credit enhancement. There can be no assurance that any additional information regarding the Class A and Mezzanine Certificates will be available through any other source. In connection with providing access to its internet website, the Trust Administrator may require the use of an assigned log-on identification number or code and the acceptance of a disclaimer. In addition, the Depositor is not aware of any source through which price information about the Class A and Mezzanine Certificates will be generally available on an ongoing basis. The limited nature of such information regarding the Class A and Mezzanine Certificates may adversely affect the liquidity of the Class A and Mezzanine Certificates, even if a secondary market for the Class A and Mezzanine Certificates becomes available.

LEGAL OPINIONS

Certain legal matters relating to the Class A and Mezzanine Certificates will be passed upon for the Depositor by Thacher Proffitt & Wood LLP, New York, New York and for the Underwriters by McKee Nelson LLP.

S-91

WFB.000467

## RATINGS

It is a condition to the issuance of the Certificates that the Offered Certificates receive the following ratings from Fitch Ratings ("Fitch"), Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc. ("S&P" and together with Fitch and Moody's, the "Rating Agencies"):

| Offered Certificates | Fitch | Moody's | S&P |
| --- | --- | --- | --- |
| A-1A | AAA | Aaa | AAA |
| A-1B | AAA | Aaa | AAA |
| A-1C | AAA | Aaa | AAA |
| A-1D | AAA | Aaa | N/R |
| A-2 | AAA | Aaa | AAA |
| A-3 | AAA | Aaa | N/R |
| A-5 | AAA | Aaa | N/R |
| M-1 | AA+ | Aa1 | AA+ |
| M-2 | AA | Aa2 | AA |
| M-3 | AA | Aa2 | AA- |
| M-4 | AA- | A1 | A+ |
| M-5 | A | A2 | A |
| M-6 | A | A2 | A- |
| M-7 | BBB+ | A3 | BBB+ |
| M-8 | BBB | Baa1 | BBB |
| M-9 | BBB | Baa2 | BBB- |
| M-10 | BBB- | Baa3 | N/R |

The ratings of the Rating Agencies assigned to asset-backed pass-through certificates address the likelihood of the receipt by certificateholders of all distributions to which such certificateholders are entitled. The rating process addresses structural and legal aspects associated with the Certificates, including the nature of the underlying Mortgage Loans. The ratings on the Offered Certificates do not, however, constitute statements regarding the likelihood or frequency of prepayments on the Mortgage Loans, the distribution of the Net WAC Rate Carryover Amount or the possibility that a holder of an Offered Certificate might realize a lower than anticipated yield. The ratings do not address the possibility that certificateholders might suffer a lower than anticipated yield due to non-credit events.

A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning rating organization. Each security rating should be evaluated independently of any other security rating. In the event that the ratings initially assigned to the Offered Certificates are subsequently lowered for any reason, no person or entity is obligated to provide any additional credit support or credit enhancement with respect to the Offered Certificates.

The Depositor has not requested that any rating agency rate the Offered Certificates other than as stated above. However, there can be no assurance as to whether any other rating agency will rate the Offered Certificates, or, if it does, what rating would be assigned by any such other rating agency. A rating on the Offered Certificates by another rating agency, if assigned at all, may be lower than the ratings assigned to the Offered Certificates as stated above.

## LEGAL INVESTMENT

The Class A and Mezzanine Certificates will not constitute "mortgage related securities" for purposes of the Secondary Mortgage Market Enhancement Act of 1984 ("SMMEA").

The Depositor makes no representations as to the proper characterization of any class of Class A or Mezzanine Certificates for legal investment or other purposes, or as to the ability of particular investors to purchase any class of Class A or Mezzanine Certificates under applicable legal investment restrictions. These uncertainties may adversely affect the liquidity of any class of Class A and Mezzanine Certificates. Accordingly, all institutions whose investment activities are subject to legal investment laws and regulations, regulatory capital requirements or review by regulatory authorities should consult with their legal advisors in determining whether and to what extent any class of Class A and Mezzanine Certificates constitutes a legal investment or is subject to investment, capital or other restrictions. See "Legal Investment" in the prospectus.

WFB.000468

ERISA CONSIDERATIONS

A fiduciary of any ERISA plan, IRA, Keogh plan or government plan, collectively referred to here as "benefit plans," or any insurance company, whether through its general or separate accounts, or any other person investing benefit plan assets of any benefit plan, should carefully review with its legal advisors whether the purchase or holding of offered certificates could give rise to a transaction prohibited or not otherwise permissible under ERISA or Section 4975 of the Code. The purchase or holding of the Offered Certificates by or on behalf of, or with benefit plan assets of, a benefit plan may qualify for exemptive relief under the Underwriter's Exemption, as described under "Considerations for Benefit Plan Investors Possible Exemptive Relief" in the prospectus. The Underwriter's exemption relevant to the Offered Certificates was granted by the Department of Labor as PTE 90-24 (May 11, 1990) and was amended by PTE 97- 34 at 62 Fed.Reg. 39021 (July 21, 1997), PTE 2000-58 at 65 Fed.Reg. 67765 (November 13, 2000) and PTE 2002-41 at 67 Fed.Reg. 54487 (August 22, 2002) and amended as described in the prospectus. However, the Underwriter's Exemption contains a number of conditions which must be met for the exemption to apply, including the requirements that the investing benefit plan must be an "accredited investor" as defined in Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under the Securities Act that the Offered Certificates be rated at least "BBB-" (or its equivalent) by the Rating Agencies at the time of the Plan's purchase. If the rating is below "BBB-" (or its equivalent), the Offered Certificates may be eligible for purchase by an "insurance company general account" under PTCE 95-60.

Each certificate owner of a Mezzanine Certificate (other than a Class M-11 Certificate) or any interest therein will be deemed to have represented, by virtue of its acquisition or holding of that certificate or interest therein, that either (i) it is not a plan investor, (ii) it has acquired and is holding such Mezzanine Certificate in reliance on the Underwriter's Exemption, and that it understands that there are certain conditions to the availability of the Underwriter's Exemption, including that the Mezzanine Certificate must be rated, at the time of purchase, not lower than "BBB-" (or its equivalent) by the Rating Agencies or (iii) (1) it is an insurance company, (2) the source of funds used to acquire or hold the certificate or interest therein is an "insurance company general account," as such term is defined in PTCE 95-60, and (3) the conditions in Sections I and III of PTCE 95-60 have been satisfied.

If any Mezzanine Certificate or any interest therein is acquired or held in violation of the conditions described in the preceding paragraph, the next preceding permitted certificate owner will be treated as the certificate owner of that Mezzanine Certificate, retroactive to the date of transfer to the purported certificate owner. Any purported certificate owner whose acquisition or holding of any such certificate or interest therein was effected in violation of the conditions described in the preceding paragraph will indemnify and hold harmless the Depositor, the Trustee, the Trust Administrator, the Master Servicer, any subservicer, and the Trust from and against any and all liabilities, claims, costs or expenses incurred by those parties as a result of that acquisition or holding.

Before purchasing any Offered Certificates, a fiduciary of a benefit plan should itself confirm that the Offered Certificates constitute "securities" for purposes of the Underwriters' Exemption and that the specific and general conditions of the Underwriters' Exemption and the other requirements set forth in the Underwriters' Exemption would be satisfied. Any benefit plan fiduciary that proposes to cause a benefit plan to purchase a Certificate should consult with its counsel with respect to the potential applicability to such investment of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code to the proposed investment. For further information regarding the ERISA considerations of investing in the Offered Certificates, see "Considerations for Benefit Plan Investors" in the prospectus.

S-93

WFB.000469

ANNEX I

GLOBAL CLEARANCE, SETTLEMENT AND TAX DOCUMENTATION PROCEDURES

Except in certain limited circumstances, the Offered Certificates will be available only in book-entry form. Investors in the Offered Certificates may hold such Offered Certificates through any of DTC, Clearstream or Euroclear. The Offered Certificates will be traceable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors through Clearstream and Euroclear will be conducted in the ordinary way in accordance with the normal rules and operating procedures of Clearstream and Euroclear and in accordance with conventional eurobond practice (i.e., seven calendar day settlement).

Secondary market trading between investors through DTC will be conducted according to DTC's rules and procedures applicable to U.S. corporate debt obligations.

Secondary cross-market trading between Clearstream or Euroclear and DTC Participants holding Certificates will be effected on a delivery-against-payment basis through the respective Depositories of Clearstream and Euroclear (in such capacity) and as DTC Participants.

Non-U.S. holders (as described below) of Offered Certificates will be subject to U.S. withholding taxes unless such holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

INITIAL SETTLEMENT

All Offered Certificates will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the Offered Certificates will be represented through financial institutions acting on their behalf as direct and indirect Participants in DTC. As a result, Clearstream and Euroclear will hold positions on behalf of their participants through their Relevant Depository which in turn will hold such positions in their accounts as DTC Participants.

Investors electing to hold their Offered Certificates through DTC will follow DTC settlement practices. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their Offered Certificates through Clearstream or Euroclear accounts will follow the settlement procedures applicable to conventional eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Offered Certificates will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

SECONDARY MARKET TRADING

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

TRADING BETWEEN DTC PARTICIPANTS. Secondary market trading between DTC Participants will be settled using the procedures applicable to prior mortgage loan asset-backed certificates issued in same-day funds.

TRADING BETWEEN CLEARSTREAM AND/OR EUROCLEAR PARTICIPANTS. Secondary market trading between Clearstream Participants or Euroclear Participants will be settled using the procedures applicable to conventional eurobonds in same-day funds.

TRADING BETWEEN DTC SELLER AND CLEARSTREAM OR EUROCLEAR PARTICIPANTS. When Offered Certificates are to be transferred from the account of a DTC Participant to the account of a Clearstream Participant or a Euroclear Participant, the purchaser will send instructions to Clearstream or Euroclear through a Clearstream Participant or Euroclear Participant at least one business day prior to settlement. Clearstream or Euroclear will instruct the Relevant Depositary, as the case may be, to receive the Offered Certificates against payment. Payment will include interest accrued on the Offered

I-1

WFB.000470

Certificates from and including the last coupon payment date to and excluding the settlement date, on basis of either the actual number of days in such accrual period, and a year assumed to consist of 360 days. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. Payment will then be made by the Relevant Depositary to the DTC Participant's account against delivery of the Offered Certificates. After settlement has been completed, the Offered Certificates will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Clearstream Participant's or Euroclear Participant's account. The securities credit will appear the next day (European time) and the cash debt will be back-valued to, and the interest on the Offered Certificates will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (I.E., the trade fails), the Clearstream or Euroclear cash debt will be valued instead as of the actual settlement date.

Clearstream Participants and Euroclear Participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Clearstream or Euroclear. Under this approach, they may take on credit exposure to Clearstream or Euroclear until the Offered Certificates are credited to their account one day later. As an alternative, if Clearstream or Euroclear has extended a line of credit to them, Clearstream Participants or Euroclear Participants can elect not to preposition funds and allow that credit line to be drawn upon to finance settlement. Under this procedure, Clearstream Participants or Euroclear Participants purchasing Offered Certificates would incur overdraft charges for one day, assuming they cleared the overdraft when the Offered Certificates were credited to their accounts. However, interest on the Offered Certificates would accrue from the value date. Therefore, in many cases the investment income on the Offered Certificates earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although the result will depend on each Clearstream Participant's or Euroclear Participant's particular cost of funds. Since the settlement is taking place during New York business hours, DTC Participants can employ their usual procedures for crediting Offered Certificates to the respective European Depositary for the benefit of Clearstream Participants or Euroclear Participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC Participants a cross-market transaction will settle no differently than a trade between two DTC Participants.

TRADING BETWEEN CLEARSTREAM OR EUROCLEAR SELLER AND DTC PURCHASER. Due to time zone differences in their favor, Clearstream Participants and Euroclear Participants may employ their customary procedures for transactions in which Offered Certificates are to be transferred by the respective clearing system, through the respective Depositary, to a DTC Participant. The seller will send instructions to Clearstream or Euroclear through a Clearstream Participant or Euroclear Participant at least one business day prior to settlement. In these cases Clearstream or Euroclear will instruct the respective Depositary, as appropriate, to credit the Offered Certificates to the DTC Participant's account against payment. Payment will include interest accrued on the Offered Certificates from and including the last coupon payment to and excluding the settlement date on the basis of the actual number of days in such accrual period and a year assumed to consist of 360 days. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of Clearstream Participant or Euroclear Participant the following day, and receipt of the cash proceeds in the Clearstream Participant's or Euroclear Participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Clearstream Participant or Euroclear Participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Clearstream Participant's or Euroclear Participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Clearstream or Euroclear and that purchase Offered Certificates from DTC Participants for delivery to Clearstream Participants or Euroclear Participants should note that these trades would automatically fail on the sale side unless affirmative action is taken. At least three techniques should be readily available to eliminate this potential problem:

      (a)      borrowing through Clearstream or Euroclear for one day (until the purchase side of the trade is reflected in their Clearstream or Euroclear accounts) in accordance with the clearing system's customary procedures;

      (b)      borrowing the Offered Certificates in the U.S. from a DTC

Participant no later than one day prior to settlement, which would give the Offered Certificates sufficient time to be reflected in their Clearstream or Euroclear account in order to settle the sale side of the trade; or

I-2

WFB.000472

(c)     staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC Participant is at least one day prior to the value date for the sale to the Clearstream Participant or Euroclear Participant.

CERTAIN U.S. FEDERAL INCOME TAX DOCUMENTATION REQUIREMENTS

A beneficial owner of Offered Certificates holding securities through Clearstream or Euroclear (or through DTC if the holder has an address outside the U.S.) will be subject to the 30% U.S. withholding tax that generally applies to payments of interest (including original issue discount) on registered debt issued by U.S. Persons, unless (i) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between such beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (ii) such beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate:

EXEMPTION FOR NON-U.S. PERSONS (FORM W-8BEN). Beneficial owners of Global Securities that are non-U.S. Persons can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of such change.

EXEMPTION FOR NON-U.S. PERSONS WITH EFFECTIVELY CONNECTED INCOME (FORM W-8ECI). A non-U.S. Person, including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the United States, can obtain an exemption from the withholding tax by filing Form W-8ECI (Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

EXEMPTION OR REDUCED RATE FOR NON-U.S. PERSONS RESIDENT IN TREATY COUNTRIES (FORM W-8BEN). Non-U.S. Persons that are Certificate Owners residing in a country that has a tax treaty with the United States can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). Form W-8BEN may be filed by the Certificate Owners or his agent.

EXEMPTION FOR U.S. PERSONS (FORM W-9). U.S. Persons can obtain a complete exemption from the withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

U.S. FEDERAL INCOME TAX REPORTING PROCEDURE.

The Certificate Owner of a Global Security or, in the case of a Form W-8BEN or a Form W-8ECI filer, his agent, files by submitting the appropriate form to the person through whom it holds (the clearing agency, in the case of persons holding directly on the books of the clearing agency). Form W-8BEN and Form W-8ECI are effective until the third succeeding calendar year from the date such form is signed.

The term "U.S. Person" means (i) a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership for United States federal income tax purposes organized in or under the laws of the United States or any state thereof or the District of Columbia (unless, in the case of a partnership, Treasury regulations provide otherwise) or (iii) an estate the income of which is includible in gross income for United States tax purposes, regardless of its source, or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have authority to control all substantial decisions of the Trust. Notwithstanding the preceding sentence, to the extent provided in Treasury regulations, certain trusts in existence on August 20, 1996, and treated as United States persons prior to such date, that elect to continue to be treated as United States persons will also be a U.S. Person. This summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the Offered Certificates. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the Offered Certificates.

WFB.000473

ANNEX II

ASSUMED MORTGAGE LOAN CHARACTERISTICS

| GROUP | AGGREGATE PRINCIPAL BALANCE | ORIGINAL GROSS MORTGAGE RATE (%) | REMAINING TERM TO MATURITY (MONTHS) | TERM TO MATURITY (MONTHS) | GROSS MARGIN (%) | MAXIMUM MORTGAGE RATE (%) | MINIMUM MORTGAGE RATE (%) | MONTHS TO NEXT ADJUSTMENT DATE | INITIAL PERIOD RATE CAP (%) | PERIODIC RATE CAP |
|---|---|---|---|---|---|---|---|---|---|---|
| Group I Initial Mortgage Loans | | | | | | | | | | |
| 1 | 610,657,982.76 | 7.542 | 360 | 359 | 5.964 | 13.542 | 7.542 | 23 | 2.000 | 1.000 |
| 1 | 242,868,528.24 | 7.779 | 359 | 358 | 5.862 | 13.779 | 7.779 | 23 | 2.000 | 1.000 |
| 1 | 340,386,107.11 | 7.464 | 359 | 358 | 5.812 | 13.464 | 7.464 | 35 | 2.000 | 1.000 |
| 1 | 22,085,497.40 | 7.457 | 360 | 359 | 5.970 | 13.457 | 7.457 | 23 | 2.000 | 1.000 |
| 1 | 148,524,048.27 | 7.218 | 359 | 358 | 5.969 | 13.218 | 7.218 | 23 | 2.000 | 1.000 |
| 1 | 26,956,579.46 | 8.117 | 360 | 359 | 5.949 | 14.117 | 8.117 | 23 | 2.000 | 1.000 |
| 1 | 4,346,120.44 | 8.065 | 356 | 355 | 5.892 | 14.065 | 8.065 | 23 | 2.000 | 1.000 |
| 1 | 10,831,349.22 | 7.793 | 360 | 359 | 5.947 | 13.793 | 7.793 | 23 | 2.000 | 1.000 |
| 1 | 112,574,097.83 | 7.156 | 359 | 358 | 5.962 | 13.156 | 7.156 | 35 | 2.000 | 1.000 |
| 1 | 4,450,630.11 | 7.657 | 360 | 359 | 5.930 | 13.657 | 7.657 | 35 | 2.000 | 1.000 |
| 1 | 35,213,850.09 | 7.257 | 360 | 359 | 5.960 | 13.257 | 7.257 | 23 | 2.000 | 1.000 |
| 1 | 9,633,899.87 | 6.982 | 360 | 358 | 5.920 | 12.982 | 6.982 | 22 | 2.000 | 1.000 |
| 1 | 50,039,600.57 | 7.607 | 360 | 359 | 5.975 | 13.607 | 7.607 | 23 | 2.000 | 1.000 |
| 1 | 6,849,086.65 | 6.930 | 360 | 359 | 6.000 | 12.930 | 6.930 | 35 | 2.000 | 1.000 |
| 1 | 2,991,878.91 | 7.984 | 360 | 359 | 5.891 | 13.984 | 7.984 | 35 | 2.000 | 1.000 |
| 1 | 7,263,282.23 | 7.987 | 358 | 357 | 5.931 | 13.987 | 7.987 | 23 | 2.000 | 1.000 |
| 1 | 36,589,788.46 | 7.747 | 360 | 359 | 5.943 | 13.747 | 7.747 | 23 | 2.000 | 1.000 |
| 1 | 3,620,856.08 | 7.855 | 360 | 359 | 5.915 | 13.855 | 7.855 | 23 | 2.000 | 1.000 |
| 1 | 2,279,387.90 | 8.560 | 360 | 359 | 5.968 | 14.560 | 8.560 | 23 | 2.000 | 1.000 |
| 1 | 18,523,126.92 | 8.174 | 360 | 359 | 5.935 | 14.174 | 8.174 | 23 | 2.000 | 1.000 |
| 1 | 14,534,702.40 | 7.953 | 360 | 359 | 5.973 | 13.953 | 7.953 | 23 | 2.000 | 1.000 |
| 1 | 605,054.72 | 9.159 | 360 | 359 | 6.110 | 15.159 | 9.159 | 23 | 2.000 | 1.000 |
| 1 | 1,811,019.63 | 7.595 | 360 | 359 | 5.722 | 13.595 | 7.595 | 35 | 2.000 | 1.000 |
| 1 | 901,007.43 | 8.132 | 360 | 359 | 6.000 | 14.132 | 8.132 | 35 | 2.000 | 1.000 |
| 1 | 3,830,135.91 | 7.550 | 360 | 358 | 5.850 | 13.550 | 7.550 | 34 | 2.000 | 1.000 |
| 1 | 3,783,881.74 | 7.131 | 360 | 359 | 5.900 | 13.131 | 7.131 | 35 | 2.000 | 1.000 |
| 1 | 4,278,411.16 | 7.420 | 360 | 359 | 6.000 | 13.420 | 7.420 | 23 | 2.000 | 1.000 |
| 1 | 4,720,596.49 | 7.664 | 360 | 359 | 5.873 | 13.664 | 7.664 | 35 | 2.000 | 1.000 |
| 1 | 3,657,754.68 | 8.058 | 360 | 357 | 5.712 | 14.058 | 8.058 | 21 | 2.000 | 1.000 |
| 1 | 2,701,124.60 | 7.611 | 350 | 349 | 5.953 | 13.611 | 7.611 | 23 | 2.000 | 1.000 |
| 1 | 2,536,303.25 | 7.590 | 356 | 355 | 5.955 | 13.590 | 7.590 | 35 | 2.000 | 1.000 |
| 1 | 3,707,323.28 | 6.615 | 360 | 359 | 6.000 | 12.615 | 6.615 | 35 | 2.000 | 1.000 |
| 1 | 4,549,382.65 | 7.964 | 360 | 358 | 5.816 | 13.964 | 7.964 | 22 | 2.000 | 1.000 |
| 1 | 210,442.80 | 5.800 | 360 | 353 | 4.500 | 11.800 | 5.800 | 17 | 2.000 | 1.000 |
| 1 | 1,815,268.45 | 8.359 | 360 | 359 | 5.981 | 14.359 | 8.359 | 23 | 2.000 | 1.000 |
| 1 | 533,781.58 | 8.023 | 360 | 358 | 6.189 | 14.023 | 8.023 | 22 | 2.000 | 1.000 |
| 1 | 2,020,656.39 | 7.973 | 360 | 357 | 5.642 | 13.973 | 7.973 | 33 | 2.000 | 1.000 |
| 1 | 765,702.63 | 8.190 | 360 | 359 | 5.924 | 14.190 | 8.190 | 35 | 2.000 | 1.000 |
| 1 | 182,795.48 | 7.827 | 360 | 357 | 5.563 | 13.827 | 7.827 | 33 | 2.000 | 1.000 |
| 1 | 413,056.15 | 8.078 | 360 | 359 | 6.000 | 14.078 | 8.078 | 35 | 2.000 | 1.000 |
| 1 | 55,773.97 | 9.750 | 360 | 359 | 6.000 | 15.750 | 9.750 | 35 | 2.000 | 1.000 |
| 1 | 163,355.57 | 9.275 | 360 | 358 | 6.000 | 15.275 | 9.275 | 22 | 2.000 | 1.000 |
| 1 | 370,069.75 | 8.016 | 360 | 359 | 6.000 | 14.016 | 8.016 | 23 | 2.000 | 1.000 |
| 1 | 505,352.90 | 6.558 | 360 | 359 | 6.000 | 12.558 | 6.558 | 35 | 2.000 | 1.000 |
| 1 | 217,383.16 | 9.080 | 360 | 359 | 6.000 | 15.080 | 9.080 | 35 | 2.000 | 1.000 |
| 1 | 100,684,019.46 | 7.502 | 351 | 350 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 212,685,104.26 | 6.788 | 351 | 350 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 28,855,888.90 | 7.518 | 355 | 354 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 23,936,525.06 | 11.338 | 357 | 355 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 9,125,653.85 | 7.497 | 333 | 332 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 2,504,197.59 | 8.120 | 355 | 354 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 6,121,259.67 | 7.086 | 351 | 350 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 579,466.82 | 7.244 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 3,753,867.94 | 8.087 | 338 | 337 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 4,052,231.29 | 7.947 | 357 | 356 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 3,419,396.11 | 7.064 | 354 | 352 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 3,912,800.75 | 8.284 | 346 | 344 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 3,503,508.23 | 7.323 | 345 | 343 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 625,872.08 | 8.370 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 956,805.62 | 8.516 | 349 | 347 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 602,724.45 | 10.927 | 301 | 299 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 157,329.22 | 5.550 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 405,606.12 | 8.623 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 381,469.11 | 8.336 | 333 | 332 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 161,405.86 | 8.645 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 55,361.38 | 11.280 | 308 | 307 | N/A | N/A | N/A | N/A | N/A | N/A |

WFB.000474

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 40,987.74 | 11.800 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 54,910.05 | 8.300 | 240 | 239 | N/A | N/A | N/A | N/A | N/A | N/A |

GROUP I SUBSEQUENT MORTGAGE LOANS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 185,050,345.39 | 7.442 | 360 | 360 | 5.964 | 13.542 | 7.542 | 24 | 2.000 | 1.000 |
| 1 | 73,591,356.42 | 7.679 | 360 | 360 | 5.862 | 13.779 | 7.779 | 24 | 2.000 | 1.000 |
| 1 | 103,146,965.74 | 7.364 | 360 | 360 | 5.812 | 13.464 | 7.464 | 36 | 2.000 | 1.000 |
| 1 | 6,693,128.44 | 7.357 | 360 | 360 | 5.970 | 13.457 | 7.457 | 24 | 2.000 | 1.000 |
| 1 | 45,012,499.58 | 7.118 | 360 | 359 | 5.969 | 13.218 | 7.218 | 24 | 2.000 | 1.000 |
| 1 | 8,168,070.51 | 8.017 | 360 | 360 | 5.949 | 14.117 | 8.117 | 24 | 2.000 | 1.000 |
| 1 | 1,316,719.51 | 7.965 | 356 | 356 | 5.892 | 14.065 | 8.065 | 24 | 2.000 | 1.000 |
| 1 | 3,282,336.30 | 7.693 | 360 | 360 | 5.947 | 13.793 | 7.793 | 24 | 2.000 | 1.000 |
| 1 | 34,118,728.34 | 7.056 | 359 | 359 | 5.962 | 13.156 | 7.156 | 36 | 2.000 | 1.000 |
| 1 | 1,348,785.33 | 7.557 | 360 | 360 | 5.929 | 13.657 | 7.657 | 36 | 2.000 | 1.000 |
| 1 | 10,671,483.33 | 7.157 | 360 | 360 | 5.960 | 13.257 | 7.257 | 24 | 2.000 | 1.000 |
| 1 | 2,920,746.23 | 6.882 | 360 | 360 | 5.920 | 12.982 | 6.982 | 24 | 2.000 | 1.000 |
| 1 | 15,163,444.18 | 7.507 | 360 | 360 | 5.975 | 13.607 | 7.607 | 24 | 2.000 | 1.000 |
| 1 | 2,076,144.95 | 6.829 | 360 | 360 | 6.000 | 12.929 | 6.929 | 36 | 2.000 | 1.000 |
| 1 | 906,498.62 | 7.883 | 360 | 360 | 5.891 | 13.983 | 7.983 | 36 | 2.000 | 1.000 |

II-1

WFB.000475

ANNEX II

ASSUMED MORTGAGE LOAN CHARACTERISTICS

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2,200,960.21 | 7.887 | 359 | 359 | 5.931 | 13.987 | 7.987 | 24 | 2.000 | 1.000 |
| 1 | 11,088,381.39 | 7.646 | 360 | 360 | 5.943 | 13.746 | 7.746 | 24 | 2.000 | 1.000 |
| 1 | 1,097,313.18 | 7.755 | 360 | 360 | 5.915 | 13.855 | 7.855 | 24 | 2.000 | 1.000 |
| 1 | 690,595.12 | 8.460 | 360 | 360 | 5.968 | 14.560 | 8.560 | 24 | 2.000 | 1.000 |
| 1 | 5,612,690.87 | 8.074 | 360 | 360 | 5.935 | 14.174 | 8.174 | 24 | 2.000 | 1.000 |
| 1 | 4,404,048.45 | 7.853 | 360 | 360 | 5.973 | 13.953 | 7.953 | 24 | 2.000 | 1.000 |
| 1 | 183,277.59 | 9.059 | 360 | 360 | 6.110 | 15.159 | 9.159 | 24 | 2.000 | 1.000 |
| 1 | 548,858.22 | 7.494 | 360 | 360 | 5.722 | 13.594 | 7.594 | 24 | 2.000 | 1.000 |
| 1 | 272,959.86 | 8.032 | 360 | 360 | 6.000 | 14.132 | 8.132 | 24 | 2.000 | 1.000 |
| 1 | 1,161,329.48 | 7.449 | 360 | 360 | 5.850 | 13.549 | 7.549 | 36 | 2.000 | 1.000 |
| 1 | 1,146,706.93 | 7.031 | 360 | 360 | 5.900 | 13.131 | 7.131 | 36 | 2.000 | 1.000 |
| 1 | 1,296,556.32 | 7.319 | 360 | 360 | 6.000 | 13.419 | 7.419 | 24 | 2.000 | 1.000 |
| 1 | 1,430,541.59 | 7.564 | 360 | 360 | 5.873 | 13.664 | 7.664 | 36 | 2.000 | 1.000 |
| 1 | 1,109,501.92 | 7.958 | 360 | 360 | 5.712 | 14.058 | 8.058 | 24 | 2.000 | 1.000 |
| 1 | 818,598.34 | 7.510 | 350 | 350 | 5.953 | 13.610 | 7.610 | 24 | 2.000 | 1.000 |
| 1 | 768,572.45 | 7.490 | 356 | 356 | 5.955 | 13.590 | 7.590 | 24 | 2.000 | 1.000 |
| 1 | 1,123,398.17 | 6.515 | 360 | 360 | 6.000 | 12.615 | 6.615 | 36 | 2.000 | 1.000 |
| 1 | 1,379,796.06 | 7.863 | 360 | 360 | 5.816 | 13.963 | 7.963 | 24 | 2.000 | 1.000 |
| 1 | 64,183.11 | 5.700 | 360 | 360 | 4.500 | 11.800 | 5.800 | 24 | 2.000 | 1.000 |
| 1 | 549,976.58 | 8.259 | 360 | 360 | 5.981 | 14.359 | 8.359 | 24 | 2.000 | 1.000 |
| 1 | 161,808.04 | 7.924 | 360 | 360 | 6.189 | 14.024 | 8.024 | 24 | 2.000 | 1.000 |
| 1 | 612,925.98 | 7.873 | 360 | 360 | 5.641 | 13.973 | 7.973 | 36 | 2.000 | 1.000 |
| 1 | 231,967.44 | 8.090 | 360 | 360 | 5.924 | 14.190 | 8.190 | 36 | 2.000 | 1.000 |
| 1 | 55,463.89 | 7.727 | 360 | 360 | 5.561 | 13.827 | 7.827 | 36 | 2.000 | 1.000 |
| 1 | 125,135.87 | 7.978 | 360 | 360 | 6.000 | 14.078 | 8.078 | 36 | 2.000 | 1.000 |
| 1 | 16,893.48 | 9.650 | 360 | 360 | 6.000 | 15.750 | 9.750 | 36 | 2.000 | 1.000 |
| 1 | 49,507.28 | 9.175 | 360 | 360 | 6.000 | 15.275 | 9.275 | 24 | 2.000 | 1.000 |
| 1 | 112,114.57 | 7.916 | 360 | 360 | 6.000 | 14.016 | 8.016 | 24 | 2.000 | 1.000 |
| 1 | 153,146.35 | 6.458 | 360 | 360 | 6.000 | 12.558 | 6.558 | 36 | 2.000 | 1.000 |
| 1 | 65,848.24 | 8.980 | 360 | 360 | 6.000 | 15.080 | 9.080 | 36 | 2.000 | 1.000 |
| 1 | 30,530,628.25 | 7.402 | 351 | 351 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 64,473,133.69 | 6.688 | 351 | 351 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 8,746,522.90 | 7.418 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 7,251,108.23 | 11.238 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 2,766,946.24 | 7.397 | 333 | 333 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 758,968.29 | 8.020 | 355 | 355 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 1,855,058.97 | 6.986 | 351 | 351 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 175,776.95 | 7.143 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 1,138,114.87 | 7.986 | 338 | 338 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 1,470,557.64 | 7.847 | 357 | 357 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 1,036,663.17 | 6.965 | 354 | 354 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 1,186,903.12 | 8.183 | 346 | 346 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 1,062,222.89 | 7.223 | 344 | 344 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 129,032.27 | 8.270 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 290,110.68 | 8.415 | 349 | 349 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 182,874.03 | 10.826 | 301 | 301 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 47,683.21 | 5.450 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 122,886.43 | 8.523 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 115,590.15 | 8.236 | 333 | 333 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 48,924.48 | 8.544 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 16,772.38 | 11.180 | 308 | 308 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 12,412.77 | 11.700 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 1 | 16,651.28 | 8.200 | 240 | 240 | N/A | N/A | N/A | N/A | N/A | N/A |
| Group II Initial Mortgage Loans | | | | | | | | | | |
| 2 | 1,450,298.70 | 8.188 | 360 | 359 | 6.000 | 14.188 | 8.188 | 23 | 2.000 | 1.000 |
| 2 | 4,588,598.09 | 8.334 | 360 | 359 | 5.917 | 14.334 | 8.334 | 23 | 2.000 | 1.000 |
| 2 | 131,624,453.00 | 7.554 | 359 | 358 | 5.962 | 13.554 | 7.554 | 23 | 2.000 | 1.000 |
| 2 | 24,308,013.87 | 7.333 | 359 | 358 | 5.949 | 13.333 | 7.333 | 35 | 2.000 | 1.000 |
| 2 | 15,971,671.02 | 7.729 | 360 | 359 | 5.978 | 13.729 | 7.729 | 23 | 2.000 | 1.000 |
| 2 | 1,029,348.46 | 7.648 | 360 | 359 | 6.000 | 13.648 | 7.648 | 35 | 2.000 | 1.000 |
| 2 | 2,704,961.79 | 8.111 | 360 | 359 | 5.993 | 14.111 | 8.111 | 23 | 2.000 | 1.000 |
| 2 | 38,116,681.31 | 7.128 | 359 | 358 | 5.964 | 13.128 | 7.128 | 23 | 2.000 | 1.000 |
| 2 | 3,830,578.63 | 7.189 | 360 | 359 | 6.000 | 13.189 | 7.189 | 23 | 2.000 | 1.000 |
| 2 | 56,958,645.52 | 7.445 | 360 | 359 | 5.860 | 13.445 | 7.445 | 35 | 2.000 | 1.000 |
| 2 | 9,687,179.44 | 8.354 | 360 | 359 | 5.970 | 14.354 | 8.354 | 23 | 2.000 | 1.000 |
| 2 | 536,605.32 | 8.248 | 360 | 359 | 5.879 | 14.248 | 8.248 | 23 | 2.000 | 1.000 |
| 2 | 45,991,459.53 | 7.662 | 359 | 358 | 5.853 | 13.662 | 7.662 | 23 | 2.000 | 1.000 |
| 2 | 1,370,706.70 | 7.832 | 360 | 358 | 5.747 | 13.832 | 7.832 | 22 | 2.000 | 1.000 |
| 2 | 687,198.55 | 7.037 | 360 | 359 | 6.000 | 13.037 | 7.037 | 23 | 2.000 | 1.000 |
| 2 | 4,029,167.73 | 7.095 | 360 | 359 | 5.917 | 13.095 | 7.095 | 23 | 2.000 | 1.000 |
| 2 | 305,261.52 | 7.048 | 360 | 359 | 6.000 | 13.048 | 7.048 | 35 | 2.000 | 1.000 |
| 2 | 5,721,287.80 | 8.168 | 360 | 359 | 6.084 | 14.168 | 8.168 | 23 | 2.000 | 1.000 |
| 2 | 1,234,230.45 | 7.624 | 360 | 359 | 6.000 | 13.624 | 7.624 | 23 | 2.000 | 1.000 |
| 2 | 1,417,173.40 | 6.819 | 360 | 359 | 6.000 | 12.819 | 6.819 | 35 | 2.000 | 1.000 |
| 2 | 1,303,135.52 | 7.682 | 360 | 359 | 6.000 | 13.682 | 7.682 | 23 | 2.000 | 1.000 |

WFB.000476

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 830,934.65 | 7.814 | 360 | 358 | 5.903 | 13.814 | 7.814 | 34 | 2.000 | 1.000 |
| 2 | 1,061,712.59 | 7.845 | 360 | 359 | 6.000 | 13.845 | 7.845 | 23 | 2.000 | 1.000 |
| 2 | 1,690,327.47 | 8.314 | 360 | 357 | 5.790 | 14.314 | 8.314 | 21 | 2.000 | 1.000 |
| 2 | 646,426.65 | 7.672 | 360 | 359 | 6.000 | 13.672 | 7.672 | 35 | 2.000 | 1.000 |
| 2 | 499,256.95 | 7.220 | 360 | 359 | 6.000 | 13.220 | 7.220 | 23 | 2.000 | 1.000 |
| 2 | 1,110,343.76 | 7.993 | 360 | 359 | 6.000 | 13.993 | 7.993 | 35 | 2.000 | 1.000 |
| 2 | 1,166,178.03 | 7.563 | 360 | 359 | 6.000 | 13.563 | 7.563 | 35 | 2.000 | 1.000 |
| 2 | 195,848.61 | 7.300 | 360 | 359 | 6.000 | 13.300 | 7.300 | 23 | 2.000 | 1.000 |
| 2 | 271,108.99 | 9.253 | 360 | 359 | 6.000 | 15.253 | 9.253 | 35 | 2.000 | 1.000 |
| 2 | 546,032.70 | 8.698 | 360 | 358 | 6.000 | 14.698 | 8.698 | 34 | 2.000 | 1.000 |
| 2 | 442,495.91 | 7.729 | 360 | 358 | 6.096 | 13.729 | 7.729 | 22 | 2.000 | 1.000 |
| 2 | 623,224.55 | 8.185 | 360 | 359 | 6.105 | 14.185 | 8.185 | 35 | 2.000 | 1.000 |
| 2 | 55,770.46 | 9.150 | 360 | 359 | 6.000 | 15.150 | 9.150 | 35 | 2.000 | 1.000 |
| 2 | 83,666.38 | 10.450 | 360 | 359 | 6.000 | 16.450 | 10.450 | 23 | 2.000 | 1.000 |

II-2

WFB.000477

ANNEX II

ASSUMED MORTGAGE LOAN CHARACTERISTICS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 294,455.52 | 7.024 | 360 | 359 | 6.000 | 13.024 | 7.024 | 35 | 2.000 | 1.000 |
| 2 | 311,394.82 | 7.605 | 360 | 358 | 5.636 | 13.605 | 7.605 | 22 | 2.000 | 1.000 |
| 2 | 163,161.47 | 8.519 | 360 | 359 | 6.000 | 14.519 | 8.519 | 23 | 2.000 | 1.000 |
| 2 | 205,885.97 | 8.938 | 360 | 359 | 6.000 | 14.938 | 8.938 | 23 | 2.000 | 1.000 |
| 2 | 524,906.35 | 8.170 | 360 | 359 | 6.000 | 14.170 | 8.170 | 23 | 2.000 | 1.000 |
| 2 | 131,785.09 | 7.050 | 360 | 358 | 6.000 | 13.050 | 7.050 | 34 | 2.000 | 1.000 |
| 2 | 51,962.55 | 7.650 | 360 | 359 | 6.000 | 13.650 | 7.650 | 35 | 2.000 | 1.000 |
| 2 | 19,470,222.95 | 7.479 | 350 | 348 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 5,456,718.28 | 10.422 | 357 | 355 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 49,266,242.44 | 6.955 | 345 | 344 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 1,660,780.30 | 8.209 | 352 | 351 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 97,671.43 | 7.100 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 870,263.41 | 7.639 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 1,952,500.41 | 7.131 | 349 | 348 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 1,844,611.68 | 8.512 | 349 | 347 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 1,698,599.75 | 8.448 | 338 | 337 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 336,261.02 | 7.739 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 2,446,156.39 | 7.775 | 355 | 354 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 80,705.89 | 9.000 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 141,762.96 | 6.550 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 797,289.87 | 6.461 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 464,651.08 | 7.608 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 49,966.44 | 8.000 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 149,132.13 | 8.600 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 51,864.90 | 6.750 | 360 | 357 | N/A | N/A | N/A | N/A | N/A | N/A |

Group II Subsequent Mortgage Loans

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | 439,372.74 | 8.088 | 360 | 360 | 6.000 | 14.188 | 8.188 | 24 | 2.000 | 1.000 |
| 2 | 1,390,218.25 | 8.234 | 360 | 360 | 5.917 | 14.334 | 8.334 | 24 | 2.000 | 1.000 |
| 2 | 39,885,718.19 | 7.453 | 360 | 360 | 5.962 | 13.553 | 7.553 | 24 | 2.000 | 1.000 |
| 2 | 7,367,291.47 | 7.233 | 359 | 359 | 5.949 | 13.333 | 7.333 | 36 | 2.000 | 1.000 |
| 2 | 4,839,317.69 | 7.629 | 360 | 360 | 5.978 | 13.729 | 7.729 | 24 | 2.000 | 1.000 |
| 2 | 311,863.30 | 7.548 | 360 | 360 | 6.000 | 13.648 | 7.648 | 36 | 2.000 | 1.000 |
| 2 | 819,665.23 | 8.011 | 360 | 360 | 5.993 | 14.111 | 8.111 | 24 | 2.000 | 1.000 |
| 2 | 11,552,694.37 | 7.027 | 359 | 359 | 5.964 | 13.127 | 7.127 | 24 | 2.000 | 1.000 |
| 2 | 1,160,824.19 | 7.089 | 360 | 360 | 6.000 | 13.189 | 7.189 | 24 | 2.000 | 1.000 |
| 2 | 17,260,172.53 | 7.344 | 360 | 360 | 5.860 | 13.444 | 7.444 | 36 | 2.000 | 1.000 |
| 2 | 2,935,073.50 | 8.253 | 360 | 360 | 5.970 | 14.353 | 8.353 | 24 | 2.000 | 1.000 |
| 2 | 162,561.89 | 8.148 | 360 | 360 | 5.879 | 14.248 | 8.248 | 24 | 2.000 | 1.000 |
| 2 | 13,936,629.57 | 7.562 | 359 | 359 | 5.853 | 13.662 | 7.662 | 24 | 2.000 | 1.000 |
| 2 | 415,563.99 | 7.731 | 360 | 360 | 5.748 | 13.831 | 7.831 | 24 | 2.000 | 1.000 |
| 2 | 208,286.30 | 6.937 | 360 | 360 | 6.000 | 13.037 | 7.037 | 24 | 2.000 | 1.000 |
| 2 | 1,220,829.34 | 6.995 | 360 | 360 | 5.917 | 13.095 | 7.095 | 24 | 2.000 | 1.000 |
| 2 | 92,493.31 | 6.948 | 360 | 360 | 6.000 | 13.048 | 7.048 | 36 | 2.000 | 1.000 |
| 2 | 1,733,754.71 | 8.068 | 360 | 360 | 6.084 | 14.168 | 8.168 | 24 | 2.000 | 1.000 |
| 2 | 374,055.83 | 7.524 | 360 | 360 | 6.000 | 13.624 | 7.624 | 24 | 2.000 | 1.000 |
| 2 | 429,489.45 | 6.719 | 360 | 360 | 6.000 | 12.819 | 6.819 | 36 | 2.000 | 1.000 |
| 2 | 394,865.39 | 7.582 | 360 | 360 | 6.000 | 13.682 | 7.682 | 24 | 2.000 | 1.000 |
| 2 | 251,764.23 | 7.714 | 360 | 360 | 5.903 | 13.814 | 7.814 | 36 | 2.000 | 1.000 |
| 2 | 321,657.28 | 7.745 | 360 | 360 | 6.000 | 13.845 | 7.845 | 24 | 2.000 | 1.000 |
| 2 | 512,650.26 | 8.212 | 360 | 360 | 5.790 | 14.312 | 8.312 | 24 | 2.000 | 1.000 |
| 2 | 195,849.31 | 7.571 | 360 | 360 | 6.000 | 13.671 | 7.671 | 36 | 2.000 | 1.000 |
| 2 | 151,269.29 | 7.120 | 360 | 360 | 6.000 | 13.220 | 7.220 | 24 | 2.000 | 1.000 |
| 2 | 336,386.10 | 7.893 | 360 | 360 | 6.000 | 13.993 | 7.993 | 24 | 2.000 | 1.000 |
| 2 | 353,356.78 | 7.462 | 360 | 360 | 6.000 | 13.562 | 7.562 | 36 | 2.000 | 1.000 |
| 2 | 59,339.10 | 7.200 | 360 | 360 | 6.000 | 13.300 | 7.300 | 24 | 2.000 | 1.000 |
| 2 | 82,121.08 | 9.153 | 360 | 360 | 6.000 | 15.253 | 9.253 | 36 | 2.000 | 1.000 |
| 2 | 165,559.12 | 8.597 | 360 | 360 | 6.000 | 14.697 | 8.697 | 36 | 2.000 | 1.000 |
| 2 | 134,148.75 | 7.629 | 360 | 360 | 6.096 | 13.729 | 7.729 | 24 | 2.000 | 1.000 |
| 2 | 188,825.50 | 8.085 | 360 | 360 | 6.105 | 14.185 | 8.185 | 24 | 2.000 | 1.000 |
| 2 | 16,893.48 | 9.050 | 360 | 360 | 6.000 | 15.150 | 9.150 | 36 | 2.000 | 1.000 |
| 2 | 25,340.22 | 10.350 | 360 | 360 | 6.000 | 16.450 | 10.450 | 24 | 2.000 | 1.000 |
| 2 | 89,220.58 | 6.924 | 360 | 360 | 6.000 | 13.024 | 7.024 | 36 | 2.000 | 1.000 |
| 2 | 94,412.75 | 7.505 | 360 | 360 | 5.636 | 13.605 | 7.605 | 24 | 2.000 | 1.000 |
| 2 | 49,427.05 | 8.419 | 360 | 360 | 6.000 | 14.519 | 8.519 | 24 | 2.000 | 1.000 |
| 2 | 62,366.61 | 8.838 | 360 | 360 | 6.000 | 14.938 | 8.938 | 24 | 2.000 | 1.000 |
| 2 | 159,019.71 | 8.069 | 360 | 360 | 6.000 | 14.169 | 8.169 | 24 | 2.000 | 1.000 |
| 2 | 39,963.07 | 6.950 | 360 | 360 | 6.000 | 13.050 | 7.050 | 36 | 2.000 | 1.000 |
| 2 | 15,743.03 | 7.550 | 360 | 360 | 6.000 | 13.650 | 7.650 | 36 | 2.000 | 1.000 |
| 2 | 5,894,620.01 | 7.379 | 350 | 350 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 1,652,024.26 | 10.322 | 357 | 357 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 14,915,380.23 | 6.855 | 345 | 345 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 502,802.09 | 8.109 | 353 | 353 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 29,570.08 | 7.000 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 263,472.69 | 7.539 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 591,120.50 | 7.031 | 349 | 349 | N/A | N/A | N/A | N/A | N/A | N/A |

WFB.000478

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2 | 558,457.13 | 8.412 | 350 | 350 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 514,251.95 | 8.348 | 339 | 339 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 101,803.20 | 7.639 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 740,575.10 | 7.675 | 356 | 356 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 24,433.75 | 8.900 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 42,918.81 | 6.450 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 241,379.92 | 6.361 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 140,673.35 | 7.508 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 15,127.37 | 7.900 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 45,149.83 | 8.500 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 2 | 15,702.13 | 6.650 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| Group III Initial Mortgage Loans | | | | | | | | | |
| 3 | 73,454,377.58 | 7.801 | 360 | 359 | 5.922 | 13.801 | 7.801 | 23 | 2.000 | 1.000 |
| 3 | 25,526,490.07 | 7.424 | 360 | 359 | 5.892 | 13.424 | 7.424 | 23 | 2.000 | 1.000 |

II-3

WFB.000479

ANNEX II

ASSUMED MORTGAGE LOAN CHARACTERISTICS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 71,262,713.19 | 6.863 | 360 | 359 | 5.975 | 12.863 | 6.863 | 23 | 2.000 | 1.000 |
| 3 | 217,076,412.23 | 7.098 | 360 | 359 | 5.921 | 13.098 | 7.098 | 23 | 2.000 | 1.000 |
| 3 | 82,483,345.11 | 7.556 | 360 | 359 | 5.850 | 13.556 | 7.556 | 35 | 2.000 | 1.000 |
| 3 | 557,578.45 | 10.529 | 360 | 359 | 6.000 | 16.529 | 10.529 | 23 | 2.000 | 1.000 |
| 3 | 33,706,055.69 | 6.665 | 360 | 359 | 5.946 | 12.665 | 6.665 | 35 | 2.000 | 1.000 |
| 3 | 1,585,928.26 | 6.605 | 360 | 359 | 6.000 | 12.605 | 6.605 | 35 | 2.000 | 1.000 |
| 3 | 2,755,631.71 | 7.815 | 360 | 359 | 6.000 | 13.815 | 7.815 | 23 | 2.000 | 1.000 |
| 3 | 1,966,418.71 | 7.827 | 360 | 359 | 5.797 | 13.827 | 7.827 | 23 | 2.000 | 1.000 |
| 3 | 2,554,937.81 | 8.267 | 360 | 358 | 5.988 | 14.267 | 8.267 | 22 | 2.000 | 1.000 |
| 3 | 367,175.76 | 6.625 | 360 | 359 | 6.000 | 12.625 | 6.625 | 35 | 2.000 | 1.000 |
| 3 | 696,464.43 | 6.698 | 360 | 355 | 4.930 | 12.698 | 6.698 | 19 | 2.000 | 1.000 |
| 3 | 3,447,966.18 | 7.169 | 360 | 359 | 6.000 | 13.169 | 7.169 | 23 | 2.000 | 1.000 |
| 3 | 857,762.23 | 8.930 | 360 | 359 | 6.000 | 14.930 | 8.930 | 35 | 2.000 | 1.000 |
| 3 | 7,493,959.13 | 7.115 | 360 | 359 | 6.000 | 13.115 | 7.115 | 23 | 2.000 | 1.000 |
| 3 | 2,040,949.45 | 7.110 | 360 | 359 | 6.000 | 13.110 | 7.110 | 23 | 2.000 | 1.000 |
| 3 | 1,074,642.70 | 8.507 | 360 | 358 | 5.918 | 14.507 | 8.507 | 22 | 2.000 | 1.000 |
| 3 | 447,814.11 | 6.750 | 360 | 359 | 6.000 | 12.750 | 6.750 | 35 | 2.000 | 1.000 |
| 3 | 3,450,321.19 | 7.735 | 360 | 358 | 6.000 | 13.735 | 7.735 | 22 | 2.000 | 1.000 |
| 3 | 1,307,220.84 | 8.003 | 360 | 359 | 6.000 | 14.003 | 8.003 | 23 | 2.000 | 1.000 |
| 3 | 946,826.17 | 7.959 | 360 | 359 | 6.000 | 13.959 | 7.959 | 23 | 2.000 | 1.000 |
| 3 | 58,533.33 | 9.600 | 360 | 358 | 6.000 | 15.600 | 9.600 | 22 | 2.000 | 1.000 |
| 3 | 469,886.39 | 8.084 | 360 | 358 | 6.000 | 14.084 | 8.084 | 22 | 2.000 | 1.000 |
| 3 | 101,212.29 | 10.800 | 360 | 359 | 6.000 | 16.800 | 10.800 | 23 | 2.000 | 1.000 |
| 3 | 383,760.09 | 8.350 | 360 | 359 | 6.000 | 14.350 | 8.350 | 35 | 2.000 | 1.000 |
| 3 | 198,915.65 | 10.200 | 360 | 359 | 6.000 | 16.200 | 10.200 | 23 | 2.000 | 1.000 |
| 3 | 823,855.20 | 7.672 | 360 | 359 | 6.000 | 13.672 | 7.672 | 23 | 2.000 | 1.000 |
| 3 | 57,378.62 | 10.800 | 360 | 359 | 6.000 | 16.800 | 10.800 | 35 | 2.000 | 1.000 |
| 3 | 102,167,764.27 | 6.054 | 357 | 356 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 18,241,961.11 | 6.832 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 10,375,158.39 | 7.108 | 353 | 352 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 10,538,624.32 | 11.289 | 358 | 356 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 1,648,822.84 | 6.707 | 360 | 358 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 5,039,820.92 | 6.394 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 496,626.70 | 6.250 | 360 | 353 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 601,873.24 | 11.271 | 273 | 271 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 493,751.26 | 7.750 | 360 | 359 | N/A | N/A | N/A | N/A | N/A | N/A |

Group III Subsequent Mortgage Loans

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 22,256,354.37 | 7.701 | 360 | 360 | 5.922 | 13.801 | 7.801 | 24 | 2.000 | 1.000 |
| 3 | 7,734,862.68 | 7.324 | 360 | 360 | 5.892 | 13.424 | 7.424 | 24 | 2.000 | 1.000 |
| 3 | 21,597,991.28 | 6.763 | 360 | 360 | 5.975 | 12.863 | 6.863 | 24 | 2.000 | 1.000 |
| 3 | 65,782,488.79 | 6.998 | 360 | 360 | 5.921 | 13.098 | 7.098 | 24 | 2.000 | 1.000 |
| 3 | 24,992,949.27 | 7.456 | 360 | 360 | 5.850 | 13.556 | 7.556 | 36 | 2.000 | 1.000 |
| 3 | 168,874.24 | 10.429 | 360 | 360 | 6.000 | 16.529 | 10.529 | 24 | 2.000 | 1.000 |
| 3 | 10,216,307.02 | 6.564 | 360 | 360 | 5.946 | 12.664 | 6.664 | 36 | 2.000 | 1.000 |
| 3 | 480,571.03 | 6.505 | 360 | 360 | 6.000 | 12.605 | 6.605 | 36 | 2.000 | 1.000 |
| 3 | 834,955.64 | 7.714 | 360 | 360 | 6.000 | 13.814 | 7.814 | 24 | 2.000 | 1.000 |
| 3 | 595,752.46 | 7.727 | 360 | 360 | 5.797 | 13.827 | 7.827 | 24 | 2.000 | 1.000 |
| 3 | 774,345.29 | 8.166 | 360 | 360 | 5.988 | 14.266 | 8.266 | 24 | 2.000 | 1.000 |
| 3 | 111,260.81 | 6.525 | 360 | 360 | 6.000 | 12.625 | 6.625 | 36 | 2.000 | 1.000 |
| 3 | 210,917.23 | 6.599 | 360 | 360 | 4.930 | 12.699 | 6.699 | 24 | 2.000 | 1.000 |
| 3 | 1,044,807.16 | 7.068 | 360 | 360 | 6.000 | 13.168 | 7.168 | 24 | 2.000 | 1.000 |
| 3 | 259,841.68 | 8.830 | 360 | 360 | 6.000 | 14.930 | 8.930 | 36 | 2.000 | 1.000 |
| 3 | 2,270,786.29 | 7.015 | 360 | 360 | 6.000 | 13.115 | 7.115 | 24 | 2.000 | 1.000 |
| 3 | 618,473.89 | 7.010 | 360 | 360 | 6.000 | 13.110 | 7.110 | 24 | 2.000 | 1.000 |
| 3 | 325,789.83 | 8.407 | 360 | 360 | 5.918 | 14.507 | 8.507 | 24 | 2.000 | 1.000 |
| 3 | 135,692.78 | 6.650 | 360 | 360 | 6.000 | 12.750 | 6.750 | 36 | 2.000 | 1.000 |
| 3 | 1,045,915.23 | 7.635 | 360 | 360 | 6.000 | 13.735 | 7.735 | 24 | 2.000 | 1.000 |
| 3 | 396,027.95 | 7.903 | 360 | 360 | 6.000 | 14.003 | 8.003 | 24 | 2.000 | 1.000 |
| 3 | 256,550.79 | 7.859 | 360 | 360 | 6.000 | 13.959 | 7.959 | 36 | 2.000 | 1.000 |
| 3 | 17,738.15 | 9.500 | 360 | 360 | 6.000 | 15.600 | 9.600 | 24 | 2.000 | 1.000 |
| 3 | 142,428.98 | 7.984 | 360 | 360 | 6.000 | 14.084 | 8.084 | 24 | 2.000 | 1.000 |
| 3 | 30,653.49 | 10.700 | 360 | 360 | 6.000 | 16.800 | 10.800 | 24 | 2.000 | 1.000 |
| 3 | 116,256.20 | 8.250 | 360 | 360 | 6.000 | 14.350 | 8.350 | 36 | 2.000 | 1.000 |
| 3 | 60,247.35 | 10.100 | 360 | 360 | 6.000 | 16.200 | 10.200 | 24 | 2.000 | 1.000 |
| 3 | 249,602.66 | 7.572 | 360 | 360 | 6.000 | 13.672 | 7.672 | 24 | 2.000 | 1.000 |
| 3 | 17,377.88 | 10.700 | 360 | 360 | 6.000 | 16.800 | 10.800 | 36 | 2.000 | 1.000 |
| 3 | 30,931,343.16 | 5.954 | 357 | 357 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 5,522,763.10 | 6.732 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 3,141,084.54 | 7.008 | 354 | 354 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 3,190,573.93 | 11.189 | 357 | 357 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 499,181.96 | 6.607 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 1,525,808.37 | 6.294 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 150,353.99 | 6.150 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |
| 3 | 182,217.43 | 11.171 | 274 | 274 | N/A | N/A | N/A | N/A | N/A | N/A |

| 3 | 149,483.45 | 7.650 | 360 | 360 | N/A | N/A | N/A | N/A | N/A | N/A |

II-4

WFB.000481

ANNEX III

COLLATERAL STATISTICS

WFB.000482

```
- ----------------------------------------------------------------------------
                     DESCRIPTION OF THE TOTAL COLLATERAL
                      SELECTION DATE MORTGAGE LOANS
- ----------------------------------------------------------------------------
                           COLLATERAL SUMMARY
- ----------------------------------------------------------------------------
```

Statistics given below are for the Mortgage Loans in the pool as of the
Collateral Selection Date. Balances and percentages are based on the Cut-off
Date scheduled balances of such Mortgage Loans (except in the case of
Debt-to-Income and FICO, which are determined at origination).

| | SUMMARY STATISTICS | RANGE (IF APPLICABLE) |
|---|---|---|
| NUMBER OF MORTGAGE LOANS: | 19,155 | |
| AGGREGATE CURRENT PRINCIPAL BALANCE: | $3,300,000,974 | $4,634 - $749,559 |
| AVERAGE CURRENT PRINCIPAL BALANCE: | $172,279 | |
| AGGREGATE ORIGINAL PRINCIPAL BALANCE: | $3,303,335,722 | $20,000 - $750,000 |
| AVERAGE ORIGINAL PRINCIPAL BALANCE: | $172,453 | |
| FULLY AMORTIZING MORTGAGE LOANS: | 100.00% | |
| 1ST LIEN: | 98.75% | |
| WTD. AVG. MORTGAGE RATE: | 7.425% | 5.350% - 12.800% |
| WTD. AVG. ORIGINAL TERM TO MATURITY (MONTHS): | 358 | 180 - 360 |
| WTD. AVG. REMAINING TERM TO MATURITY  (MONTHS): | 357 | 173 - 360 |
| WTD. AVG. MARGIN (ARM LOANS ONLY): | 5.920% | 4.500% - 7.125% |
| WTD. AVG. MAXIMUM MORTGAGE RATE (ARM LOANS ONLY): | 13.477% | 11.350% - 18.650% |
| WTD. AVG. MINIMUM MORTGAGE RATE (ARM LOANS ONLY): | 7.477% | 5.350% - 12.650% |
| WTD. AVG. ORIGINAL LTV(1): | 82.94% | 13.21% - 100.00% |
| WTD. AVG. BORROWER FICO: | 610 | 500 - 810 |

| GEOGRAPHIC DISTRIBUTION (TOP 5): | | |
|---|---|---|
| | CA | 29.72% |
| | IL | 8.84% |
| | FL | 7.97% |
| | NY | 6.76% |
| | MI | 3.87% |

(1) The original LTV ("OLTV") of a first-lien mortgage at any given time is a
fraction, expressed as a percentage, the numerator of which is the principal
balance of the mortgage loan at the date of origination and the denominator of
which is the lesser of the sales price of the related mortgage property and its
appraised value determined in an appraisal obtained by the originator at
origination of the mortgage loan. The OLTV of a second lien mortgage loan at any
given time is a fraction, expressed as a percentage the numerator of which is
(i) the sum of (a) the principal balance of such mortgage loan at the date of
origination plus (b) the outstanding balance of the senior mortgage loan at the
date of origination of such mortgage loan and the denominator of which is (ii)
the lesser of the sales price of the related mortgage property and its appraised
value determined in an appraisal obtained by the originator at origination of
the mortgage loan.

III-1

WFB.000483

DESCRIPTION OF THE TOTAL COLLATERAL
SELECTION DATE MORTGAGE LOANS

### COLLATERAL TYPE

| COLLATERAL TYPE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV |
|---|---|---|---|---|---|---|---|---|
| ARM - 2 Year/6 Month | 10,936 | $1,953,198,603.70 | 59.19% | 359 | 39.39 | 7.511 | 601 | 83.4 |
| ARM - 3 Year/6 Month | 3,811 | 703,185,500.68 | 21.31 | 358 | 38.82 | 7.382 | 615 | 84.1 |
| Fixed Rate | 4,408 | 643,616,869.94 | 19.50 | 351 | 38.84 | 7.210 | 631 | 80.1 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.9 |

### PRINCIPAL BALANCES AT ORIGINATION

| RANGE OF PRINCIPAL BALANCES AT ORIGINATION ($) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF ORIGINATION | % OF PRINCIPAL BALANCE AS OF ORIGINATION | REMAINING TERM TO MATURITY (MONTHS)* | DEBT-TO-INCOME (%)* | MORTGAGE RATES (%)* | FICO* | OLTV(% |
|---|---|---|---|---|---|---|---|---|
| <= 50,000.00 | 796 | $ 28,583,945.00 | 0.87% | 351 | 35.42 | 10.398 | 639 | 91.79 |
| 50,000.01 - 100,000.00 | 5,032 | 378,949,043.00 | 11.47 | 353 | 36.33 | 8.159 | 603 | 83.71 |
| 100,000.01 - 150,000.00 | 4,424 | 550,770,662.00 | 16.67 | 356 | 38.10 | 7.652 | 603 | 83.38 |
| 150,000.01 - 200,000.00 | 3,100 | 539,587,223.00 | 16.33 | 357 | 39.09 | 7.478 | 605 | 82.21 |
| 200,000.01 - 250,000.00 | 1,966 | 440,212,609.00 | 13.33 | 358 | 39.89 | 7.299 | 607 | 81.79 |
| 250,000.01 - 300,000.00 | 1,404 | 385,077,661.00 | 11.66 | 358 | 40.39 | 7.208 | 606 | 82.20 |
| 300,000.01 - 350,000.00 | 910 | 294,785,254.00 | 8.92 | 357 | 40.54 | 7.153 | 619 | 83.72 |
| 350,000.01 - 400,000.00 | 587 | 220,399,434.00 | 6.67 | 359 | 40.28 | 7.047 | 624 | 84.39 |
| 400,000.01 - 450,000.00 | 336 | 142,957,770.00 | 4.33 | 359 | 40.84 | 7.097 | 629 | 84.97 |
| 450,000.01 - 500,000.00 | 307 | 147,493,174.00 | 4.46 | 358 | 39.16 | 7.058 | 628 | 83.62 |
| 500,000.01 - 550,000.00 | 109 | 57,510,359.00 | 1.74 | 358 | 40.42 | 6.860 | 615 | 81.39 |
| 550,000.01 - 600,000.00 | 78 | 44,748,618.00 | 1.35 | 357 | 39.51 | 6.867 | 607 | 81.33 |
| 600,000.01 - 650,000.00 | 44 | 27,853,948.00 | 0.84 | 356 | 40.25 | 6.649 | 622 | 80.41 |
| 650,000.01 - 700,000.00 | 23 | 15,598,400.00 | 0.47 | 359 | 41.61 | 6.593 | 609 | 76.71 |
| 700,000.01 - 750,000.00 | 39 | 28,907,622.00 | 0.88 | 359 | 37.77 | 6.684 | 619 | 74.86 |
| TOTAL: | 19,155 | $3,303,335,722.00 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

*Based on the original balances of the Mortgage Loans.

III-2

WFB.000484

```
-------------------------------------------------------------------------------------
                        DESCRIPTION OF THE TOTAL COLLATERAL
                          SELECTION DATE MORTGAGE LOANS
-------------------------------------------------------------------------------------
                     PRINCIPAL BALANCES AS OF THE CUT-OFF DATE
-------------------------------------------------------------------------------------
```

| RANGE OF PRINCIPAL BALANCES AS OF THE CUT-OFF DATE ($) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| 0.01 - 50,000.00 | 807 | $ 29,067,066.40 | 0.88% | 351 | 35.44 | 10.356 | 638 | 91.65 |
| 50,000.01 - 100,000.00 | 5,022 | 378,023,648.39 | 11.46 | 353 | 36.34 | 8.159 | 603 | 83.72 |
| 100,000.01 - 150,000.00 | 4,432 | 551,474,573.88 | 16.71 | 356 | 38.1 | 7.651 | 603 | 83.40 |
| 150,000.01 - 200,000.00 | 3,091 | 537,722,877.47 | 16.29 | 357 | 39.09 | 7.479 | 605 | 82.19 |
| 200,000.01 - 250,000.00 | 1,969 | 440,532,006.06 | 13.35 | 358 | 39.9 | 7.298 | 607 | 81.79 |
| 250,000.01 - 300,000.00 | 1,404 | 384,824,329.32 | 11.66 | 358 | 40.38 | 7.210 | 606 | 82.19 |
| 300,000.01 - 350,000.00 | 908 | 293,927,038.01 | 8.91 | 358 | 40.54 | 7.153 | 619 | 83.74 |
| 350,000.01 - 400,000.00 | 588 | 220,617,590.87 | 6.69 | 359 | 40.31 | 7.043 | 624 | 84.40 |
| 400,000.01 - 450,000.00 | 334 | 142,015,278.31 | 4.30 | 359 | 40.8 | 7.105 | 628 | 84.96 |
| 450,000.01 - 500,000.00 | 307 | 147,343,580.95 | 4.46 | 358 | 39.16 | 7.058 | 628 | 83.62 |
| 500,000.01 - 550,000.00 | 109 | 57,457,616.68 | 1.74 | 358 | 40.42 | 6.861 | 615 | 81.39 |
| 550,000.01 - 600,000.00 | 78 | 44,706,348.05 | 1.35 | 357 | 39.51 | 6.867 | 607 | 81.33 |
| 600,000.01 - 650,000.00 | 44 | 27,827,197.20 | 0.84 | 356 | 40.25 | 6.650 | 622 | 80.41 |
| 650,000.01 - 700,000.00 | 23 | 15,582,133.50 | 0.47 | 359 | 41.61 | 6.594 | 609 | 76.71 |
| 700,000.01 - 750,000.00 | 39 | 28,879,689.23 | 0.88 | 359 | 37.77 | 6.684 | 619 | 74.86 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

```
-------------------------------------------------------------------------------------
                            REMAINING TERM TO MATURITY
-------------------------------------------------------------------------------------
```

| RANGE OF MONTHS REMAINING | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| 121 - 180 | 186 | $ 19,267,031.21 | 0.58% | 179 | 37.06 | 7.287 | 618 | 75.43 |
| 181 - 240 | 169 | 19,945,687.85 | 0.60 | 239 | 39.47 | 7.366 | 625 | 81.32 |
| 301 - 360 | 18,800 | 3,260,788,255.26 | 98.81 | 359 | 39.17 | 7.426 | 610 | 82.99 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

III-3

WFB.000485

```
--------------------------------------------------------------------------------
                        DESCRIPTION OF THE TOTAL COLLATERAL
                        SELECTION DATE MORTGAGE LOANS
--------------------------------------------------------------------------------

                                   MORTGAGE RATE
--------------------------------------------------------------------------------
```

|                               | NUMBER OF | PRINCIPAL BALANCE | % OF PRINCIPAL | REMAINING TERM TO | DEBT-TO- |                |      |       |
| RANGE OF CURRENT              | MORTGAGE  | AS OF THE         | BALANCE AS OF  | MATURITY          | INCOME   | MORTGAGE       |      |       |
| MORTGAGE RATES (%)            | LOANS     | CUT-OFF DATE      | THE CUT-OFF DATE | (MONTHS)        | (%)      | RATES (%)      | FICO | OLTV( |
|-------------------------------|-----------|-------------------|----------------|-------------------|----------|----------------|------|-------|
| 5.000 - 5.499                 | 161       | $   42,018,145.91 | 1.27%          | 358               | 40.04    | 5.405          | 645  | 77.   |
| 5.500 - 5.999                 | 1,305     | 340,917,335.90    | 10.33          | 356               | 39.98    | 5.758          | 646  | 76.   |
| 6.000 - 6.499                 | 1,606     | 347,759,625.52    | 10.54          | 357               | 39.12    | 6.242          | 634  | 79.   |
| 6.500 - 6.999                 | 2,888     | 579,052,542.37    | 17.55          | 357               | 39.20    | 6.748          | 623  | 81.   |
| 7.000 - 7.499                 | 2,591     | 462,862,862.69    | 14.03          | 357               | 38.89    | 7.241          | 613  | 83.   |
| 7.500 - 7.999                 | 3,563     | 596,718,834.00    | 18.08          | 357               | 39.11    | 7.741          | 599  | 85.   |
| 8.000 - 8.499                 | 2,211     | 345,698,692.94    | 10.48          | 357               | 39.19    | 8.229          | 592  | 85.   |
| 8.500 - 8.999                 | 2,043     | 300,494,376.55    | 9.11           | 357               | 38.86    | 8.708          | 582  | 85.   |
| 9.000 - 9.499                 | 1,008     | 128,967,027.60    | 3.91           | 357               | 38.34    | 9.208          | 573  | 85.   |
| 9.500 - 9.999                 | 603       | 69,825,698.21     | 2.12           | 357               | 40.01    | 9.712          | 567  | 83.   |
| 10.000 - 10.499               | 250       | 28,457,638.98     | 0.86           | 358               | 39.49    | 10.214         | 568  | 82.   |
| 10.500 - 10.999               | 273       | 22,341,736.80     | 0.68           | 355               | 39.94    | 10.719         | 583  | 82.   |
| 11.000 - 11.499               | 286       | 16,209,150.58     | 0.49           | 356               | 37.17    | 11.206         | 623  | 91.   |
| 11.500 - 11.999               | 167       | 8,991,837.36      | 0.27           | 354               | 38.26    | 11.656         | 605  | 89.   |
| 12.000 - 12.499               | 158       | 7,983,434.48      | 0.24           | 355               | 37.00    | 12.257         | 622  | 96.   |
| 12.500 - 12.999               | 42        | 1,702,034.43      | 0.05           | 356               | 37.76    | 12.599         | 632  | 98.   |
| TOTAL:                        | 19,155    | $3,300,000,974.32 | 100.00%        | 357               | 39.16    | 7.425          | 610  | 82.9  |

III-4

----------------------------------------------------------------------

DESCRIPTION OF THE TOTAL COLLATERAL
SELECTION DATE MORTGAGE LOANS

----------------------------------------------------------------------

ORIGINAL LOAN-TO-VALUE RATIOS*

----------------------------------------------------------------------

| RANGE OF ORIGINAL LOAN-TO-VALUE RATIOS (%) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| <= 25.00 | 14 | $ 1,866,948.41 | 0.06% | 359 | 43.53 | 7.304 | 561 | 18.73 |
| 25.01 - 30.00 | 21 | 2,499,303.88 | 0.08 | 343 | 34.20 | 6.65 | 588 | 27.72 |
| 30.01 - 35.00 | 25 | 2,966,727.17 | 0.09 | 358 | 38.04 | 6.917 | 611 | 33.08 |
| 35.01 - 40.00 | 58 | 6,311,083.61 | 0.19 | 352 | 35.86 | 7.042 | 595 | 37.55 |
| 40.01 - 45.00 | 102 | 14,596,165.16 | 0.44 | 350 | 38.86 | 6.863 | 605 | 42.64 |
| 45.01 - 50.00 | 155 | 27,053,001.62 | 0.82 | 354 | 39.79 | 6.898 | 597 | 47.96 |
| 50.01 - 55.00 | 167 | 28,984,760.00 | 0.88 | 351 | 37.04 | 6.946 | 600 | 52.95 |
| 55.01 - 60.00 | 321 | 57,758,559.95 | 1.75 | 356 | 39.17 | 7.205 | 587 | 58.04 |
| 60.01 - 65.00 | 582 | 110,128,648.44 | 3.34 | 356 | 40.27 | 7.203 | 584 | 63.54 |
| 65.01 - 70.00 | 913 | 168,265,884.53 | 5.10 | 356 | 40.59 | 7.312 | 581 | 68.67 |
| 70.01 - 75.00 | 1,521 | 280,458,468.60 | 8.50 | 357 | 40.67 | 7.361 | 583 | 74.06 |
| 75.01 - 80.00 | 4,038 | 733,587,971.45 | 22.23 | 357 | 38.75 | 6.998 | 620 | 79.59 |
| 80.01 - 85.00 | 2,252 | 406,627,178.40 | 12.32 | 357 | 38.82 | 7.236 | 596 | 84.44 |
| 85.01 - 90.00 | 5,142 | 867,330,057.72 | 26.28 | 357 | 38.68 | 7.643 | 604 | 89.74 |
| 90.01 - 95.00 | 2,609 | 499,865,767.16 | 15.15 | 358 | 39.81 | 7.647 | 642 | 94.81 |
| 95.01 - 100.00 | 1,235 | 91,700,448.22 | 2.78 | 356 | 37.19 | 9.673 | 667 | 99.99 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

----------------------------------------------------------------------

*References to loan-to-value ratios are references to combined loan-to-value
ratios with respect to second lien Mortgage Loans.

III-5

WFB.000487

---

DESCRIPTION OF THE TOTAL COLLATERAL
SELECTION DATE MORTGAGE LOANS

---

FICO SCORE AT ORIGINATION

| RANGE OF FICO SCORES | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV(%) |
|---|---|---|---|---|---|---|---|---|
| 500 - 519 | 1,185 | $ 184,084,902.77 | 5.58% | 357 | 42.05 | 8.393 | 510 | 76.92 |
| 520 - 539 | 1,698 | 282,203,353.01 | 8.55 | 358 | 40.47 | 8.098 | 529 | 78.55 |
| 540 - 559 | 1,980 | 326,874,160.75 | 9.91 | 357 | 40.80 | 7.858 | 551 | 80.33 |
| 560 - 579 | 1,702 | 295,230,532.80 | 8.95 | 357 | 40.16 | 7.636 | 569 | 80.45 |
| 580 - 599 | 2,053 | 357,748,740.40 | 10.84 | 357 | 39.44 | 7.422 | 588 | 82.45 |
| 600 - 619 | 2,608 | 453,044,451.11 | 13.73 | 357 | 39.10 | 7.274 | 609 | 84.68 |
| 620 - 639 | 2,202 | 377,484,864.27 | 11.44 | 356 | 38.31 | 7.146 | 629 | 85.32 |
| 640 - 659 | 1,844 | 323,504,987.05 | 9.80 | 356 | 38.35 | 7.108 | 650 | 85.74 |
| 660 - 679 | 1,370 | 235,813,989.19 | 7.15 | 357 | 37.82 | 7.074 | 669 | 84.98 |
| 680 - 699 | 1,105 | 206,441,859.89 | 6.26 | 357 | 37.34 | 6.952 | 688 | 85.36 |
| 700 - 719 | 605 | 109,379,273.55 | 3.31 | 358 | 37.51 | 7.036 | 709 | 85.65 |
| 720 - 739 | 381 | 67,613,040.35 | 2.05 | 357 | 37.27 | 6.945 | 728 | 84.51 |
| 740 - 759 | 238 | 42,749,231.30 | 1.30 | 357 | 38.70 | 7.092 | 750 | 87.26 |
| 760 - 779 | 117 | 23,033,172.45 | 0.70 | 356 | 35.39 | 6.799 | 769 | 81.95 |
| 780 - 799 | 59 | 13,309,143.71 | 0.40 | 358 | 32.00 | 6.614 | 788 | 80.68 |
| 800 - 819 | 8 | 1,485,271.72 | 0.05 | 358 | 30.01 | 7.511 | 804 | 73.85 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

---

DEBT-TO-INCOME RATIO

| RANGE OF DEBT-TO-INCOME RATIOS (%) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV(%) |
|---|---|---|---|---|---|---|---|---|
| <= 20.00 | 1,088 | $ 161,017,265.08 | 4.88% | 356 | 14.01 | 7.558 | 626 | 82.26 |
| 20.01 - 25.00 | 1,055 | 155,401,477.65 | 4.71 | 357 | 23.28 | 7.411 | 620 | 81.97 |
| 25.01 - 30.00 | 1,743 | 256,960,247.96 | 7.79 | 357 | 28.20 | 7.497 | 615 | 82.32 |
| 30.01 - 35.00 | 2,509 | 387,002,362.56 | 11.73 | 357 | 33.18 | 7.417 | 614 | 83.33 |
| 35.01 - 40.00 | 3,430 | 591,629,092.95 | 17.93 | 357 | 38.15 | 7.430 | 617 | 83.52 |
| 40.01 - 45.00 | 4,438 | 798,489,016.53 | 24.20 | 357 | 43.08 | 7.387 | 615 | 83.98 |
| 45.01 - 50.00 | 4,244 | 816,984,302.17 | 24.76 | 357 | 48.07 | 7.416 | 599 | 84.19 |
| 50.01 - 55.00 | 648 | 132,517,209.42 | 4.02 | 358 | 53.07 | 7.426 | 570 | 68.31 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

---

III-6

WFB.000488

DESCRIPTION OF THE TOTAL COLLATERAL
SELECTION DATE MORTGAGE LOANS

GEOGRAPHIC DISTRIBUTION

| STATE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV(%) |
|---|---|---|---|---|---|---|---|---|
| California | 3,665 | $980,659,511.67 | 29.72% | 358 | 40.62 | 6.943 | 610 | 79.23 |
| Illinois | 1,743 | 291,703,185.10 | 8.84 | 358 | 38.92 | 7.643 | 621 | 86.08 |
| Florida | 1,848 | 263,048,185.95 | 7.97 | 356 | 39.40 | 7.643 | 607 | 84.36 |
| New York | 786 | 223,235,752.37 | 6.76 | 358 | 39.71 | 7.510 | 621 | 83.09 |
| Michigan | 1,121 | 127,786,842.28 | 3.87 | 358 | 38.21 | 7.854 | 598 | 85.71 |
| New Jersey | 553 | 127,114,842.02 | 3.85 | 358 | 38.69 | 7.361 | 612 | 82.90 |
| Arizona | 1,006 | 117,241,223.46 | 3.55 | 357 | 37.58 | 7.613 | 612 | 86.23 |
| Massachusetts | 375 | 87,989,644.62 | 2.67 | 359 | 40.03 | 7.360 | 618 | 81.76 |
| Maryland | 469 | 87,665,467.67 | 2.66 | 357 | 38.33 | 7.527 | 598 | 82.66 |
| Texas | 765 | 87,589,481.41 | 2.65 | 350 | 35.93 | 8.069 | 593 | 84.45 |
| Nevada | 442 | 81,913,654.97 | 2.48 | 358 | 39.37 | 7.533 | 608 | 82.08 |
| Georgia | 462 | 61,862,434.85 | 1.87 | 356 | 37.55 | 7.820 | 615 | 87.77 |
| Colorado | 360 | 60,893,575.73 | 1.85 | 358 | 37.96 | 7.258 | 616 | 86.16 |
| Minnesota | 331 | 57,732,534.95 | 1.75 | 358 | 39.66 | 7.598 | 610 | 84.35 |
| Washington | 344 | 56,286,954.48 | 1.71 | 357 | 38.37 | 7.634 | 609 | 84.74 |
| Hawaii | 191 | 56,098,355.55 | 1.70 | 355 | 40.28 | 6.425 | 641 | 79.33 |
| Connecticut | 258 | 51,515,608.33 | 1.56 | 357 | 38.58 | 7.663 | 610 | 82.61 |
| Pennsylvania | 417 | 50,648,665.12 | 1.53 | 353 | 37.79 | 7.682 | 593 | 84.02 |
| Missouri | 419 | 41,891,361.76 | 1.27 | 358 | 35.86 | 8.091 | 590 | 84.92 |
| Ohio | 457 | 41,675,362.89 | 1.26 | 352 | 37.98 | 7.809 | 600 | 88.06 |
| Wisconsin | 315 | 38,560,950.37 | 1.17 | 358 | 39.08 | 8.046 | 596 | 86.37 |
| Indiana | 452 | 38,124,686.90 | 1.16 | 356 | 36.32 | 8.030 | 606 | 87.18 |
| Utah | 235 | 28,904,684.68 | 0.88 | 358 | 36.19 | 7.615 | 627 | 85.82 |
| Tennessee | 261 | 25,360,000.89 | 0.77 | 351 | 38.33 | 8.064 | 600 | 86.94 |
| Rhode Island | 128 | 23,174,054.97 | 0.70 | 356 | 39.08 | 7.513 | 633 | 81.71 |

*Geographic Distribution continued on the next page

III-7

WFB.000489

```
----------------------------------------------------------------------
                    DESCRIPTION OF THE TOTAL COLLATERAL
                     SELECTION DATE MORTGAGE LOANS
----------------------------------------------------------------------


                    GEOGRAPHIC DISTRIBUTION (CONTINUED)
----------------------------------------------------------------------
```

|  | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV(%) |
|---|---|---|---|---|---|---|---|---|
| STATE | | | | | | | | |
| North Carolina | 204 | 20,380,953.52 | 0.62 | 353 | 35.58 | 7.914 | 601 | 85.40 |
| Oregon | 127 | 18,569,438.23 | 0.56 | 357 | 39.29 | 7.615 | 608 | 81.66 |
| Kentucky | 140 | 14,475,790.59 | 0.44 | 356 | 37.69 | 7.710 | 584 | 85.53 |
| Alabama | 146 | 14,123,632.36 | 0.43 | 351 | 38.30 | 7.953 | 585 | 86.18 |
| Louisiana | 132 | 13,614,923.78 | 0.41 | 350 | 36.14 | 7.808 | 598 | 85.13 |
| South Carolina | 144 | 13,469,306.27 | 0.41 | 355 | 37.32 | 7.967 | 588 | 83.02 |
| Alaska | 78 | 12,972,201.65 | 0.39 | 359 | 38.69 | 7.318 | 621 | 85.15 |
| Iowa | 115 | 10,381,220.23 | 0.31 | 358 | 37.64 | 7.906 | 598 | 86.35 |
| Oklahoma | 113 | 9,745,773.76 | 0.30 | 357 | 35.27 | 8.594 | 597 | 88.87 |
| Mississippi | 100 | 9,243,048.11 | 0.28 | 355 | 37.20 | 8.240 | 593 | 87.66 |
| New Hampshire | 47 | 8,794,047.94 | 0.27 | 358 | 40.92 | 7.372 | 600 | 81.32 |
| Kansas | 85 | 8,610,136.19 | 0.26 | 358 | 38.35 | 8.084 | 593 | 85.75 |
| New Mexico | 75 | 8,136,664.20 | 0.25 | 359 | 36.36 | 8.032 | 614 | 85.50 |
| Nebraska | 75 | 7,185,316.89 | 0.22 | 357 | 36.33 | 7.614 | 605 | 85.16 |
| Delaware | 35 | 4,945,015.12 | 0.15 | 353 | 40.16 | 7.993 | 596 | 84.52 |
| Maine | 35 | 4,437,122.08 | 0.13 | 355 | 40.3 | 7.375 | 580 | 85.24 |
| Arkansas | 27 | 3,326,516.95 | 0.10 | 359 | 37.00 | 8.048 | 603 | 83.60 |
| Idaho | 33 | 3,294,932.89 | 0.10 | 355 | 35.61 | 7.457 | 623 | 83.97 |
| North Dakota | 11 | 1,685,297.85 | 0.05 | 343 | 36.97 | 6.812 | 660 | 82.01 |
| South Dakota | 13 | 1,643,396.91 | 0.05 | 354 | 41.76 | 7.445 | 616 | 85.09 |
| Wyoming | 10 | 1,256,013.63 | 0.04 | 348 | 43.37 | 6.907 | 591 | 83.73 |
| Montana | 5 | 672,815.91 | 0.02 | 333 | 46.85 | 8.669 | 598 | 84.68 |
| Vermont | 2 | 360,386.27 | 0.01 | 359 | 51.95 | 7.595 | 607 | 65.78 |
| TOTAL: | 19,155 | $ 3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

```
                                III-8
```

```
DESCRIPTION OF THE TOTAL COLLATERAL
SELECTION DATE MORTGAGE LOANS
```

## OCCUPANCY STATUS

| OCCUPATION STATUS* | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV(%) |
|---|---|---|---|---|---|---|---|---|
| Owner Occupied | 16,640 | $2,966,516,987.97 | 89.89% | 357 | 39.93 | 7.377 | 606 | 82.77 |
| Non-Owner Occupied | 2,314 | 299,391,578.92 | 9.07 | 357 | 31.65 | 7.926 | 644 | 84.50 |
| Second Home | 201 | 34,092,407.43 | 1.03 | 356 | 38.44 | 7.181 | 647 | 83.29 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

*Based on mortgagor representation at origination.

## DOCUMENTATION TYPE

| INCOME DOCUMENTATION | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV(%) |
|---|---|---|---|---|---|---|---|---|
| Full Documentation | 10,916 | $ 1,760,157,839.79 | 53.34% | 356 | 39.57 | 7.152 | 598 | 81.83 |
| Stated Documentation | 7,053 | 1,311,821,930.86 | 39.75 | 358 | 39.06 | 7.791 | 630 | 84.42 |
| Limited Documentation | 1,186 | 228,021,203.67 | 6.91 | 357 | 36.55 | 7.421 | 594 | 82.94 |
| TOTAL: | 19,155 | $ 3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

## LOAN PURPOSE

| PURPOSE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| Refinance-Debt Consolidation Cash Out** | 11,032 | $2,051,206,775.01 | 62.16% | 357 | 39.92 | 7.305 | 595 | 80.36 |
| Purchase | 7,111 | 1,105,335,772.95 | 33.50 | 358 | 37.85 | 7.662 | 639 | 87.85 |
| Refinance-Debt Consolidation No Cash Out*** | 1,012 | 143,458,426.36 | 4.35 | 354 | 38.50 | 7.307 | 606 | 81.90 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

** Cash proceeds to the borrower inclusive of debt consolidation payments exceed 2% or $2,000 of the original principal balance of the related loan. Also includes all home equity loans originated in Texas with any cash proceeds.

*** Cash proceeds to the borrower inclusive of debt consolidation payments do not exceed 2% or $2,000 of the original principal balance of the related loan. Excludes home equity loans originated in Texas with any cash proceeds.

WFB.000491

```
--------------------------------------------------------------------------
                       DESCRIPTION OF THE TOTAL COLLATERAL
                        SELECTION DATE MORTGAGE LOANS
--------------------------------------------------------------------------

--------------------------------------------------------------------------
                               CREDIT GRADE
--------------------------------------------------------------------------
```

|  | NUMBER OF | PRINCIPAL | % OF PRINCIPAL | REMAINING | | | | |
|  | MORTGAGE | BALANCE | BALANCE AS OF | TERM TO | DEBT-TO- | | | |
|  | MORTGAGE | AS OF THE | BALANCE AS OF | MATURITY | INCOME | MORTGAGE | | |
| RISK CATEGORY | LOANS | CUT-OFF DATE | THE CUT-OFF DATE | (MONTHS) | (%) | RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| A+ | 497 | $  100,784,233.64 | 3.05% | 359 | 39.80 | 7.421 | 619 | 83. |
| A | 251 | 44,266,439.98 | 1.34 | 355 | 40.39 | 7.560 | 599 | 81. |
| A- | 73 | 15,060,340.55 | 0.46 | 359 | 39.97 | 8.403 | 550 | 78. |
| B | 77 | 14,149,711.63 | 0.43 | 357 | 40.07 | 8.644 | 546 | 74. |
| C | 80 | 14,735,042.34 | 0.45 | 359 | 43.01 | 9.085 | 538 | 70. |
| C- | 70 | 16,929,265.74 | 0.51 | 358 | 41.70 | 8.811 | 563 | 79. |
| I | 13,208 | 2,217,129,469.76 | 67.19 | 357 | 38.71 | 7.270 | 626 | 84. |
| II | 1,377 | 258,436,896.75 | 7.83 | 357 | 39.63 | 7.505 | 584 | 82. |
| III | 1,505 | 265,859,827.04 | 8.06 | 357 | 39.24 | 7.460 | 578 | 82. |
| IV | 1,145 | 190,674,068.76 | 5.78 | 357 | 40.55 | 7.823 | 567 | 78. |
| V | 683 | 126,526,312.59 | 3.83 | 358 | 40.80 | 8.057 | 552 | 70. |
| VI | 189 | 35,449,365.54 | 1.07 | 358 | 43.13 | 9.468 | 551 | 67. |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82. |

```
--------------------------------------------------------------------------
                               PROPERTY TYPE
--------------------------------------------------------------------------
```

| | NUMBER OF | PRINCIPAL | % OF PRINCIPAL | REMAINING | | | | |
| | MORTGAGE | BALANCE | BALANCE AS OF | TERM TO | DEBT-TO- | | | |
| | MORTGAGE | AS OF THE | BALANCE AS OF | MATURITY | INCOME | MORTGAGE | | |
| PROPERTY TYPE | LOANS | CUT-OFF DATE | THE CUT-OFF DATE | (MONTHS) | (%) | RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| Single Family Detached | 14,270 | $2,429,378,133.61 | 73.62% | 357 | 39.47 | 7.395 | 605 | 82.7 |
| Two-to-Four Family | 1,455 | 317,226,731.18 | 9.61 | 358 | 37.17 | 7.600 | 640 | 83.7 |
| PUD Detached | 1,373 | 271,230,160.08 | 8.22 | 357 | 39.35 | 7.427 | 605 | 83.7 |
| Condominium | 1,201 | 188,857,325.04 | 5.72 | 359 | 38.49 | 7.486 | 626 | 84.4 |
| Manufactured/Mobile Home | 759 | 77,058,507.82 | 2.34 | 353 | 38.56 | 7.434 | 625 | 77.2 |
| PUD Attached | 69 | 11,692,789.12 | 0.35 | 358 | 40.35 | 7.707 | 606 | 85.9 |
| Single Family Attached | 28 | 4,557,327.47 | 0.14 | 359 | 39.86 | 7.478 | 609 | 84.5 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.9 |

III-10

WFB.000492

```
-------------------------------------------------------------------------------------
                        DESCRIPTION OF THE TOTAL COLLATERAL
                          SELECTION DATE MORTGAGE LOANS
-------------------------------------------------------------------------------------


-------------------------------------------------------------------------------------
                        PREPAYMENT CHARGE TERM AT ORIGINATION
-------------------------------------------------------------------------------------
```

| PREPAYMENT CHARGE TERM AT ORIGINATION (MONTHS) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| 0 | 6,328 | $1,012,604,405.55 | 30.68% | 357 | 38.80 | 7.727 | 614 | 84.96 |
| 12 | 695 | 155,094,528.84 | 4.70 | 357 | 38.68 | 7.547 | 622 | 81.62 |
| 24 | 6,603 | 1,146,732,420.68 | 34.75 | 358 | 39.18 | 7.498 | 602 | 82.81 |
| 36 | 5,529 | 985,569,619.25 | 29.87 | 355 | 39.59 | 7.010 | 614 | 81.21 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.94 |

```
-------------------------------------------------------------------------------------
                                  CONFORMING BALANCE
-------------------------------------------------------------------------------------
```

| CONFORMING BALANCE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| Conforming | 17,534 | $2,626,629,258.41 | 79.59% | 357 | 38.84 | 7.516 | 608 | 82.8 |
| Non-Conforming | 1,621 | 673,371,715.91 | 20.41 | 358 | 40.40 | 7.068 | 619 | 83.3 |
| TOTAL: | 19,155 | $3,300,000,974.32 | 100.00% | 357 | 39.16 | 7.425 | 610 | 82.9 |

III-11

WFB.000493

DESCRIPTION OF THE TOTAL COLLATERAL
SELECTION DATE MORTGAGE LOANS

MAXIMUM MORTGAGE RATES OF THE ADJUSTABLE-RATE LOANS

| RANGE OF MAXIMUM MORTGAGE RATES (%) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| 11.000 - 11.499 | 135 | $   33,422,325.45 | 1.26% | 358 | 41.16 | 5.402 | 639 | 79.5 |
| 11.500 - 11.999 | 759 | 184,605,727.01 | 6.95 | 358 | 40.03 | 5.738 | 633 | 78.0 |
| 12.000 - 12.499 | 1,206 | 260,601,516.66 | 9.81 | 358 | 39.03 | 6.251 | 633 | 80.9 |
| 12.500 - 12.999 | 2,330 | 471,324,965.36 | 17.74 | 359 | 39.20 | 6.750 | 621 | 82.3 |
| 13.000 - 13.499 | 2,188 | 399,839,636.91 | 15.05 | 359 | 39.13 | 7.240 | 611 | 84.0 |
| 13.500 - 13.999 | 3,026 | 526,660,092.64 | 19.83 | 359 | 39.16 | 7.742 | 599 | 85.6 |
| 14.000 - 14.499 | 1,864 | 305,148,190.71 | 11.49 | 359 | 39.17 | 8.228 | 589 | 86.1 |
| 14.500 - 14.999 | 1,717 | 263,767,672.56 | 9.93 | 358 | 38.91 | 8.711 | 580 | 86.0 |
| 15.000 - 15.499 | 829 | 112,251,990.88 | 4.23 | 359 | 38.40 | 9.205 | 570 | 85.1 |
| 15.500 - 15.999 | 415 | 56,427,339.57 | 2.12 | 358 | 40.57 | 9.718 | 559 | 82.7 |
| 16.000 - 16.499 | 139 | 21,068,790.20 | 0.79 | 359 | 40.34 | 10.195 | 552 | 79.1 |
| 16.500 - 16.999 | 80 | 12,951,163.96 | 0.49 | 358 | 42.42 | 10.701 | 536 | 71.9 |
| 17.000 - 17.499 | 29 | 4,299,572.67 | 0.16 | 359 | 40.21 | 11.175 | 524 | 69.1 |
| 17.500 - 17.999 | 20 | 3,063,980.00 | 0.12 | 359 | 40.78 | 11.627 | 526 | 70.8 |
| 18.000 - 18.499 | 9 | 883,556.53 | 0.03 | 359 | 40.89 | 12.189 | 518 | 71.8 |
| 18.500 - 18.999 | 1 | 67,583.27 | 0.00 | 359 | 45.00 | 12.650 | 543 | 65.0 |
| TOTAL: | 14,747 | $2,656,384,104.38 | 100.00% | 359 | 39.24 | 7.477 | 605 | 83.6 |

III-12

WFB.000494

DESCRIPTION OF THE TOTAL COLLATERAL
SELECTION DATE MORTGAGE LOANS

MINIMUM MORTGAGE RATES OF THE ADJUSTABLE-RATE LOANS

| RANGE OF MINIMUM MORTGAGE RATES (%) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| 5.000 - 5.499 | 135 | $ 33,422,325.45 | 1.26% | 358 | 41.16 | 5.402 | 639 | 79.5 |
| 5.500 - 5.999 | 759 | 184,605,727.01 | 6.95 | 358 | 40.03 | 5.738 | 633 | 78.0 |
| 6.000 - 6.499 | 1,206 | 260,601,516.66 | 9.81 | 358 | 39.03 | 6.251 | 633 | 80.9 |
| 6.500 - 6.999 | 2,330 | 471,324,965.36 | 17.74 | 359 | 39.20 | 6.750 | 621 | 82.3 |
| 7.000 - 7.499 | 2,188 | 399,839,636.91 | 15.05 | 359 | 39.13 | 7.240 | 611 | 84.0 |
| 7.500 - 7.999 | 3,026 | 526,660,092.64 | 19.83 | 359 | 39.16 | 7.742 | 599 | 85.6 |
| 8.000 - 8.499 | 1,864 | 305,148,190.71 | 11.49 | 359 | 39.17 | 8.228 | 589 | 86.1 |
| 8.500 - 8.999 | 1,717 | 263,767,672.56 | 9.93 | 358 | 38.91 | 8.711 | 580 | 86.0 |
| 9.000 - 9.499 | 829 | 112,251,990.88 | 4.23 | 359 | 38.40 | 9.205 | 570 | 85.1 |
| 9.500 - 9.999 | 415 | 56,427,339.57 | 2.12 | 358 | 40.57 | 9.718 | 559 | 82.7 |
| 10.000 - 10.499 | 139 | 21,068,790.20 | 0.79 | 359 | 40.34 | 10.195 | 552 | 79.1 |
| 10.500 - 10.999 | 80 | 12,951,163.96 | 0.49 | 358 | 42.42 | 10.701 | 536 | 71.9 |
| 11.000 - 11.499 | 29 | 4,299,572.67 | 0.16 | 359 | 40.21 | 11.175 | 524 | 69.1 |
| 11.500 - 11.999 | 20 | 3,063,980.00 | 0.12 | 359 | 40.78 | 11.627 | 526 | 70.8 |
| 12.000 - 12.499 | 9 | 883,556.53 | 0.03 | 359 | 40.89 | 12.189 | 518 | 71.8 |
| 12.500 >= | 1 | 67,583.27 | 0.00 | 359 | 45.00 | 12.650 | 543 | 65.0 |
| TOTAL: | 14,747 | $2,656,384,104.38 | 100.00% | 359 | 39.24 | 7.477 | 605 | 83.6 |

III-13

WFB.000495

```
DESCRIPTION OF THE TOTAL COLLATERAL
SELECTION DATE MORTGAGE LOANS
```

## MARGINS OF THE ADJUSTABLE-RATE LOANS

| RANGE OF MORTGAGE MARGINS (%) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| 4.500 - 4.749 | 281 | $   48,222,580.07 | 1.82% | 357 | 39.09 | 7.386 | 609 | 84.7 |
| 4.750 - 4.999 | 1 | 212,503.93 | 0.01 | 353 | 53.00 | 10.050 | 512 | 70.0 |
| 5.000 - 5.249 | 561 | 99,775,504.38 | 3.76 | 359 | 38.23 | 7.524 | 628 | 86.4 |
| 5.500 - 5.749 | 725 | 150,718,235.92 | 5.67 | 359 | 40.00 | 7.583 | 602 | 83.1 |
| 6.000 - 6.249 | 12,927 | 2,312,911,346.29 | 87.07 | 359 | 39.20 | 7.444 | 605 | 83.6 |
| 6.250 - 6.499 | 2 | 409,774.72 | 0.02 | 358 | 45.53 | 6.264 | 595 | 88.2 |
| 6.500 - 6.749 | 141 | 23,475,204.58 | 0.88 | 358 | 39.07 | 8.271 | 570 | 78.4 |
| 7.000 - 7.249 | 109 | 20,658,954.49 | 0.78 | 359 | 43.20 | 9.435 | 535 | 69.9 |
| TOTAL: | 14,747 | $2,656,384,104.38 | 100.00% | 359 | 39.24 | 7.477 | 605 | 83.6 |

## NEXT RATE ADJUSTMENT DATE OF THE ADJUSTABLE-RATE LOANS

| NEXT RATE ADJUSTMENT DATE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| March 2006 | 2 | $    589,009.04 | 0.02% | 352 | 47.09 | 5.821 | 598 | 78. |
| April 2006 | 46 | 6,389,612.11 | 0.24 | 353 | 40.33 | 7.387 | 562 | 80. |
| May 2006 | 43 | 5,672,911.80 | 0.21 | 354 | 41.29 | 7.467 | 580 | 82. |
| June 2006 | 116 | 19,033,722.59 | 0.72 | 355 | 40.83 | 7.510 | 572 | 79. |
| July 2006 | 143 | 24,566,074.07 | 0.92 | 356 | 40.24 | 7.752 | 580 | 84. |
| August 2006 | 70 | 11,662,189.41 | 0.44 | 357 | 39.23 | 7.186 | 597 | 85. |
| September 2006 | 1,241 | 204,596,678.78 | 7.70 | 358 | 39.51 | 7.490 | 591 | 83. |
| October 2006 | 9,269 | 1,679,466,157.90 | 63.22 | 359 | 39.34 | 7.514 | 603 | 83. |
| November 2006 | 6 | 1,222,248.00 | 0.05 | 360 | 39.32 | 6.650 | 628 | 82. |
| March 2007 | 2 | 193,107.03 | 0.01 | 352 | 25.04 | 7.976 | 580 | 87. |
| April 2007 | 18 | 3,116,125.06 | 0.12 | 353 | 39.72 | 7.406 | 591 | 78. |
| May 2007 | 8 | 1,437,490.82 | 0.05 | 348 | 36.49 | 6.736 | 621 | 88. |
| June 2007 | 25 | 4,153,679.04 | 0.16 | 355 | 39.62 | 7.308 | 577 | 82. |
| July 2007 | 52 | 9,271,731.41 | 0.35 | 356 | 39.52 | 7.330 | 608 | 81. |
| August 2007 | 34 | 6,995,897.73 | 0.26 | 357 | 41.00 | 7.230 | 607 | 82. |
| September 2007 | 390 | 65,352,461.63 | 2.46 | 358 | 39.94 | 7.356 | 602 | 83. |
| October 2007 | 3,282 | 612,665,007.96 | 23.06 | 359 | 38.66 | 7.389 | 617 | 84. |
| TOTAL: | 14,747 | $2,656,384,104.38 | 100.00% | 359 | 39.24 | 7.477 | 605 | 83. |

III-14

WFB.000496

```
-------------------------------------------------------------------------------
                        DESCRIPTION OF THE TOTAL COLLATERAL
                        SELECTION DATE MORTGAGE LOANS
-------------------------------------------------------------------------------


-------------------------------------------------------------------------------
                 INITIAL PERIODIC RATE CAP OF THE ADJUSTABLE-RATE LOANS
-------------------------------------------------------------------------------

                                     PRINCIPAL                    REMAINING
                      NUMBER OF        BALANCE       % OF PRINCIPAL  TERM TO    DEBT-TO-
INITIAL PERIODIC RATE MORTGAGE        AS OF THE      BALANCE AS OF  MATURITY    INCOME    MORTGAGE
CAP (%)               LOANS          CUT-OFF DATE    THE CUT-OFF DATE (MONTHS)    (%)      RATES (%)    FICO    OLTV(
-------------------------------------------------------------------------------

2.000                 14,747      $2,656,384,104.38    100.00%        359       39.24      7.477        605     83.6
-------------------------------------------------------------------------------
TOTAL:                14,747      $2,656,384,104.38    100.00%        359       39.24      7.477        605     83.6
-------------------------------------------------------------------------------


-------------------------------------------------------------------------------
               SUBSEQUENT PERIODIC RATE CAP OF THE ADJUSTABLE-RATE LOANS
-------------------------------------------------------------------------------

                                     PRINCIPAL                    REMAINING
                      NUMBER OF        BALANCE       % OF PRINCIPAL  TERM TO    DEBT-TO-
SUBSEQUENT PERIODIC   MORTGAGE        AS OF THE      BALANCE AS OF  MATURITY    INCOME    MORTGAGE
RATE CAP (%)          LOANS          CUT-OFF DATE    THE CUT-OFF DATE (MONTHS)    (%)      RATES (%)    FICO    OLTV(
-------------------------------------------------------------------------------

1.000                 14,747      $2,656,384,104.38    100.00%        359       39.24      7.477        605     83.
-------------------------------------------------------------------------------
TOTAL:                14,747      $2,656,384,104.38    100.00%        359       39.24      7.477        605     83.
-------------------------------------------------------------------------------
```

III-15

```
- --------------------------------------------------------------------------------------
                            DESCRIPTION OF THE GROUP I COLLATERAL
                              SELECTION DATE MORTGAGE LOANS
- --------------------------------------------------------------------------------------


- --------------------------------------------------------------------------------------
                                    COLLATERAL SUMMARY
- --------------------------------------------------------------------------------------
```

Statistics given below are for the Mortgage Loans in the pool as of the
Collateral Selection Date. Balances and percentages are based on the Cut-Off
Date scheduled balances of such Mortgage Loans (except in the case of
Debt-to-Income and FICO, which are determined at origination).

|  | SUMMARY STATISTICS | RANGE (IF APPLICABLE) |
|---|---|---|
| NUMBER OF MORTGAGE LOANS: | 13,957 | |
| AGGREGATE CURRENT PRINCIPAL BALANCE: | $2,162,733,102 | $4,634 - $639,420 |
| AVERAGE CURRENT PRINCIPAL BALANCE: | $154,957 | |
| AGGREGATE ORIGINAL PRINCIPAL BALANCE: | $2,164,937,208 | $20,000 - $639,999 |
| AVERAGE ORIGINAL PRINCIPAL BALANCE: | $155,115 | |
| FULLY AMORTIZING MORTGAGE LOANS: | 100.00% | |
| 1ST LIEN: | 98.86% | |
| WTD. AVG. MORTGAGE RATE: | 7.501% | 5.350% - 12.800% |
| WTD. AVG. ORIGINAL TERM TO MATURITY (MONTHS): | 358 | 180 - 360 |
| WTD. AVG. REMAINING TERM TO MATURITY (MONTHS): | 357 | 173 - 360 |
| WTD. AVG. MARGIN (ARM LOANS ONLY): | 5.917% | 4.500% - 7.125% |
| WTD. AVG. MAXIMUM MORTGAGE RATE (ARM LOANS ONLY): | 13.530% | 11.350% - 18.400% |
| WTD. AVG. MINIMUM MORTGAGE RATE (ARM LOANS ONLY): | 7.530% | 5.350% - 12.400% |
| WTD. AVG. ORIGINAL LTV(1): | 82.81% | 13.21% - 100.00% |
| WTD. AVG. BORROWER FICO: | 608 | 500 - 805 |

| GEOGRAPHIC DISTRIBUTION (TOP 5): | | |
|---|---|---|
| | CA | 22.20% |
| | IL | 10.63% |
| | FL | 8.78% |
| | NY | 5.96% |
| | MI | 4.24% |

(1) The original LTV ("OLTV") of a first-lien mortgage at any given time is a
fraction, expressed as a percentage, the numerator of which is the principal
balance of the mortgage loan at the date of origination and the denominator of
which is the lesser of the sales price of the related mortgage property and its
appraised value determined in an appraisal obtained by the originator at
origination of the mortgage loan. The OLTV of a second lien mortgage loan at any
given time is a fraction, expressed as a percentage the numerator of which is
(i) the sum of (a) the principal balance of such mortgage loan at the date of
origination plus (b) the outstanding balance of the senior mortgage loan at the
date of origination of such mortgage loan and the denominator of which is (ii)
the lesser of the sales price of the related mortgage property and its appraised
value determined in an appraisal obtained by the originator at origination of
the mortgage loan.

WFB.000498

DESCRIPTION OF THE GROUP I COLLATERAL
SELECTION DATE MORTGAGE LOANS

### COLLATERAL TYPE

| COLLATERAL TYPE | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| ARM - 2 Year/6 Month | 7,891 | $1,262,853,247.07 | 58.39% | 358 | 39.04 | 7.585 | 601 | 83.30 |
| ARM - 3 Year/6 Month | 2,919 | 492,702,788.92 | 22.78 | 358 | 38.42 | 7.391 | 613 | 83.75 |
| Fixed Rate | 3,147 | 407,177,065.56 | 18.83 | 350 | 39.27 | 7.377 | 625 | 80.19 |
| TOTAL: | 13,957 | $2,162,733,101.55 | 100.00% | 357 | 38.94 | 7.501 | 608 | 82.81 |

### PRINCIPAL BALANCES AT ORIGINATION

| RANGE OF PRINCIPAL BALANCES AT ORIGINATION (%) | NUMBER OF MORTGAGE LOANS | PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | % OF PRINCIPAL BALANCE AS OF THE CUT-OFF DATE | REMAINING TERM TO MATURITY (MONTHS) | DEBT-TO-INCOME (%) | MORTGAGE RATES (%) | FICO | OLTV( |
|---|---|---|---|---|---|---|---|---|
| <= 50,000.00 | 623 | $    21,887,566.00 | 1.01% | 350 | 35.81 | 10.712 | 636 | 93.6 |
| 50,000.01 - 100,000.00 | 3,414 | 260,691,441.00 | 12.04 | 354 | 36.50 | 8.073 | 603 | 83.6 |
| 100,000.01 - 150,000.00 | 3,615 | 451,226,032.00 | 20.84 | 356 | 38.11 | 7.649 | 603 | 83.3 |
| 150,000.01 - 200,000.00 | 2,642 | 459,964,060.00 | 21.25 | 357 | 39.03 | 7.470 | 606 | 82.1 |
| 200,000.01 - 250,000.00 | 1,682 | 376,747,822.00 | 17.40 | 358 | 39.90 | 7.313 | 608 | 81.7 |
| 250,000.01 - 300,000.00 | 1,198 | 328,510,548.00 | 15.17 | 358 | 40.53 | 7.199 | 606 | 82.1 |
| 300,000.01 - 350,000.00 | 597 | 190,402,479.00 | 8.79 | 357 | 40.37 | 7.143 | 621 | 83.8 |
| 350,000.01 - 400,000.00 | 109 | 41,218,473.00 | 1.90 | 358 | 38.55 | 7.226 | 648 | 84.6 |
| 400,000.01 - 450,000.00 | 48 | 20,087,119.00 | 0.93 | 359 | 36.82 | 6.935 | 650 | 83.5 |
| 450,000.01 - 500,000.00 | 24 | 11,531,169.00 | 0.53 | 359 | 34.91 | 6.774 | 637 | 78.3 |
| 500,000.01 - 550,000.00 | 4 | 2,030,500.00 | 0.09 | 359 | 34.23 | 6.780 | 712 | 85.6 |
| 600,000.01 - 650,000.00 | 1 | 639,999.00 | 0.03 | 359 | 47.00 | 6.500 | 669 | 82.5 |
| TOTAL: | 13,957 | $ 2,164,937,208.00 | 100.00% | 357 | 38.94 | 7.501 | 608 | 82.8 |

*Based on the original balances of the Mortgage Loans.

III-17

WFB.000499